# EXHIBIT A

Orange County Clerk **-** Court Records Search

## 2025-CA-002038-O : EDALAT, PAUL vs. NBA PROPERTIES, INC.

| | | | |
|---|---|---|---|
| Case Type: | BC - Breach of Agreement/Contract | Date Filed: | 3/10/2025 |
| Location: | Div 43 | UCN: | 482025CA002038A001OX |
| Judge: | Chad K Alvaro | Status: | Pending |
| Citation Number: | BC - Breach of Agreement/Contract | Appear By Date: | |

### Parties

| Name | Type | Attorney | Atty Phone |
|---|---|---|---|
| PAUL EDALAT | Plaintiff | JULIEN MAYNARD | 561-260-9300 |
| NBA PROPERTIES, INC. | Defendant | | |

### Charge Details

| Offense Date | Charge | Plea | Arrest | Disposition | Sentence |
|---|---|---|---|---|---|
| | | | | | |

### Docket Events

| Date | Description | Pages |
|---|---|---|
| 2/27/2026 | Amended Complaint | 17 |
| | Comments: (Second) | |
| 1/13/2026 | Order of Dismissal | 1 |
| 1/13/2026 | Order of Dismissal | 1 |
| | Comments: AND ORDER GRANTING MOTION TO AMEND COMPLAINT | |
| 12/5/2025 | Correspondence | 1 |
| 8/20/2025 | Motion to Amend | 24 |
| | Comments: COMPLAINT AND FOR ORDER DISMISSING DEFENDANT | |
| 7/1/2025 | Notice Appearance of Counsel | 2 |
| 6/30/2025 | Order Enlargement and Extension of Time | 2 |
| | Comments: to file a response | |
| 6/27/2025 | Court Minutes | 2 |
| 6/27/2025 | HEARING - Case Management - Alvaro, Chad K (Actual: Alvaro, Chad K) | |
| 6/23/2025 | Declaration of Taking | 3 |
| | Comments: of George Fleming in Support of Defendant National Basketball Assocation's Motion to Dismiss | |
| 6/23/2025 | Declaration of Taking | 2 |
| | Comments: of Ayala Deutsch | |
| 6/23/2025 | Motion to Dismiss | 35 |
| | Comments: the Amended Complaint for Lack of Personal Jurisdiction, Under the Doctrine of Forum Non Conveniens and for Failure to State a Claim | |
| 6/13/2025 | Joint Case Management Report | 10 |
| 6/11/2025 | Motion for Enlargement/Extension of Time | 4 |
| | Comments: TO RESPOND TO PLAINTIFFS AMENDED COMPLAINT | |
| 6/11/2025 | Notice Appearance of Counsel | 3 |
| 6/11/2025 | Correspondence | 1 |
| 6/5/2025 | Amended Complaint | 32 |

| Date | Description | Pages |
|------|-------------|-------|
| | Comments: AND DEMAND FOR JURY TRIAL | |
| 5/16/2025 | Motion to Dismiss | 37 |
| | Comments: FOR LACK OF PERSONAL JURISIDICTION, UNDER THE DOCTRINE OF FORUM NON CONVENIENS, AND FOR FAILURE TO STATE A CLAIM | |
| 5/2/2025 | Order Granting | 2 |
| | Comments: Verified Motion for Admission to Appear Pro Hac Vice Pursuant to Florida Rule of General Practice and Judicial Administration 2.510 | |
| 5/2/2025 | Order Granting | 2 |
| | Comments: Verified Motion for Admission to Appear Pro Hac Vice Pursuant to Florida Rule of General Practice and Judicial Administration 2.510 | |
| 5/2/2025 | Order Granting | 2 |
| | Comments: Verified Motion for Admissions to Appear Pro Hac Vice Pursuant to Florida Rule of General Practice and Judicial Administration 2.510 | |
| 5/2/2025 | Order Granting | 2 |
| | Comments: Verified Motion for Admission to Appear Pro Hac Vice Pursuant to Florida Rules of General Practice and Judicial Administration 2.510 | |
| 4/23/2025 | Correspondence | 2 |
| 4/22/2025 | Motion for Admission of Attorney Pro Hac Vice | 8 |
| 4/22/2025 | Motion for Admission of Attorney Pro Hac Vice | 8 |
| 4/22/2025 | Motion for Admission of Attorney Pro Hac Vice | 8 |
| 4/14/2025 | Order Enlargement and Extension of Time | 2 |
| | Comments: TO FILE RESPONSE TO COMPLAINT | |
| 4/1/2025 | Correspondence | 1 |
| 4/1/2025 | Motion for Enlargement/Extension of Time | 3 |
| | Comments: TO RESPOND TO COMPLAINT | |
| 3/31/2025 | Notice Appearance of Counsel | 2 |
| 3/26/2025 | Order Setting Case Management Conference | 5 |
| 3/26/2025 | Order Designating Case a Complex Case | 1 |
| 3/26/2025 | Summons Returned Served | 1 |
| | Comments: NATIONAL BASKETBALL ASSOCIATION | |
| 3/11/2025 | Summons Issued Electronically as to | 3 |
| | Comments: EMAILED ATTY | |
| 3/10/2025 | Complaint | 32 |
| 3/10/2025 | Addendum to | 2 |
| 3/10/2025 | Civil Cover Sheet | 3 |
| 3/10/2025 | Case Initiated | |

---

## Hearings

| Date | Hearing | Time | Location | Pages |
|------|---------|------|----------|-------|
| 6/27/2025 | Case Management - Alvaro, Chad K (Actual: Alvaro, Chad K) | 9:30 AM | Room 9-A On The 9th Floor | |

---

## Financial

| Date | Description | Payer | Amount |
|------|-------------|-------|--------|
| 3/10/2025 | Transaction Assessment | | 410.00 |
| 3/10/2025 | Payment | Byrd Campbell, P.A. | -410.00 |
| 4/22/2025 | Transaction Assessment | | 300.00 |
| 4/22/2025 | Payment | Akerman LLP | -300.00 |

| Date | Description | Payer | Amount |
|------|-------------|-------|--------|
|      |             | Balance Due: | 0.00 |

| Bonds | | | |
|-------------|-------------|-------------|--------|
| Description | Status Date | Bond Status | Amount |

| Warrants | | | | | | |
|--------|--------------------|------------|--------------|-------------|-----------------|--------------|
| Number | Status Description | Issue Date | Service Date | Recall Date | Expiration Date | Warrant Type |

**FORM 1.997.    CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

### I.    CASE STYLE

IN THE CIRCUIT/COUNTY COURT OF THE <u>NINTH</u>  JUDICIAL CIRCUIT,
IN AND FOR <u>ORANGE</u>  COUNTY, FLORIDA

<u>Paul Edalat</u>
Plaintiff                                        Case # _____
                                                 Judge  _____

vs.

<u>National Basketball Association</u>
Defendant

### II.    AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐  $8,000 or less
☐  $8,001 - $30,000
☐  $30,001- $50,000
☐  $50,001- $75,000
☐  $75,001 - $100,000
☒  over $100,000.00

### III.    TYPE OF CASE      (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

**CIRCUIT CIVIL**

☐ Condominium
☒ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
    ☐ Business governance
    ☐ Business torts
    ☐ Environmental/Toxic tort
    ☐ Third party indemnification
    ☐ Construction defect
    ☐ Mass tort
    ☐ Negligent security
    ☐ Nursing home negligence
    ☐ Premises liability—commercial
    ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
    ☐ Commercial foreclosure
    ☐ Homestead residential foreclosure
    ☐ Non-homestead residential foreclosure
    ☐ Other real property actions

☐ Professional malpractice
    ☐ Malpractice—business
    ☐ Malpractice—medical
    ☐ Malpractice—other professional
☐ Other
    ☐ Antitrust/Trade regulation
    ☐ Business transactions
    ☐ Constitutional challenge—statute or ordinance
    ☐ Constitutional challenge—proposed amendment
    ☐ Corporate trusts
    ☐ Discrimination—employment or other
    ☐ Insurance claims
    ☐ Intellectual property
    ☐ Libel/Slander
    ☐ Shareholder derivative action
    ☐ Securities litigation
    ☐ Trade secrets
    ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
     ☐ Residential Evictions
     ☐ Non-residential Evictions
☐ Other civil (non-monetary)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☒ No ☐

**IV.    REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.    NUMBER OF CAUSES OF ACTION:** [    ]
(Specify)

  1

**VI.    IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.    HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.    IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

**IX.    DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
    ☐ yes
    ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: <u>s/ Tucker H. Byrd</u>       Fla. Bar # <u>381632</u>
      Attorney or party              (Bar # if attorney)

<u>Tucker H. Byrd     </u>       <u>03/10/2025</u>
 (type or print name)         Date

## CIVIL COVER SHEET BUSINESS COURT ADDENDUM
## PARTY OR ATTORNEY FILING ACTION MUST SELECT WHICH APPLIES

Cases Subject to Business Court. The principles set out below shall guide the parties and the Court in the assignment of cases to Business Court. All jury, non-jury, injunction and class action cases shall be assigned to Business Court if they are among the following types of actions:

      A.      Any of the following where the amount in controversy is **$500,000.00 or more**:

      ___    1.      Claims arising from U.C.C. related transactions;

      ___    2.      Claims arising from the purchases and sales of business or the assets of a business including contract disputes and business torts;

      ___    3.      Claims involving the sale of goods or services by or to business enterprises;

      ___    4.      Claims involving non-consumer bank or brokerage accounts, including loan, deposit, cash management, and investment accounts;

      ___    5.      Claims arising from the purchase, sale, lease of real or personal property or security interests therein, excluding commercial landlord tenant claims;

      ___    6.      Claims related to surety bonds;

      ___    7.      Franchisee/franchisor relationships and liabilities;

      ___    8.      Malpractice claims of non-medical professionals in connection with rendering services to a business enterprise;

      ___    9.      Insurance coverage disputes, bad faith suits, and third party indemnity actions against insurers arising under policies issued to businesses, such as those claims arising under a commercial general liability policy or commercial property policy; and

      X    10.      Other complex disputes of a commercial nature, excluding those listed in Section II of Administrative Order Number 2019-08-02  Cases eligible under this category will normally have four or more parties, multiple claims and defenses, third party, cross or counterclaims, complex factual or legal issues, or other unusual features warranting assignment to Business Court.

B.    Any of the following without regard to the amount in controversy:

_____    1.    Actions relating to the internal affairs or governance, dissolution or liquidation rights or obligations between or among owners (shareholders, partners, members), or liability or indemnity of managers (officers, directors, managers, trustees, or members or partners functioning as managers) of corporations, partnerships, limited partnerships, limited liability companies or partnerships, professional associations, business trusts, joint ventures or other business enterprises;

_____    2.    Actions relating to trade secrets and non-compete agreements;

_____    3.    Intellectual property claims;

_____    4.    Actions relating to securities or relating to or arising under the state securities laws or antitrust statutes;

_____    5.    Shareholder derivative suits and class actions involving claims that are subject to Business Court, pursuant to Administrative Order Number 2019-08-02; and

_____    6.    Actions relating to corporate trust affairs or director and officer liability.

*NOTE*:  A copy of the Civil Cover Sheet and this Addendum must be served with the Complaint for all Business Court cases.  See Administrative Order Number 2019-08-02 for further Business Court requirements.

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND
FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,

     Plaintiff,

                            Case No: _____

v.                             **Complex Business**
                                  **Litigation Court**

NATIONAL BASKETBALL
ASSOCIATION,

     Defendant.
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, PAUL EDALAT ("Edalat"), sues Defendant, NATIONAL BASKETBALL ASSOCIATION ("NBA"), and alleges:

### INTRODUCTION

1.    The NBA had long pursued establishing relationships with corporate partners worldwide to expand the NBA's global presence. Dubai, the largest city in the United Arab Emirates and an affluent market with a major corporate presence, offered an attractive market in general, having developed into a Middle East and North Africa ("MENA") gateway for sports and entertainment with a keen interest in basketball given its increasing popularity in the region. It also served as the home for Emirates Airline, which had a prominent global brand, already with active sponsorships in sports like soccer, cricket, and golf.

2.     To the NBA, entering a sponsorship deal with Emirates Airline would have been a major step in furthering the NBA's global brand, especially MENA. One problem, however, existed. Despite efforts to secure any partnership with Emirates Airline as early as 2013, the NBA was unable to secure a deal, in part because of the cultural differences between the USA-centric NBA business practices and the traditional value-based culture of Emirates Airlines, and the NBA's limited experience dealing with the decision-makers at Emirates Airline.

3.     The government of Dubai, through its investment corporation, The Emirates Group, owns Emirates Airline.  Ultimately, the ruling family of Dubai controls Emirates Airline through CEO Sheikh Ahmed bin Saeed Al Maktoum. As is typical with MENA-region business dealings, relationships with the decision-makers are paramount to entering any agreements.

4.     This impasse to establishing a partnership deal between the NBA and Emirates Airline led KiKi VanDeWeghe ("VanDeWeghe"), then Senior Vice President of Basketball Operations for the NBA, himself a long-time NBA player and all-star, to reach out and make a simple ask of his longtime friend, Plaintiff, Paul Edalat, a United States businessman of Iranian descent with deep ties to the region, including relationships with its business and government leaders. VanDeWeghe asked if Edalat could help the NBA negotiate a sponsorship deal with Emirates Airline.

5.      The NBA's partnership with its prior airline partner, Delta Airlines, was about to expire, so there was some time urgency to the matter.

6.      On or about March 28, 2014, Edalat received an email from VanDeWeghe asking Edalat to *"[relay the NBA's] interest"* about the possibility of a partnership with Emirates Airline. The complete text reads:

> **VanDeWeghe, Kiki** <KVanDeWeghe@nba.com>                     Fri, Mar 28, 2014 at 11:27 AM
> To: ": Paul Edalat" <paul@scilabs.net>
>
> Paul
>
> Thank you for getting back to me regarding Emirates interest in a possible partnership with the NBA.
>
> I want to confirm our interest in having discussions with Emirates Airline about partnership opportunities within the NBA. The airline sponsorship category is currently open and everyone here is excited about the possibility of a partnership with Emirates. The Deputy Commissioner of the NBA, Mark Tatum, who was past head of Global Marketing Partnerships for the NBA, believes that Emirates would be a perfect partner. Given the NBA's strong recognition within the United States, our internationally recognized superstars and branding potential worldwide, brought together with Emirates powerful worldwide presence and current push into United States marketplace, the timing could not be better. We would like you to relay our interest to Timothy Clark, President of Emirates, and see what is the best way for us to proceed.
>
> Thank you again
>
> Kiki Vandeweghe

7.      Edalat agreed to help the NBA. To that end, Edalat engaged Mr. Zaki Kada ("Kada"), his longtime friend and colleague from the MENA-region to reach out to Emirates Airline, and Kada contacted Mr. Salem Ghanem Al-Marri ("Al-Marri"), the head of Planning, Aeropolitical, and Industry Affairs for Emirates Airline—a former colleague of Kada's—to inquire about approaching Mr. Boutros Boutros ("Boutros"),  the Divisional Senior Vice President, Corporate Communications, Marketing & Brand for Emirates Airline, to share the NBA's

interest in a sponsorship or partnership deal with Emirates Airline, with an emphasis on large scale MENA expansion.

8.    Kada also forwarded VanDeWeghe's March 28, 2014, email to Al-Marri, to which Al-Marri responded by requesting an "official" letter from the NBA for the purposes of beginning partnership discussions and to confirm Edalat's prominent role in them. Kada sent this response to Edalat, who forwarded it back to VanDeWeghe. The wheels had been set in motion and momentum was building to pursue a sponsorship agreement between the NBA and Emirates Airline with Edalat the tip of that negotiation spear.

9.    Kada and Edalat had several telephone conversations in the first few weeks of April 2014 preparing for an in-person meeting with Boutros, who Kada had already introduced to Edalat years earlier.

10.    Kada, through his contact Al-Marri, introduced Edalat to Boutros in 2014 while Edalat was on a business trip to Dubai. Edalat met in person with Boutros the week of May 11, 2014, during the May 2014 Travel Show.

### **THE NBA ENGAGED PLAINTIFF**

11.    On May 1, 2014, critical to this meeting's occurring, VanDeWeghe issued the letter (*see* **Exhibit "A")** on behalf of the NBA confirming:

a.    The NBA was *"excited about the possibility of a potential partnership with Emirates Airline"*;

b. The NBA's *"focus is for Emirates to become the exclusive airline sponsor and partner of the NBA";* and

c. That *"Liwa North America and CEO Paul Edalat has provided this introduction and will continue to assist in seeing the process through."*

12.    Edalat and the NBA had negotiated a simple commission-based compensation. Edalat and his company, Liwa North America, Inc. ("Liwa"), would be paid ten percent (10%) of the value of any sponsorship agreement and any future partnership between the NBA and Emirates Airline. Since then, Liwa has been dissolved, and Edalat has succeeded to the rights and interests of Liwa.

### **PLAINTIFF PURSUES THE SPONSORSHIP FOR THE NBA.**

13.    Kada had planned for Edalat to meet Boutros in May 2014 at Travel Show in Dubai.

14.    Edalat travelled to Dubai in early May 2014 and met with Boutros and Kada during the week of May 11, 2014. A close mutual friend of Kada and Boutros assisted in arranging a last-minute meeting with Boutros given his busy schedule. At this meeting Edalat handed Boutros the original "wet signed" letter from VanDeWeghe, and Boutros responded favorably requesting time to communicate with other senior level executives at Emirates Airline about this opportunity.

15.    Edalat returned to the United States in late May of 2014, and continued to apprise Kada of conversations with the NBA about an Emirates Airline deal.

16.    Boutros later indicated to Kada that he was asked by his superiors to explore a good commercial deal with the NBA. Kada related this information to Edalat, who conveyed it to VanDeWeghe, who eventually handed off the project to Mark Tatum, the NBA's Deputy Commissioner and Chief Operating Officer.

17.    The discussions between the NBA and Emirates Airline, however, cooled off in 2014. VanDeWeghe advised Edalat that the NBA was renegotiating the Delta Airlines deal, and that Emirates Airline was not overly eager about a sponsorship with the NBA. VanDeWeghe advised Edalat to temporarily back off from his activities while the NBA regrouped on its plans for an Emirates Airlines deal.

18.    The Delta Airlines deal, announced in 2015, was a continuation of a 2004 sponsorship deal between Delta Airlines and the NBA.

## PLAINTIFF RE-ENGAGED BY THE NBA

19.    This all changed in early 2015, when VanDeWeghe, on behalf of the NBA, asked Edalat to re-engage with Emirates Airline. The NBA's request led to renewed discussions. On July 9, 2015, Edalat advised VanDeWeghe that Emirates Airline had *"come back to the table and are interested in a potential sponsorship as the NBA's airline partner."* The complete email reads:

**From:** Paul Edalat [mailto:paul@liwana.com]
**Sent:** Thursday, July 09, 2015 3:27 PM
**To:** VanDeWeghe, Kiki
**Subject:** Emirates Airline
**Importance:** High

Dear Kiki

I hope that you are well and everything is going great at the NBA.

As you are aware, I have contacts high up in emirates airlines with their CEO Mr. Timothy Clark and was close to putting a deal together last year regarding Emirates and the NBA on a sponsorship. Unfortunately, it fell apart last year due to unforeseen events that occurred back in June and their additional interest in the Clippers.

Now they (Emirates) has come back to the table and are interested in a potential sponsorship as the NBA's airline partner. Nothing has really changed in perspective with the deal that was offered to them last year from your organization. I have attached your letter of last year's offer for your review.

I have been intouch with their global marketing chief Mr. Boutros. From what I understand, he is authorized to sign off on any approved sponsorship up to $6millilon and can get it done pretty quickly. If over and above that amount, then he will have to have the board's approval. They are looking to expand their brand in the US and have been approached by many organizations in sports and marquee teams.

I think that we can get this done pretty quick if the terms are still available and we don't need the board's approval on behalf of Emirates. Obviously this information that I am sharing with you is highly confidential and meant for the purpose of this deal and assisting in moving things along quickly. As you are one of my dearest friends and have the trust in you I have had a long term professional relationship with the royal families of Dubai and Abu Dhabi who control these companies. We can always have a call or meeting in person to further strategize a deal with Emirates.

I will put you in direct touch with Mr. Boutros once you have approval on this deal and its availability. As Emirates plans to be a larger player in the US airline industry, I find it a great opportunity to take advantage of my contacts and trust with them to put a lucrative deal together for both sides.

I look forward to your response and hope to see you in Vegas next week.

Thanks my friend,

Paul P. Edalat

Vice Chairman/CEO

LIWA, North America Division

United States | www.LiwaNA.com

Group LIWA, UAE Division

Abu Dhabi, UAE | www.groupliwa.com

COMPLAINT
7

20.    Edalat's email led VanDeWeghe to introduce Edalat to Mark Tatum.

The complete email reads:

**From:** VanDeWeghe, Kiki
**Sent:** Thursday, July 09, 2015 04:16 PM
**To:** Paul Edalat <paul@liwana.com>; Tatum, Mark
**Subject:** RE: Emirates Airline

Thank you Paul. I am looping in Mark Tatum, our Deputy Commissioner, to carry the ball from our side. As I stated in my previous letter, Mark is the right person to get this done. This email will serve as an introduction for you and Mark.

I will be available throughout to help in any way I am needed.

Best – Kiki

**Kiki VanDeWeghe**

Senior Vice President - Basketball Operations

Phone: +1 2124078390

Mobile: +1 9177492872

21.    Tatum acknowledged Edalat and the NBA's renewed interest in this opportunity with Emirates Airline, stating, *"We [The NBA] are still very interested in having a discussion with Emirates about a partnership"*  The complete email reads:

On Jul 9, 2015, at 4:57 PM, Tatum, Mark <mtatum@nba.com> wrote:

Paul,

It is a pleasure to meet you via email. We are still very interested in having a discussion with Emirates about a partnership. Let's set up a call or meeting to discuss. Please let me know when you might be available. Thanks.

Best,

Mark

22.    The NBA negotiating team did not have the access needed to reach the decision-makers at Emirates Airline. Edalat, however, did.

23.    Putting his contacts to work again, over the ensuing weeks, Edalat and Tatum attempted to coordinate an in-person or phone conference. Given his schedule limitations, Tatum was not available, but he dispatched Emillio Collins and Rachel Jacobson to meet Edalat on July 16, 2015, at the Wynn Terrace Point Café, in Las Vegas, Nevada, to discuss this renewed opportunity with Emirates Airline. The complete email showing the initial scheduling for this July 16, 2015, meeting reads:

---

**RE: Emirates Airline (Call with Mark Tatum / NBA)**

Santiago, Iveliz <ISantiago@nba.com>                                   Wed, Jul 15, 2015 at 7:38 AM
To: Paul Edalat <paul@liwana.com>
Cc: "Duperval, Arielle" <ADuperval@nba.com>

Dear Paul,

Thank you for your kind reply.

Unfortunately, Thursday (7/16) at 7:30am is the only time Mark is able to meet as he has meetings that morning and then is immediately traveling back to NY.

I will send you a calendar notice for now to hold the time and if we need to cancel then we can.

Thursday, 7/16 @ 7:30am

Breakfast Meeting - LIWA, North America Division / NBA

Location: Wynn Las Vegas - Terrace Pointe Café

_Walking Directions from Wynn Las Vegas Lobby:_

To walk to Terrace Point Café you turn right when you exit the Tower Suites Lobby and walk towards the B Bar, at the B Bar you make a right and walk down the hallway, Terrace Point Café will be down the hallway on the right hand side past La Cave.

Thank you and I look forward to hearing from you.

Best regards,

[Quoted text hidden]

---

24.    In his email, Tatum admitted that the NBA had been having discussions with Emirates Airline and was "equipped" to have a discussion about a potential partnership. Tatum advised that his team would explain the history of these discussions with Edalat during their meeting.  The complete email reads:

On Jul 15, 2015, at 9:46 PM, Tatum, Mark <mtatum@nba.com> wrote:

Paul,

Unfortunately, I won't be able to meet tomorrow morning, however, Emilio Collins and Rachel Jacobson can meet with you at the same time and place (7:30am at the Wynn Terrace Point Cafe). I've copied them on this email.

Emilio is the head of our Global Marketing Partnerships Department and Rachel runs our Global Business Development group. They have actually been in discussions with Emirates and are equipped to have the conversation with you around a potential partnership with Emirates going forward. Very sorry for the schedule change but hope that you can still get together with them to discuss.

Best,

Mark

25.    Edalat met with Emillio Collins and Rachel Jacobson on July 16, 2015, and committed to continuing discussions about a possible Emirates Airline deal. Collins admitted that the NBA's discussions with Emirates Airline team members at that time were not with decisionmakers, who the NBA had been unable to reach. An email from Ms. Jacobson acknowledges this productive meeting:

**RE: Emirates Airline**

Jacobson, Rachel <rjacobson@nba.com>                                    Thu, Jul 16, 2015 at 2:46 PM
To: "paul@liwana.com" <paul@liwana.com>
Cc: "Tatum, Mark" <mtatum@nba.com>, "Santiago, Iveliz" <ISantiago@nba.com>, "Collins, Emilio" <ecollins@nba.com>

Paul,

It was very nice to meet you at Breakfast this morning. Let us have some internal discussions on this end and figure out the best next steps based on our discussion. We are all flying back today, so give us a few days and we will be in touch next week.

Have a great time with your friends that are coming to town this weekend. Talk soon.

Best,
Rachel

**THE NBA RENEWS SPONSORSHIP WITH DELTA AIRLINES**

26.    By the end of summer 2015, however, Rachel Jacobson advised Edalat on a phone call that the NBA would be continuing the Delta Airline sponsorship because the NBA could not find common ground with Emirates Airline.

27.    Plaintiff reasonably believes, and alleges upon information and belief, that the NBA and Delta Airlines then re-entered a ten-year agreement.

**THE NBA EMERGES WITH A DEAL WITH EMIRATES AIRLINE**

28.    The prospect of a sponsorship deal between the NBA and Emirates Airlines lay fallow for the following years, until February 8, 2024, when the NBA announced a multiyear global marketing partnership naming Emirates Airline the "Official Global Airline Partner of the NBA." This included such luminary features as the "NBA In-Season Tournament," and extensive co-branding.  The deal was announced by none other than Mark Tatum, who had been central to the earlier initiative that had been started by Edalat, with the enthusiastic support of Emirates Airline's CEO, Sheikh Ahmed bin Saeed Al Maktoum, who said, *"The NBA is a valuable addition to our sponsorship portfolio as it allows us to connect with a vast global fanbase, including in the U.S., where the game is an integral part of the country's sport culture."*[1]

---

[1] *See*, APNews.Com, February 8, 2024.

29.     Edalat became apprised of the deal when VanDeWeghe, now retired as an NBA executive, contacted him and advised him to "look into" the sponsorship transaction, a strong nod that Edalat been cut out of the deal.

30.     Despite the years which had elapsed since Edalat, and his cohort, introduced and facilitated discussions between the NBA and Emirates Airline, the NBA and Emirates Airline picked up their discussions right where they had been left off years earlier—before the Delta Airlines renewal—between the same persons, negotiating the same deal, proving the negotiations had been paused, not irreversibly terminated.  What Edalat had set in motion years earlier had now come into fruition.

31.     The value of the sponsorship between the NBA and Emirates, and the ancillary financial arrangements between the two, could reach a staggering amount, easily in the tens of millions, and possibly hundreds of millions of dollars.

## PLAINTIFF SEEKS CONFIRMATION OF HIS COMMISSION

32.     Not being apprised that the NBA had recommenced and eventually consummated a sponsorship deal with Emirates Airline had been disconcerting to Edalat, but those concerns became even more alarming when Edalat, through counsel, contacted the NBA to confirm Edalat's compensation for having facilitated the sponsorship.

33.     Edalat sent a letter to the NBA on April 29, 2024, to confirm his recognition and compensation for the sponsorship. *See* **Exhibit "B"** attached hereto.

34.    The NBA responded with a letter ("Spillane Letter") from its Assistant General Counsel, Dan Spillane, essentially disavowing any knowledge of Edalat and any involvement with Boutros. Incredibly, Spillane claimed, "*We have no record and are not aware of any agreement between the NBA and Edalat,*" this despite the irrefutable existence of the letter from VanDeWeghe dated May 1, 2014, creating the agreement.  Edalat attaches hereto a true and correct copy of the Spillane Letter as **Exhibit "C."**

35.    Since then, Edalat has secured the sworn statement from Zaki Kada ("Kada Declaration), confirming the truth that Edalat had indeed established the initial high-level relationship between the NBA and Emirates Airline that ultimately led to the sponsorship deal.  Edalat attaches hereto a true and correct copy of the Kada Declaration as **Exhibit "D."**

## PARTIES, JURISDICTION, AND VENUE

36.    This is an action that includes claims for damages that exceed $500,000.00 exclusive of interest, costs and attorneys' fees.

37.    Plaintiff, Edalat, resides in California.

38.    Edalat succeeds to the interests and rights of Jiwa, which has since been dissolved.

39.    Defendant, NBA, maintains its principal offices in New York, but engages in substantial and not isolated activity in the state of Florida.

40.     Defendant lies subject to jurisdiction in Florida under Section 48.193(2), Florida Statutes.

41.     Venue lies in Orange County, Florida, under Section 47.051, Florida Statutes.

**COUNT I**
**(BREACH OF CONTRACT)**

42.     Plaintiff sues Defendant for damages which exceed $500,000.00 for breach of contract.

43.     Plaintiff incorporates the allegations stated in paragraphs 1 through 41.

44.     On or about May 1, 2014, Defendants contracted with Plaintiff to provide services in securing sponsorship deals with Emirates Airlines.

45.     For this service, Defendant had agreed to pay Plaintiff a fee equal to ten percent (10% ) of the value of any sponsorship deals reached.

46.     Plaintiff provided the essential introductions of Defendant to Emirates Airline which eventually led to their entering a sponsorship deal on or about February 2024, valued at tens of millions of dollars.

47.     Plaintiff also expended time and money working tirelessly on the project, traveling to the Middle East and within the United States to work on the project.

48.     But for Plaintiff's efforts, the sponsorship relationship between the Defendant and Emirates Airline would not have occurred, certainly not within the reasonably foreseeable future at that time.

49.     Despite having been the cause for procuring the Defendant's sponsorship deal, Defendant has failed and refused to pay the amounts lawfully due Plaintiffs.

50.     As a direct and proximate result of Defendant's breaches, Plaintiffs have suffered direct and consequential damages millions more than the jurisdictional threshold ($500,000.00) of this Court.

WHEREFORE, Plaintiffs demand judgment against the Defendant for compensatory damages and court costs.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

Date: March 10, 2025      *s/ Tucker H. Byrd*
                          **Tucker H. Byrd**
                          Florida Bar No. 381632
                          **Jeffrey T. Donner**
                          Florida Bar No. 0180122
                          **BYRD CAMPBELL, P.A**.
                          180 Park Avenue North, Suite 2A
                          Winter Park, Florida 32789
                          Telephone: (407) 392-2285
                          Facsimile: (407) 392-2286
                          Primary Email: TByrd@ByrdCampbell.com
                          Primary Email: JDonner@ByrdCampbell.com
                          Secondary Email: Paralegal@ByrdCampbell.com
                          *Attorneys for Plaintiff*

COMPLAINT
15

# EXHIBIT "A"

 **National Basketball Association**

May 1, 2014

Mr. Timothy Clark
President, Emirates Airline
C/O Paul P. Edalat
Vice Chairman/CEO
Liwa North America

Re: NBA Sponsorship

Dear Mr. Clark,

I would like to confirm our interest in having discussions with Emirates Airline about partnership opportunities within the National Basketball Association. Specifically, the NBA's airline sponsorship category is currently open and everyone here is excited about the possibility of a potential partnership with Emirates Airline.

The focus is for Emirates to become the exclusive airline sponsor and partner of the NBA. This will give Emirates the opportunity to expand their brand not only in the United States, but globally, with the assistance of the NBA, through its various marketing channels and programs. The relationship can expand in many ways; from having grassroots opportunities within the United States to having branding opportunities with possible exhibition games abroad.

The partnership opportunities and benefits associated with the NBA global brand are extensive and we would be happy to discuss any present or future thoughts or goals Emirates might have. Mark Tatum, current NBA Deputy Commissioner and Chief Operating Officer, previously Executive Vice President of Global Marketing Partnerships, also believes that Emirates would be a perfect partner for the NBA. Given the NBA's strong recognition within the United States, our internationally recognizable superstars and branding potential worldwide, brought together with Emirates powerful global presence and current expansion within the United States, the timing could not be better.

I would also like to confirm that Liwa North America and CEO Paul Edalat has provided this introduction and will continue to assist in seeing the process through.

The NBA has several offices worldwide and we would be happy to meet with you and your team at any mutually convenient time and place.

Sincerely,

Kiki VanDeWeghe
Senior Vice President, Basketball Operations
National Basketball Association

# EXHIBIT "B"

**BYRD CAMPBELL**

ORLANDO • DALLAS • BOSTON

April 29, 2024

***Via U.S. Mail and Email***
Mr. Mark Tatum
Deputy Commissioner and
Chief Operating Officer
National Basketball Association
645 Fifth Avenue
New York, NY 10022
mtatum@NBA.com

### RE: EMIRATES AIRLINES/NBA – GLOBAL MARKETING PARTNERSHIP

Dear Mr. Tatum:

     This law firm represents Mr. Paul Edalat and his company LIWA North America (collectively, "Edalat") related to their services in brokering a sponsorship between Emirates Airline ("Emirates") and the National Basketball Association ("NBA").

     First, congratulations are in order for the recent multiyear global marketing partnership naming Emirates the official Global Airline Partner of the NBA. The announcement on February 8, 2024, represented the culmination of efforts which began in 2014, beginning with our clients whose vision of pairing two iconic companies (NBA and Emirates) kindled this relationship. Although our clients were a bit surprised the NBA did not apprise them a deal was imminent, they nonetheless share their elation that a deal was reached and express their expectation to get compensated for their efforts in bringing the NBA and Emirates together.

     A brief historical recap should make their position clear:

1.  In March 2014, ***Mr. Kiki VanDeWeghe***, the Senior Vice President Basketball Operations for the NBA shared with Mr. Edalat that the NBA had an interest in a partnership with Emirates. The NBA had no prior connection with Emirates. Emirates, long involved in other global sports, notably soccer, had no connection with American basketball. At the time Mr. VanDeWeghe shared that the NBA did not intend on continuing its relationship with Delta Airlines.

2.  Because of Mr. Edalat's unique experience in sports marketing and his decades long high-level relationships in the United Arab Emirates with government officials, the royal families of Dubai and Abu Dhabi, and the Chairman and executives of Emirates Airlines, he possessed the skills and connections to broker a sport sponsorship deal.

| BOSTON | ORLANDO | DALLAS | NATCHEZ | PENSACOLA |
|--------|---------|--------|---------|-----------|
| 75 Arlington Street | 180 Park Avenue North | 3838 Oak Lawn | 423 Main Street | 3298 Summit Boulevard |
| Suite 500 | Suite 2A | Suite 300 | Suite 8 | Suite 27 |
| Boston, MA 02116 | Winter Park, FL 32789 | Dallas, TX 75255 | Natchez, MS 39120 | Pensacola, FL 32503 |
| Phone (617) 967-2820 | Phone (407) 392-2285 | Phone (214) 764-4106 | Phone (407) 392-2285 | Phone (850) 308-7440 |
| | Fax (407) 392-2286 | | | By Appointment Only |

April 29, 2024
Mr. Tatum
Page Two

3.  In April 2024, Emirates requested an official letter from the NBA designating Mr. Edalat as the NBA's representative responsible for "brokering" the deal.

4.  On May 1, 2014, Mr. VanDeWeghe authored the official letter addressed to Mr. Timothy Clark, President, Emirates Airline, naming Paul Edalat as the person responsible for "seeing the process through." I have attached a copy of the letter as **Exhibit "A."**

5.  Throughout the spring of 2014, Mr. Edalat engaged in numerous talks concerning the sponsorship, even travelling to the middle east to pursue this deal for the NBA.

6.  You personally were engaged in some of those discussions. Many other high ranking NBA officials interacted with Mr. Edalat.

7.  The Emirates deal was paused in the summer of 2014 when the NBA renewed its official sponsorship with Delta Airlines. Given the timing of the Delta Airlines renewal, no doubt the NBA benefitted from the Emirates interest as leverage in the NBA's negotiations with Delta.

8.  Once the Delta Airlines deal expired, Emirates and the NBA picked right up with where they had left off and finalized the deal through the same principals for both Emirates and the NBA who Mr. Edalat had connected. Unfortunately, the person who procured the relationship, Mr. Paul Edalat, was excluded from those final negotiations.

9.  The NBA had a simple compensation arrangement with Mr. Edalat. He would get ten percent (10%) of any deal he procured. If the news reports are accurate, Emirates has agreed to pay Sixty Million Dollars ($60,000,000.00) for sponsorship rights. There may be other economic benefits which have not been disclosed.

At this point, we ask the NBA to confirm that Mr. Edalat and his company will be compensated for their efforts. We have not reached out to Emirates to confirm our clients' involvement since they had a deal with the NBA. We remain confident, lest you have any doubt, that a simple call to *Mr. Boutros Boutros* with Emirates will confirm their acknowledgement of Mr. Edalat's importance to the deal. With him, there would have been no relationship, and certainly no deal.

To make sure the NBA gives this immediate attention, I am inclined to put a ten (10) day deadline for a response. If you need additional information to respond, let me know.

Very Truly Yours,

Tucker H. Byrd, Esq.

C:  Client

# EXHIBIT "A"

 # National Basketball Association

May 1, 2014

Mr. Timothy Clark
President, Emirates Airline
C/O Paul P. Edalat
Vice Chairman/CEO
Liwa North America

Re: NBA Sponsorship

Dear Mr. Clark,

I would like to confirm our interest in having discussions with Emirates Airline about partnership opportunities within the National Basketball Association. Specifically, the NBA's airline sponsorship category is currently open and everyone here is excited about the possibility of a potential partnership with Emirates Airline.

The focus is for Emirates to become the exclusive airline sponsor and partner of the NBA. This will give Emirates the opportunity to expand their brand not only in the United States, but globally, with the assistance of the NBA, through its various marketing channels and programs. The relationship can expand in many ways; from having grassroots opportunities within the United States to having branding opportunities with possible exhibition games abroad.

The partnership opportunities and benefits associated with the NBA global brand are extensive and we would be happy to discuss any present or future thoughts or goals Emirates might have. Mark Tatum, current NBA Deputy Commissioner and Chief Operating Officer, previously Executive Vice President of Global Marketing Partnerships, also believes that Emirates would be a perfect partner for the NBA. Given the NBA's strong recognition within the United States, our internationally recognizable superstars and branding potential worldwide, brought together with Emirates powerful global presence and current expansion within the United States, the timing could not be better.

I would also like to confirm that Liwa North America and CEO Paul Edalat has provided this introduction and will continue to assist in seeing the process through.

The NBA has several offices worldwide and we would be happy to meet with you and your team at any mutually convenient time and place.

Sincerely,

Kiki VanDeWeghe
Senior Vice President, Basketball Operations
National Basketball Association

# EXHIBIT "C"

 **National Basketball Association**

May 9, 2024

<u>**Via Email**</u>

Tucker H. Byrd, Esq.
Byrd Campbell, P.A.
tbyrd@byrdcampbell.com

Dear Mr. Byrd:

I write in response to your letter to Mark Tatum dated April 29, 2024. We have reviewed the information supplied in your letter and do not agree that your clients, Paul Edalat and LIWA North America (together, "Edalat"), are entitled to any compensation from the NBA. Among other inaccuracies and deficiencies contained in your correspondence:

1.    Edalat played no role in brokering or negotiating the NBA's marketing partnership agreement with Emirates that was announced on February 8, 2024. That agreement was handled by the NBA's in-house Global Partnerships group with the assistance of an agency firm, with no involvement from Edalat. Any interactions Edalat may have had with Emirates and a member of the NBA's Basketball Operations group in 2014 have no relevance to the Emirates partnership that the NBA directly negotiated and announced a decade later.

2.    As you suggested, we contacted Mr. Boutros Boutros at Emirates. Contrary to what your letter states, he has no recollection of Paul Edalat, let alone any involvement of Mr. Edalat with the NBA-Emirates marketing partnership agreement.

3.    You assert that Edalat had a "compensation arrangement" with the NBA, but offer no evidence to support that contention. We have no record and are not aware of any agreement between the NBA and Edalat.

4.    Your letter's statement that in 2014 "the NBA had no prior connection to Emirates" is not correct. To the contrary, the NBA entered into agreements with Emirates in 2012 and 2013 to sponsor NBA games played in China. Discussions between the NBA and Emirates regarding

a broader partnership were publicly reported more than one year before the 2014 letter you cite.[1]

For these and other reasons, we see no basis to conclude that your clients are owed any compensation by the NBA.

Sincerely,

Dan Spillane
Senior Vice President and
Assistant General Counsel,
League Governance & Policy

---

[1] *See, e.g., Emirates deal could land at NBA*, Sports Business Journal, Jan. 21, 2013,
https://www.sportsbusinessjournal.com/Journal/Issues/2013/01/21/Marketing-and-Sponsorship/Emirates.aspx

# EXHIBIT "D"

1        **DECLARATION OF ZAKI KADA**

2    1.   I am over the age of eighteen and live and work in Dubai, United Arab Emirates.  I make

3         this declaration based upon the facts personally known to me.  If called upon to testify as

4         to any of the below facts, I could and would competently do so.

5    2.   I made an introduction between Paul Edalat and Emirates Airlines ("Emirates") Chief

6         Marketing Officer Boutros Boutros sometime in 2014 during one of Mr. Edalat's

7         business trips to Dubai.

8    3.   Mr. Boutros has been a personal friend since being introduced by his close friend

9         Tony Kazal who I have known since 2009. Mr. Edalat has been a close personal friend of

10        mine since 2010.

11   4.   In or around February of 2014, Mr. Edalat had discussed with me that the National

12        Basketball Association ("NBA") was in search of a new airline partner as the NBA and

13        Delta Airlines partnership was to expire in 2014.

14

15   5.   On or about March 29, 2014, Mr. Edalat forwarded to me an e-mail dated March 28,

16        2014 from KiKi VanDeWeghe, the Head of Basketball Operations at the NBA. In that e-

17        mail Mr. VanDeWeghe stated that the NBA was seeking a partnership opportunity with

18        Emirates. Furthermore, Mr. VanDeWeghe's email specifically requested that Mr. Edalat

19        "[relay NBA's] interest to … Emirates, and see what is the best way for us to proceed."

20   6.   Separate to this e-mail, Mr. Edalat relayed to me that NBA had no direct contact with

21        Emirates executives– and that NBA was reliant on Mr. Edalat to make the introduction to

22        the appropriate Emirates senior executive.

23

24

25

26

7. Acting on this information I initially reached out to Salem Ghanem Al-Marri, the head of Planning, Aeropolitical, and Industry Affairs at Emirates, and a former colleague of mine. I forwarded Mr. VanDeWeghe's email to Mr. Ghanem Al-Marri to ascertain early interest from Emirates before approaching Mr. Boutros.

8. On April 1, 2014, Mr. Ghanem Al-Marri responded, requesting an "official" letter from NBA for the purposes of beginning partnership discussions. I forwarded this response to Mr. Edalat. It is my understanding that Mr. Edalat in turn forwarded my e-mail to Mr. VanDeWeghe.

9. During a telephonic conversation later that same week, Mr. Edalat and I discussed the opportunity between Emirates and NBA at length. As part of the multiple phone calls during the first few weeks of April 2014, we were preparing for the in-person meeting between Mr. Edalat and Mr. Boutros.

10. I planned for Mr. Edalat and Mr. Boutros to meet in person during the May 2014 Travel Show in Dubai, United Arab Emirates.

11. On or about May 1, 2014 Mr. Edalat sent the NBA's sponsorship request letter ("NBA Letter") dated May 1, 2014 to myself and Mr. Boutros. A true and correct copy of the NBA Letter is attached as **Exhibit A** to this declaration.

12. Subsequently, Mr. Edalat travelled to Dubai in early May 2014, and met with Mr. Boutros, and myself during the week of May 11, 2014. Mr. Kazal assisted in arranging a last minute meeting with Mr. Boutros, given the latter's very busy schedule.

2

13. At the time of our initial meeting, Mr. Edalat handed Mr. Boutros the original wet signed copy of the NBA Letter, as Mr. Boutros had requested. Mr. Boutros requested some time to communicate with other senior level executives at Emirates in pursuit of this opportunity.

14. After Mr. Edalat's return to the United States in late May of 2014, he continued to keep me apprised of conversations with NBA officials.

15. At some point later on Mr. Boutros indicated that he would be keen to explore a good commercial deal with NBA.

16. Mr. Edalat relayed this information to Mr. VanDeWeghe, and discussions were subsequently handed off to Mark Tatum, the NBA Deputy Commissioner and Chief Operating Officer.

17. Mr. Edalat and Mr. Tatum exchanged a series of e-mails, some of which Mr. Edalat forwarded to me to keep Mr. Boutros updated on the conversation. In his July 9, 2014 email to Mr. Edalat, Mr. Tatum stated "[NBA] are still very interested in having a discussion with Emirates about a partnership".

18. It is my understanding that Mr. Edalat and Mr. Tatum were to meet in Las Vegas in July 2014 to further discuss the opportunity and arrange for the introduction between Mr. Tatum and Mr. Boutros.

19. After these July 2014 conversations, it came to light that NBA chose to re-sign their agreement with Delta, and we heard no further updates on the matter.

20. In late February 2024, Mr. Edalat and I became aware of the Emirates and NBA sponsorship deal via a Retuer's article in which both Mr. Boutros and Mr. Tatum were quoted. This deal is reported to be worth at least $250M over a period of 5 years.

3

21. After becoming aware of this, I reached out to Mr. Boutros and Mr. Kazal for further information.

22. Mr. Edalat requested a confirmation of the introduction from Mr. Boutros, who was at the time willing to provide this information. However, due to Mr. Boutros' position at Emirates, he advised me that the Emirates legal department prevented him from providing any information in his official capacity and have advised him to not communicate in writing about this matter.

23. It has been relayed to me by Mr. Edalat that the NBA's attorney has claimed that Mr. Boutros disavowed knowing Mr. Edalat. However, Mr. Boutros advised that his conversation with the NBA attorney was simply that he could not recall a meeting from 10 years ago, and needed time to refer to his diaries from that time. Mr. Boutros did not deny knowing Mr. Edalat. Therfore, I do not know on what basis the NBA's attorney makes that statement.

24. Furthermore, Mr. Boutros has relayed to both Mr. Kazal and myself that he has reached out to Mark Tatum in an effort to resolve this dispute between Mr. Edalat and NBA prior to any escalation, but cautioned that Emirates would not tolerate any negative publicity surrounding the NBA and Emirates 2024 deal, and, to quote Mr. Boutros, "if there was any noise, the contract would be cancelled".


I certify under penalty of perjury that the foregoing is true and correct.

Dated this 30th day of July, 2024

Dubai, United Arab Emirates

ZAKI KADA

4

EXHIBIT "A"

 # National Basketball Association

May 1, 2014

Mr. Timothy Clark
President, Emirates Airline
C/O Paul P. Edalat
Vice Chairman/CEO
Liwa North America

Re: NBA Sponsorship

Dear Mr. Clark,

I would like to confirm our interest in having discussions with Emirates Airline about partnership opportunities within the National Basketball Association. Specifically, the NBA's airline sponsorship category is currently open and everyone here is excited about the possibility of a potential partnership with Emirates Airline.

The focus is for Emirates to become the exclusive airline sponsor and partner of the NBA. This will give Emirates the opportunity to expand their brand not only in the United States, but globally, with the assistance of the NBA, through its various marketing channels and programs. The relationship can expand in many ways; from having grassroots opportunities within the United States to having branding opportunities with possible exhibition games abroad.

The partnership opportunities and benefits associated with the NBA global brand are extensive and we would be happy to discuss any present or future thoughts or goals Emirates might have. Mark Tatum, current NBA Deputy Commissioner and Chief Operating Officer, previously Executive Vice President of Global Marketing Partnerships, also believes that Emirates would be a perfect partner for the NBA. Given the NBA's strong recognition within the United States, our internationally recognizable superstars and branding potential worldwide, brought together with Emirates powerful global presence and current expansion within the United States, the timing could not be better.

I would also like to confirm that Liwa North America and CEO Paul Edalat has provided this introduction and will continue to assist in seeing the process through.

The NBA has several offices worldwide and we would be happy to meet with you and your team at any mutually convenient time and place.

Sincerely,

Kiki VanDeWeghe
Senior Vice President, Basketball Operations
National Basketball Association

IN THE CIRCUIT COURT OF THE NINTH
JUDICIAL CIRCUIT, IN AND FOR ORANGE
COUNTY, FLORIDA

PAUL EDALAT,

     Plaintiff,

v.

Case No: _____

**Complex Business
Litigation Court**

NATIONAL BASKETBALL
ASSOCIATION,

     Defendant.

_____/

## SUMMONS

THE STATE OF FLORIDA:

To Each Sheriff of the State:

     YOU ARE COMMANDED to serve this summons and a copy of the complaint or petition in this action on defendant:

**NATIONAL BASKETBALL ASSOCIATION**
By Serving Its Chief Operating Officer
Mark Tatum
645 Fifth Avenue
New York, NY 10022

     Each defendant is required to serve written defenses to said complaint or petition on **TUCKER H. BYRD, ESQ.,** Plaintiff's attorney, whose address is **BYRD CAMPBELL, P.A., 180 Park Avenue North, Suite 2A**, **Winter Park, Florida 32789, Telephone: (407) 392-2285**, within **twenty (20) days** after service of this Summons upon you, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter. If you fail to do so, a default will be entered against you for the relief demanded in the Complaint.

WITNESS my hand and the seal of this Court on this the _____ day of March, 2025.

**Tiffany Moore Russell**
Clerk of the Court


By_____
As Deputy Clerk

## REQUESTS FOR ACCOMMODATIONS BY PERSONS WITH DISABILITIES

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator, Human Resources, Orange County Courthouse, 425 N. Orange Avenue, Suite 510, Orlando, Florida, (407) 836-2303, at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

## **IMPORTANT**

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecu-tifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).
Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egale-ment, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

**Tucker H. Byrd**
Florida Bar No. 381632
**Jeffrey T. Donner**
Florida Bar No. 0180122
**BYRD CAMPBELL, P.A.**
180 Park Avenue North, Suite 2A
Winter Park, Florida 32789
Telephone: (407) 392-2285
Facsimile: (407) 392-2286
Primary Email: TByrd@ByrdCampbell.com
Primary Email: JDonner@ByrdCampbell.com
Secondary Email: Paralegal@ByrdCampbell.com

Case 6:26-cv-00521-JA-LHP   Document 1-1   Filed 03/06/26   Page 45 of 270 PageID 54

**AFFIDAVIT OF SERVICE**

| Case:<br>2025-CA-002038-0 | Court:<br>IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT IN and FOR ORANGE COUNTY, FLORIDA | County:<br>ORANGE COUNTY | Job:<br>12890097 |
|---|---|---|---|
| **Plaintiff / Petitioner:**<br>PAUL EDALAT, | | **Defendant / Respondent:**<br>NATIONAL BASKETBALL ASSOCIATION. | |
| **Received by:**<br>RUSHReady Serve | | **For:**<br>Diligent Legal Services | |
| **To be served upon:**<br>NATIONAL BASKETBALL ASSOCIATION. | | | |

I, Joshua Lee, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

| Recipient Name / Address: | Madeleine Bruml, 645 5th Avenue, New York, NY 10022 |
|---|---|
| Manner of Service: | Authorized, Mar 13, 2025, 10:21 am EDT |
| Documents: | Summons, Complaint, Civil Cover Sheet |

**Additional Comments:**

1) Successful Attempt: Mar 13, 2025, 10:21 am EDT at 645 5th Avenue, New York, NY 10022 received by Madeleine Bruml. Age: 45-50; Ethnicity: Caucasian; Gender: Female; Weight: 140; Height: 5'5"; Hair: Other; Eyes: Brown; Relationship: Associate General Counsel ; Other: Dark Brown Hair;

I arrived at the location, spoke with the security who called up to the legal department. A female employee came downstairs and met with me. The female employee identified herself as the associate general counsel and accepted service.


_____         03/26/2025
Joshua Lee                               **Date**
2095110-DCA


RUSHReady Serve
2851 Cropsey Ave Suite 130
Brooklyn, NY 11214
9146202266

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT, IN AND FOR ORANGE AND OSCEOLA COUNTIES, FLORIDA

EDALAT, PAUL

Plaintiff(s),

vs.

NATIONAL BASKETBALL ASSOCIATION

Defendant(s).

_____/

Case No.        2025-CA-002038-O
Division        43 (Orange County)
                23 (Osceola County)

## ORDER DESIGNATING CASE AS COMPLEX
## AND DIRECTIONS TO THE CLERK OF COURT

THIS CAUSE was considered to designate this case a "complex case" as defined in Florida Rules of General Practice and Judicial Administration 1.201. Being fully advised in the circumstances, the Court determines that the case meets the criteria for proceeding under the rule and designates it as a "complex case."

The Clerk of the Court shall designate this case a "complex case," update the Court's records accordingly, and report such designation and the case activity to the Florida Supreme Court pursuant to Section 25.075, Fla. Stat., and Florida Rules of General Practice and Judicial Administration 2.245(a).

DONE and ORDERED.

03/26/2025 11:01:2
2025-CA-002038-O

eSigned by Chad Alvaro  03/26/2025 11:01:29 Obst+kNz

Chad K. Alvaro
CIRCUIT JUDGE

Copies to Counsel of Record via
Florida's E-Filing Portal

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT, IN AND FOR ORANGE AND OSCEOLA COUNTIES, FLORIDA

EDALAT, PAUL

      Plaintiff(s)

vs.

NATIONAL BASKETBALL ASSOCIATION

      Defendant(s).

_____/

Case No.     2025-CA-002038-O
Division     43 (Orange County)
             23 (Osceola County)

## ORDER SETTING
## CASE MANAGEMENT CONFERENCE

THIS MATTER came before the Court on a finding that the case is a "complex case" and the Court, being duly advised in the premises, finds that it is

ORDERED and ADJUDGED as follows:

1.     Notice is hereby given that on **June 27, 2025**, at **9:30AM** in Courtroom 9A, Orange County Courthouse, 425 N Orange Ave., Orlando, FL 32801. The undersigned shall convene a Case Management Conference ("CMC") in this cause. Parties may appear remotely using the division's WebEx link:

https://ninthcircuit.webex.com/join/BusinessCourt

Attendee cameras must be activated. Parties are expected to comport themselves as though present in-person in the courtroom. AI-assisted note taking applications are not permitted in the meeting space.

2.     All documents shall be electronically filed with the Clerk of the Court. This case is governed by the Business Court Procedures (BCP) which can be found at:

http://www.ninthcircuit.org/divisions/business-court

Plaintiff's counsel is ordered to confirm all parties subsequently named or appearing herein

have been served copies of this order.

3.      Lead trial counsel shall appear for the CMC pursuant to BCP 6.4. Clients are not required to attend the CMC. Regardless of the pendency of any undecided motions, Trial Counsel shall meet no less than 30 days in advance of the CMC and address the following subjects, along with other appropriate topics, including those set forth in Florida Rule of Civil Procedure 1.200(a), some of which subjects and topics will be incorporated into a Case Management Order:

a.      a brief factual statement of the case;

b.      pleading issues, including service of process, venue, joinder of additional parties, theories of liability, damages claimed, and applicable defenses;

c.      the identity and number of any motions to dismiss or other preliminary or pre-discovery motions which have been filed and the time period in which they shall be filed, briefed and argued;

d.      a discovery plan and schedule including the length of the discovery period, the anticipated number of fact and expert depositions to be permitted and, as appropriate, the length and sequence of such depositions;

e.      anticipated areas of any expert testimony, timing for identification of experts, responses to expert discovery, and exchange of expert reports;

f.      an estimate of the volume of documents and computerized information likely to be the subject of discovery from parties and nonparties and whether there are technological means which may render document discovery more manageable at an acceptable cost;

g.      the advisability of using the general magistrate or special magistrate for fact finding, mediation, or discovery disputes or such other matters as the parties may agree upon;

2

    h.       the time period after the close of discovery within which post-discovery dispositive motions shall be filed, briefed, and argued, and a tentative schedule for such activities;

    i.       the possibility of settlement and the timing of alternative dispute resolution, including the selection of a mediator or arbitrator(s);

    j.       whether or not a party or parties desire to use technologically advanced methods of presentation or court-reporting and, to the extent that this is the case, a determination of the following:

    i.       fairness issues, including but not necessarily limited to use of such capabilities by some but not all of the parties and/or by parties whose resources permit or require variations in the use of such capabilities;

    ii.       issues related to compatibility of court and party facilities and equipment;

    iii.       issues related to the use of demonstrative exhibits and any balancing of relevance and potential prejudice which may need to occur in connection with such exhibits; and,

    iv.       such other issues related to the use of the Court's and parties' special technological facilities as may be raised by any party or the Court or its technological advisor, given the nature of the case and the resources of the parties.

    k.       a good faith estimate by counsel for each party based upon consultation with all of the parties of the attorney's fees and costs each party is likely to incur in pursuing the litigation through trial court adjudication;

    l.       a preliminary listing of the principal legal and factual issues which

counsel believes will need to be decided in the case;

      m.     a preliminary listing of any legal principles and facts that are not in dispute;

      n.     a good faith estimate by counsel for each party of the length of time to try the case;

      o.     whether a demand for jury trial has been made;

      p.     the deadline for filing motions in limine; and,

      q.     the track to which the case will be assigned. The Complex Business Litigation Court typically employs the following management tracks: Business Expedited (Target Trial Date within 13 months of the filing of the complaint); Business Standard (Target Trial Date within 18 months of the filing of the complaint); and Business Complex (Target Trial Date within 24 months of the filing of the complaint) and Complex Construction. If the case is a Complex Construction case, then the following topics shall also be addressed:

           i.     the selection of a Special Magistrate to be used in the case and the compensation for the Special Magistrate;

           ii.     whether the parties will produce discovery through disc exchange or through a virtual depository. If the parties select a virtual depository, then the parties shall designate a cloud depository service;

           iii.     the selection of a court reporting service to be used in the case;

           iv.     The selection of a mediator to be used in the case; and,

           v.     deadlines for destructive testing and extrapolation support testing.

4.     Within 14 days of the meeting among Trial Counsel, but no less than 14 days

in advance of the Case Management Conference, the parties shall file a Joint Case Management Report pursuant to BCP 6.3 addressing the matters described above. If the case is a Complex Construction case, Plaintiff shall serve a Preliminary Defect List on all parties at least 14 calendar days in advance of the Case Management Conference. The Preliminary Defect List shall provide Defendants with sufficient information to identify which, if any, additional parties should be joined in the action.

5.    All counsel and parties are responsible for filing the Joint Case Management Report in full compliance with this Order. Plaintiff's counsel shall have the primary responsibility to coordinate the meeting of Lead Trial Counsel and unrepresented parties in person, and the filing of the Joint Case Management Report. If counsel is unable to coordinate such compliance, counsel shall timely notify the Court by written motion or request for a status conference.

DONE and ORDERED.

03/26/2025 11:01:3
2025-CA-002038-O

eSigned by Chad Alvaro  03/26/2025 11:01:31 wW7faysG

Chad K. Alvaro
CIRCUIT JUDGE

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was filed with the Clerk of the Court by using the Florida Courts E-Filing Portal System. Accordingly, a copy of the foregoing is being served on this day to all attorney(s)/interested parties identified on the ePortal Electronic Service List, via transmission of Notices of Electronic Filing generated by the ePortal System.

Shenise Baker, Judicial Assistant for Chad K. Alvaro

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator, Human Resources, Orange County Courthouse, 425 N. Orange Avenue, Suite 510, Orlando, Florida, (407) 836-2303, at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,

       Plaintiff,

v.

NATIONAL BASKETBALL
ASSOCIATION,

       Defendant.

_____/

Case No.: 2025-CA-002038-O
Business Court Division 43

## NOTICE OF APPEARANCE AND EMAIL DESIGNATIONS

E. Ginnette Childs, Esq., and Kevin T. McGavock, Esq., of Akerman, LLP, hereby give

notice of their appearance as counsel for Defendant, NATIONAL BASKETBALL

ASSOCIATION. All notices, pleadings and other papers served or filed in this action should be

sent to the undersigned. Additionally, pursuant to Florida Rule of General Practice and Judicial

Administration 2.516, counsel hereby designates the following addresses for service by e-mail:

**Primary Emails:**
ginny.childs@akerman.com
kevin.mcgavock@akerman.com

**Secondary Emails:**
melisa.tejada@akerman.com
caren.deruiter@akerman.com
masterdocketlit@akerman.com

Dated: March 31, 2025.

Respectfully submitted,

/s/ *Kevin T. McGavock*_____
**E. Ginnette Childs, Esq.**
Florida Bar No. 0298130
Primary Email: ginny.childs@akerman.com
Secondary Emails:
melisa.tejada@akerman.com
masterdocketlit@akerman.com
**Kevin T. McGavock, Esq.**
Florida Bar No. 1002313
Primary Email: kevin.mcgavock@akerman.com
Secondary Emails:
caren.deruiter@akerman.com

masterdocketlit@akerman.com
**AKERMAN LLP**
420 South Orange Avenue, Suite 1200
Orlando, FL 32801
P. O. Box 231
Orlando, FL  32802-0231
Phone:  (407) 423-4000
Fax:  (407) 843-6610
*Attorneys for National Basketball Association.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 31, 2025, a true and correct copy of the foregoing

document has been electronically filed with the Clerk of Court using the Florida Courts E-Filing

Portal which will send notification to all counsel of record.

/s/ *Kevin T. McGavock*
Kevin T. McGavock, Esq.

2

Filing # 220063324 E-Filed 04/01/2025 02:59:05 PM

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,

       Plaintiff,

v.

NATIONAL BASKETBALL
ASSOCIATION,

       Defendant.

_____/

Case No.: 2025-CA-002038-O
Business Court Division 43

## NATIONAL BASKETBALL ASSOCIATION'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFF'S COMPLAINT

Defendant, National Basketball Association, through undersigned counsel, and pursuant to Rule 1.090 of the Florida Rules of Civil Procedure, moves for an extension of time to respond to Plaintiff, Paul Edalat's Complaint and Demand for Jury Trial ("Complaint"), filed March 10, 2025, and states as follows:

1.    Plaintiff filed his Complaint and Demand for Jury Trial on March 10, 2025.

2.    Defendant's current deadline to respond to Plaintiff's Complaint is April 2, 2025.

3.    Undersigned counsel just recently appeared in the case, and seeks an extension, through and including May 16, 2025, to respond to Plaintiff's Complaint.

4.    This motion is unopposed, is filed in good faith and not for any

80779081;1

improper purpose.

5.    Undersigned counsel has conferred with Plaintiff's counsel regarding the requested extension of time.  Plaintiff's counsel has agreed to the requested extension of time to respond to the Complaint.

**WHEREFORE**, Defendant, National Basketball Association, respectfully requests that this Court grant it an extension of time to respond to Plaintiff's Complaint, making the new deadline to respond May 16, 2025, together with such other and further relief as it may deem just, equitable, and proper under the circumstances.

Dated: April 1, 2025.              Respectfully submitted,

/s/ *E. Ginnette Childs*
**E. Ginnette Childs, Esq.**
Florida Bar No. 0298130
Primary Email: ginny.childs@akerman.com
Secondary Emails:
melisa.tejada@akerman.com
masterdocketlit@akerman.com
**Kevin T. McGavock, Esq.**
Florida Bar No. 1002313
Primary Email:
kevin.mcgavock@akerman.com
Secondary Emails:
caren.deruiter@akerman.com
masterdocketlit@akerman.com
**AKERMAN LLP**
420 South Orange Avenue, Suite 1200
Orlando, FL 32801
P. O. Box 231
Orlando, FL  32802-0231
Phone:  (407) 423-4000

80779081;1

Fax: (407) 843-6610

*Attorneys for National Basketball Association.*

## CERTIFICATE OF COMPLIANCE OF GOOD FAITH CONFERRAL

I HEREBY CERTIFY that on March 31, 2025, I conferred with Plaintiff's counsel, Tucker Byrd, in a good faith effort to resolve the issues raised in this motion. Plaintiff's counsel does not oppose the motion and has agreed to the requested extension of time to respond to the Complaint

*/s/ E. Ginnette Childs*
E. Ginnette Childs, Esq.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 1, 2025, a true and correct copy of the foregoing document has been electronically filed with the Clerk of Court using the Florida Courts E-Filing Portal which will send notification to all counsel of record.

*/s/ Kevin T. McGavock*
Kevin T. McGavock, Esq.

80779081;1



Kevin McGavock

Akerman LLP
420 South Orange Avenue
Suite 1200
Orlando, FL  32801-4904

D: 407 419 8437
T: 407 423 4000
F: 407 843 6610
kevin.mcgavock@akerman.com

April 1, 2025

**VIA ELECTRONIC SERVICE**

Honorable Chad K. Alvaro
Circuit Judge
Ninth Judicial Circuit, Division 43
Orange County Courthouse
425 N. Orange Avenue

      RE:    **Paul Edalat v. National Basketball Association**
              **Case Number: 2025-CA-002038-O**
              **Agreed Order Granting Defendant, National Basketball Association's Unopposed Motion For Extension Of Time To Respond To Plaintiff's Complaint**

Dear Judge Alvaro:

      Attached to this email, please find an agreed order (in Word format) relating to the following matter:

- National Basketball Association's Unopposed Motion For Extension Of Time To Respond To Plaintiff's Complaint, dated April 1, 2025 (Filing # 220063324 E-Filed 04/01/2025 02:59:05 PM).

      Counsel for Plaintiff, Paul Edalat, has reviewed the order and has no objection to its form or content.  If the proposed order meets your approval, please sign and e-file it.

      Respectfully submitted,

      **AKERMAN LLP**

      */s/ Kevin T. McGavock*
      Kevin T. McGavock

Enclosure

80783261;1

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,                                    Case No.: 2025-CA-002038-O
                                                Business Court Division 43
     Plaintiff,

v.

NATIONAL BASKETBALL
ASSOCIATION,

     Defendant.

_____/

## AGREED ORDER GRANTING NATIONAL
## BASKETBALL ASSOCIATION'S UNOPPOSED MOTION
## FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFF'S COMPLAINT

THIS CAUSE came before the Court on, Defendant, National Basketball

Association's Unopposed Motion For Extension Of Time To Respond To Plaintiff's

Complaint, dated April 1, 2025 (the "Motion"). The Court having reviewed the Motion, the

record, and being otherwise fully advised, it is hereby:

ORDERED AND ADJUDGED:

1.     Defendant's Motion is Granted.

2.     Defendant, National Basketball Association's deadline to file a response to

Plaintiff's Complaint is May 16, 2025.

DONE AND ORDERED.

04/14/2025 11:36:20
2025-CA-002038-O

eSigned by Chad Alvaro  04/14/2025 11:36:20 oMuc008-

Chad K. Alvaro
Circuit Judge

80781774;1

1

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing document has been electronically filed with the Clerk of Court using the Florida Courts E-Filing Portal which will send notification to all counsel of record.


_/s/_
Judicial Assistant

80781774;1

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,

      Plaintiff,

v.

NATIONAL BASKETBALL
ASSOCIATION,

      Defendant.

_____/

Case No.: 2025-CA-002038-O
Business Court Division 43

## VERIFIED MOTION FOR ADMISSION TO APPEAR PRO HAC VICE PURSUANT TO FLORIDA RULE OF GENERAL PRACTICE AND JUDICIAL ADMINISTRATION 2.510

      Comes now, Mahrah M. Taufique, Movant herein, and respectfully represents the following:

      1.      Movant resides in Brooklyn, New York. Movant is not a resident of the State of Florida.

      2.      Movant is an attorney and a member of the law firm of Hecker Fink LLP, with offices at 350 Fifth Avenue, 63rd Floor, New York, New York 10118, (212) 763-0883, mtaufique@heckerfink.com.

      3.      Movant has been retained as a member of the above named law firm on March 25, 2025 by the National Basketball Association to provide legal representation in connection with the above-styled matter now pending before the above-named court of the State of Florida.

-1-

4.      Movant is an active member in good standing and currently eligible to practice law in the following jurisdiction(s):

| JURISDICTION | DATE OF ADMISSION | ATTORNEY/BAR NUMBER |
|---|---|---|
| State of New York, 1st Department | September 18, 2017 | 5540513 |
| U.S. District Court for the Eastern District of New York | September 14, 2023 | 5540513 |
| U.S. District Court for the Southern District of New York | July 7, 2020 | 5540513 |
| U.S. District Court for the Western District of Michigan | June 10, 2020 | NY5540513 |
| U.S. Court of Appeals for the 2nd Circuit | September 5, 2023 | N/A |
| U.S. Court of Appeals for the 6th Circuit | June 23, 2020 | N/A |
| U.S. Court of Appeals for the District of Columbia | December 15, 2020 | 62804 |

5.      A judicial officer or the entity responsible for attorney regulation has neither initiated disciplinary, suspension, disbarment or contempt proceedings or disciplined, suspended, disbarred or held Movant in contempt in the preceding 5 years.

6.      Movant, either by resignation, withdrawal, or otherwise, never has terminated or attempted to terminate Movant's office as an attorney in order to avoid administrative, disciplinary, disbarment, or suspension proceedings.

7.      Movant is not an inactive member of The Florida Bar.

8.      Movant is not now a member of The Florida Bar.

9.      Movant is not a suspended member of The Florida Bar.

10.     Movant is not a disbarred member of The Florida Bar nor has Movant received a disciplinary resignation or disciplinary revocation from The Florida Bar.

11.     Movant has not previously been disciplined or held in contempt by reason of misconduct committed while engaged in representation pursuant to Florida Rule of General Practice and Judicial Administration 2.510.

12.     Movant has not filed motion(s) to appear as counsel in Florida state courts during the past five (5) years.

13.     Local counsel of record associated with Movant in this matter is E. Ginnette Childs, Esq., of Akerman LLP, who is an active member in good standing of The Florida Bar, Bar Number 0298130, and has offices at 420 South Orange Avenue, Suite 1200, Orlando, FL 32801, (407) 423-4000.

14.     Movant has read the applicable provisions of Florida Rule of General Practice and Judicial Administration 2.510 and Rule 1- 3.10 of the Rules Regulating The Florida Bar and certifies that this verified motion complies with those rules.

15.     Movant agrees to comply with the provisions of the Florida Rules of Professional Conduct and consents to the jurisdiction of the courts and the Bar of the State of Florida.

**WHEREFORE**, Defendant, Movant respectfully requests permission to appear in this court for this cause only.

DATED this 22nd day of April, 2025.


Mahrah M. Taufique
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Phone: (212) 763-0883
Email: mtaufique@heckerfink.com

STATE OF NEW YORK

COUNTY OF NEW YORK

I, Mahrah M. Taufique, do hereby swear or affirm under penalty of perjury that I am the Movant in the above-styled matter; that I have read the foregoing Motion and know the contents thereof, and the contents are true of my own knowledge and belief.

Mahrah M. Taufique, Movant

I hereby consent to be associated as local counsel of record in this cause pursuant to Florida Rule of General Practice and Judicial Administration 2.510.

DATED this 22nd day of April, 2025.

/s/ *E. Ginnette Childs*
E. Ginnette Childs, Esq.
AKERMAN LLP
420 South Orange Avenue, Suite 1200
Orlando, FL 32801
Phone: (407) 423-4000
Florida Bar No. 0298130
Email: ginny.childs@akerman.com

-5-

## <u>CERTIFICATE OF SERVICE</u>
### <u>(The Florida Bar)</u>

I HEREBY CERTIFY that that a true and correct copy of the foregoing motion was served electronically to PHV Admissions, The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300; and via the Clerk's E-Portal to: Tucker Byrd, Esq. (tbyrd@byrdcampbell.com), Byrd Campbell, P.A., counsel for Plaintiff,  and that the movant has paid the fees described in the Rules Regulating The Florida Bar concerning non-Florida lawyers appearances in a Florida court or has notified The Florida Bar of movant's request for a judicial waiver of said fees.

This 22nd day of April, 2025.

/s/ *E. Ginnette Childs*
E. Ginnette Childs, Esq.
AKERMAN LLP
420 South Orange Avenue, Suite 1200
Orlando, FL 32801
Phone: (407) 423-4000
Florida Bar No. 0298130
Email: ginny.childs@akerman.com

## <u>CERTIFICATE OF COMPLIANCE OF GOOD FAITH CONFERRAL</u>

I HEREBY CERTIFY that on April 22, 2025, a lawyer in my firm conferred with Plaintiff's counsel, Tucker Byrd, regarding the relief requested in in this motion. Plaintiff's counsel does not oppose the motion.

/s/ <i>E. Ginnette Childs</i>
E. Ginnette Childs, Esq.

Dated: April 22, 2025.            Respectfully submitted,

/s/ <i>E. Ginnette Childs</i>
**E. Ginnette Childs, Esq.**
Florida Bar No. 0298130
Primary Email: ginny.childs@akerman.com
Secondary Emails:
melisa.tejada@akerman.com
masterdocketlit@akerman.com
**Kevin T. McGavock, Esq.**
Florida Bar No. 1002313
Primary Email:
kevin.mcgavock@akerman.com
Secondary Emails:
caren.deruiter@akerman.com
masterdocketlit@akerman.com
**AKERMAN LLP**
420 South Orange Avenue, Suite 1200
Orlando, FL 32801
P. O. Box 231
Orlando, FL 32802-0231
Phone: (407) 423-4000
Fax: (407) 843-6610

*Attorneys for National Basketball Association.*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 22, 2025, a true and correct copy of the

foregoing document has been electronically filed with the Clerk of Court using the

Florida Courts E-Filing Portal which will send notification to all counsel of record.

/s/ *E. Ginnette Childs*
E. Ginnette Childs, Esq.

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,                              Case No.: 2025-CA-002038-O
                                          Business Court Division 43

      Plaintiff,

v.

NATIONAL BASKETBALL
ASSOCIATION,

      Defendant.

_____/

## VERIFIED MOTION FOR ADMISSION TO APPEAR PRO HAC VICE PURSUANT TO FLORIDA RULE OF GENERAL PRACTICE AND JUDICIAL ADMINISTRATION 2.510

Comes now, Sean Hecker, Movant herein, and respectfully represents the following:

1.      Movant resides in New York, New York. Movant is not a resident of the State of Florida.

2.      Movant is an attorney and a member of the law firm of Hecker Fink LLP, with offices at 350 Fifth Avenue, 63rd Floor, New York, New York 10118, (212) 763-0883, shecker@heckerfink.com.

3.      Movant has been retained as a member of the above named law firm on March 25, 2025 by the National Basketball Association to provide legal representation in connection with the above-styled matter now pending before the above-named court of the State of Florida.

-1-

4.      Movant is an active member in good standing and currently eligible to practice law in the following jurisdiction(s):

| JURISDICTION | DATE OF ADMISSION | ATTORNEY/BAR NUMBER |
|---|---|---|
| State of New York | October 16, 2000 | 3897444 |
| District of Columbia | August 30, 2022 | 90002619 |
| U.S. District Court for the Southern District of N.Y. | November 12, 2000 | SH78856 |
| U.S. District Court for the Eastern District of N.Y. | March 25, 2023 | SH7856 |
| U.S. District Court for the Northern District of N.Y. | August 7, 2024 | 705667 |
| U.S. Court of Appeals for the Second Circuit | May 23, 2006 | N/A |
| U.S. Court of Appeals for the District of Columbia | February 26, 2025 | 65924 |
| U.S. Supreme Court | March 27, 2006 | 258826 |

5.      There have been no disciplinary, suspension, disbarment, or contempt proceedings initiated against Movant in the preceding 5 years.

6.      Movant, either by resignation, withdrawal, or otherwise, never has terminated or attempted to terminate Movant's office as an attorney in order to avoid administrative, disciplinary, disbarment, or suspension proceedings.

7.      Movant is not an inactive member of The Florida Bar.

8.      Movant is not now a member of The Florida Bar.

9.      Movant is not a suspended member of The Florida Bar.

10.      Movant is not a disbarred member of The Florida Bar nor has Movant

-2-

received a disciplinary resignation or disciplinary revocation from The Florida Bar.

11.    Movant has not previously been disciplined or held in contempt by reason of misconduct committed while engaged in representation pursuant to Florida Rule of General Practice and Judicial Administration 2.510.

12.    Movant has filed motion(s) to appear as counsel in Florida state courts during the past five (5) years in the following matters:

| Date of Motion | Case Name | Case Number | Date Motion Granted |
|---|---|---|---|
| January 20, 2023 | *Klayman v. PGA Tour, et al.* | 50-2022-CA-006587-MB (15th Cir.) | February 14, 2023 |

13.    Local counsel of record associated with Movant in this matter is E. Ginnette Childs, Esq., of Akerman LLP, who is an active member in good standing of The Florida Bar, Bar Number 0298130, and has offices at 420 South Orange Avenue, Suite 1200, Orlando, FL 32801, (407) 423-4000.

14.    Movant has read the applicable provisions of Florida Rule of General Practice and Judicial Administration 2.510 and Rule 1- 3.10 of the Rules Regulating The Florida Bar and certifies that this verified motion complies with those rules.

15.    Movant agrees to comply with the provisions of the Florida Rules of Professional Conduct and consents to the jurisdiction of the courts and the Bar of the State of Florida.

**WHEREFORE**, Defendant, Movant respectfully requests permission to appear in this court for this cause only.

DATED this 22nd day of April, 2025.

Sean Hecker
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Phone: (212) 763-0883
Email: shecker@heckerfink.com

STATE OF NEW YORK

COUNTY OF NEW YORK

I, Sean Hecker, do hereby swear or affirm under penalty of perjury that I am the Movant in the above-styled matter; that I have read the foregoing Motion and know the contents thereof, and the contents are true of my own knowledge and belief.

_____
Sean Hecker, Movant


I hereby consent to be associated as local counsel of record in this cause pursuant to Florida Rule of General Practice and Judicial Administration 2.510.

DATED this 22nd day of April, 2025.

/s/ E. Ginnette Childs
E. Ginnette Childs, Esq.
AKERMAN LLP
420 South Orange Avenue, Suite 1200
Orlando, FL 32801
Phone: (407) 423-4000
Florida Bar No. 0298130
Email: ginny.childs@akerman.com

## <u>CERTIFICATE OF SERVICE</u>
### <u>(The Florida Bar)</u>

I HEREBY CERTIFY that that a true and correct copy of the foregoing motion was served electronically to PHV Admissions, The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300; and via the Clerk's E-Portal to: Tucker Byrd, Esq. (tbyrd@byrdcampbell.com), Byrd Campbell, P.A., counsel for Plaintiff, and that the movant has paid the fees described in the Rules Regulating The Florida Bar concerning non-Florida lawyers appearances in a Florida court or has notified The Florida Bar of movant's request for a judicial waiver of said fees.

This 22nd day of April, 2025.

/s/ *E. Ginnette Childs*
E. Ginnette Childs, Esq.
AKERMAN LLP
420 South Orange Avenue, Suite 1200
Orlando, FL 32801
Phone: (407) 423-4000
Florida Bar No. 0298130
Email: ginny.childs@akerman.com

## **<u>CERTIFICATE OF COMPLIANCE OF GOOD FAITH CONFERRAL</u>**

I HEREBY CERTIFY that on April 22, 2025, a lawyer in my firm conferred

with Plaintiff's counsel, Tucker Byrd, regarding the relief requested in in this motion.

Plaintiff's counsel does not oppose the motion.

/s/ *E. Ginnette Childs*
E. Ginnette Childs, Esq.

Dated: April 22, 2025.          Respectfully submitted,

/s/ *E. Ginnette Childs*
**E. Ginnette Childs, Esq.**
Florida Bar No. 0298130
Primary Email: ginny.childs@akerman.com
Secondary Emails:
melisa.tejada@akerman.com
masterdocketlit@akerman.com
**Kevin T. McGavock, Esq.**
Florida Bar No. 1002313
Primary Email:
kevin.mcgavock@akerman.com
Secondary Emails:
caren.deruiter@akerman.com
masterdocketlit@akerman.com
**AKERMAN LLP**
420 South Orange Avenue, Suite 1200
Orlando, FL 32801
P. O. Box 231
Orlando, FL 32802-0231
Phone: (407) 423-4000
Fax: (407) 843-6610

*Attorneys for National Basketball
Association.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 22, 2025, a true and correct copy of the

foregoing document has been electronically filed with the Clerk of Court using the

Florida Courts E-Filing Portal which will send notification to all counsel of record.

/s/ *E. Ginnette Childs*
E. Ginnette Childs, Esq.

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,                                    Case No.: 2025-CA-002038-O
                                                Business Court Division 43
     Plaintiff,

v.

NATIONAL BASKETBALL
ASSOCIATION,

     Defendant.

_____/

## VERIFIED MOTION FOR ADMISSION TO APPEAR PRO HAC VICE PURSUANT TO FLORIDA RULE OF GENERAL PRACTICE AND JUDICIAL ADMINISTRATION 2.510

Comes now, David Gopstein, Movant herein, and respectfully represents the following:

1.      Movant resides in Brooklyn, New York. Movant is not a resident of the State of Florida.

2.      Movant is an attorney and a member of the law firm of Hecker Fink LLP, with offices at 350 Fifth Avenue, 63rd Floor, New York, New York 10118, (212) 763-0883, dgopstein@heckerfink.com.

3.      Movant has been retained as a member of the abovenamed law firm on March 25, 2025 by the National Basketball Association to provide legal representation in connection with the above-styled matter now pending before the above-named court of the State of Florida.

-1-

4.    Movant is an active member in good standing and currently eligible to practice law in the following jurisdiction(s):

| JURISDICTION | DATE OF ADMISSION | ATTORNEY/BAR NUMBER |
|---|---|---|
| State of New York | March 16, 2009 | 4706628 |
| U.S. District Court for the Southern District of N.Y. | February 23, 2012 | DG4321 |
| U.S. District Court for the Eastern District of N.Y. | June 15, 2015 | DG4321 |
| U.S. District Court for the Northern District of N.Y. | August 8, 2024 | 705668 |
| U.S. Court of Appeals for the Second Circuit | March 6, 2010 | N/A |

5.    A judicial officer or the entity responsible for attorney regulation has neither initiated disciplinary, suspension, disbarment or contempt proceedings or disciplined, suspended, disbarred or held Movant in contempt in the preceding 5 years.

6.    Movant, either by resignation, withdrawal, or otherwise, never has terminated or attempted to terminate Movant's office as an attorney in order to avoid administrative, disciplinary, disbarment, or suspension proceedings.

7.    Movant is not an inactive member of The Florida Bar.

8.    Movant is not now a member of The Florida Bar.

9.    Movant is not a suspended member of The Florida Bar.

10.    Movant is not a disbarred member of The Florida Bar nor has Movant received a disciplinary resignation or disciplinary revocation from The Florida Bar.

11.     Movant has not previously been disciplined or held in contempt by reason of misconduct committed while engaged in representation pursuant to Florida Rule of General Practice and Judicial Administration 2.510.

12.     Movant has not filed motion(s) to appear as counsel in Florida state courts during the past five (5) years.

13.     Local counsel of record associated with Movant in this matter is E. Ginnette Childs, Esq., of Akerman LLP, who is an active member in good standing of The Florida Bar, Bar Number 0298130, and has offices at 420 South Orange Avenue, Suite 1200, Orlando, FL 32801, (407) 423-4000.

14.     Movant has read the applicable provisions of Florida Rule of General Practice and Judicial Administration 2.510 and Rule 1- 3.10 of the Rules Regulating The Florida Bar and certifies that this verified motion complies with those rules.

15.     Movant agrees to comply with the provisions of the Florida Rules of Professional Conduct and consents to the jurisdiction of the courts and the Bar of the State of Florida.

**WHEREFORE**, Defendant, Movant respectfully requests permission to appear in this court for this cause only.

DATED this 22nd  day of April, 2025.

David Gopstein
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Phone: (212) 763-0883
Email: dgopstein@heckerfink.com

STATE OF NEW YORK

COUNTY OF NEW YORK

I, David Gopstein, do hereby swear or affirm under penalty of perjury that I am the Movant in the above-styled matter; that I have read the foregoing Motion and know the contents thereof, and the contents are true of my own knowledge and belief.

David Gopstein, Movant

I hereby consent to be associated as local counsel of record in this cause pursuant to Florida Rule of General Practice and Judicial Administration 2.510.

DATED this 22nd day of April, 2025.

/s/ E. Ginnette Childs
E. Ginnette Childs, Esq.
AKERMAN LLP
420 South Orange Avenue, Suite 1200
Orlando, FL 32801
Phone: (407) 423-4000
Florida Bar No. 0298130
Email: ginny.childs@akerman.com

## <u>CERTIFICATE OF SERVICE</u>
### <u>(The Florida Bar)</u>

I HEREBY CERTIFY that that a true and correct copy of the foregoing motion was served electronically to PHV Admissions, The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300; and via the Clerk's E-Portal to: Tucker Byrd, Esq. (tbyrd@byrdcampbell.com), Byrd Campbell, P.A., counsel for Plaintiff, and that the movant has paid the fees described in the Rules Regulating The Florida Bar concerning non-Florida lawyers appearances in a Florida court or has notified The Florida Bar of movant's request for a judicial waiver of said fees.

This 22nd day of April, 2025.

/s/ <u>*E. Ginnette Childs*</u>
E. Ginnette Childs, Esq.
AKERMAN LLP
420 South Orange Avenue, Suite 1200
Orlando, FL 32801
Phone: (407) 423-4000
Florida Bar No. 0298130
Email: ginny.childs@akerman.com

## <u>CERTIFICATE OF COMPLIANCE OF GOOD FAITH CONFERRAL</u>

I HEREBY CERTIFY that on April 22, 2025, a lawyer in my firm conferred

with Plaintiff's counsel, Tucker Byrd, regarding the relief requested in in this motion.

Plaintiff's counsel does not oppose the motion.

/s/ *E. Ginnette Childs*
E. Ginnette Childs, Esq.

Dated: April 22, 2025.                Respectfully submitted,

/s/ *E. Ginnette Childs*
**E. Ginnette Childs, Esq.**
Florida Bar No. 0298130
Primary Email: ginny.childs@akerman.com
Secondary Emails:
melisa.tejada@akerman.com
masterdocketlit@akerman.com
**Kevin T. McGavock, Esq.**
Florida Bar No. 1002313
Primary Email:
kevin.mcgavock@akerman.com
Secondary Emails:
caren.deruiter@akerman.com
masterdocketlit@akerman.com
**AKERMAN LLP**
420 South Orange Avenue, Suite 1200
Orlando, FL 32801
P. O. Box 231
Orlando, FL 32802-0231
Phone: (407) 423-4000
Fax: (407) 843-6610

*Attorneys for National Basketball*
*Association.*

## **<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on April 22, 2025, a true and correct copy of the

foregoing document has been electronically filed with the Clerk of Court using the

Florida Courts E-Filing Portal which will send notification to all counsel of record.

/s/ *E. Ginnette Childs*
E. Ginnette Childs, Esq.

Kevin McGavock

Akerman LLP
420 South Orange Avenue
Suite 1200
Orlando, FL  32801-4904

D: 407 419 8437
T: 407 423 4000
F: 407 843 6610
kevin.mcgavock@akerman.com

April 23, 2025

**VIA ELECTRONIC SERVICE**

Honorable Chad K. Alvaro
Circuit Judge
Ninth Judicial Circuit, Division 43
Orange County Courthouse
425 N. Orange Avenue

> **RE:    Paul Edalat v. National Basketball Association**
> **Case Number: 2025-CA-002038-O**
> **Agreed Orders Granting Verified Motions For Admission To Appear Pro Hac Vice Pursuant To Florida Rule Of General Practice And Judicial Administration 2.510**

Dear Judge Alvaro:

Attached to this email, please find three (3) agreed orders (in Word format) relating to the following matters:

- Verified Motion For Admission To Appear Pro Hac Vice Pursuant To Florida Rule Of General Practice And Judicial Administration 2.510 (Sean Hecker) (Filing # 221563862 E-Filed 04/22/2025 04:31:54 PM);

- Verified Motion For Admission To Appear Pro Hac Vice Pursuant To Florida Rule Of General Practice And Judicial Administration 2.510 (David Gopstein) (Filing # 221563862 E-Filed 04/22/2025 04:31:54 PM); and

- Verified Motion For Admission To Appear Pro Hac Vice Pursuant To Florida Rule Of General Practice And Judicial Administration 2.510 (Mahrah M. Taufique) (Filing # 221563862 E-Filed 04/22/2025 04:31:54 PM).

Counsel for Plaintiff, Paul Edalat, has reviewed the orders and has no objection to their form or content.  If the proposed orders meet your approval, please sign and e-file them.

Respectfully submitted,

**AKERMAN LLP**

_/s/ Kevin T. McGavock_
Kevin T. McGavock

Enclosures

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,                                      Case No.: 2025-CA-002038-O
                                                  Business Court Division 43
     Plaintiff,

v.

NATIONAL BASKETBALL
ASSOCIATION,

     Defendant.

_____/

## AGREED ORDER GRANTING VERIFIED MOTION FOR ADMISSION TO APPEAR PRO HAC VICE PURSUANT TO FLORIDA RULE OF GENERAL PRACTICE AND JUDICIAL ADMINISTRATION 2.510

**THIS CAUSE**, came before the Court on  the Verified Motion For Admission To Appear Pro Hac Vice Pursuant To Florida Rule Of General Practice And Judicial Administration 2.510, of Mahrah M. Taufique, Esq.,filed on April 22, 2025 (the "Motion"), designating E. Ginnette Childs, Esq., of Akerman, LLP, as Florida counsel for Defendant, National Basketball    Association, and the Court having reviewed the Motion, the record, having noted that the Motion is unopposed, and being otherwise fully advised, it is hereby:

**ORDERED AND ADJUDGED:** The Motion is **Granted**. Mahrah M. Taufique, Esq., is authorized to appear  and participate in the above -captioned case and to receive notifications at the law firm of Hecker Fink LLP, 350 Fifth Avenue, 63rd Floor, New York, New York 10118, Telephone: (212) 763-0883, Email: mtaufique@heckerfink.com.

**DONE AND ORDERED**

05/02/2025 15:53:58
2025-CA-002038-O
eSigned by Chad Alvaro  05/02/2025 15:53:58 xALWW0OK

Chad K. Alvaro
Circuit Judge

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _____ day of April, 2025, a true and correct copy of the foregoing document has been electronically filed with the Clerk of Court using the Florida Courts E-Filing Portal which will send notification to all counsel of record.

_____
Judicial Assistant

80781774;1

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,                                    Case No.: 2025-CA-002038-O
                                                Business Court Division 43
      Plaintiff,

v.

NATIONAL BASKETBALL
ASSOCIATION,

      Defendant.

_____/

**AGREED ORDER GRANTING VERIFIED MOTION FOR ADMISSION TO APPEAR
PRO HAC VICE PURSUANT TO FLORIDA RULE OF GENERAL PRACTICE AND
JUDICIAL ADMINISTRATION 2.510**

      **THIS CAUSE**, came before the Court on  the Verified Motion For Admission To Appear

Pro Hac Vice Pursuant To Florida Rule Of General Practice And Judicial Administration 2.510, of

David Gopstein, Esq.,filed on April 22, 2025 (the "Motion"), designating E. Ginnette Childs, Esq.,

of Akerman, LLP, as Florida counsel for Defendant, National Basketball Ass    ociation, and t he

Court having reviewed the Motion, the record,   having noted that the Motion  is unopposed, and

being otherwise fully advised, it is hereby:

      **ORDERED AND ADJUDGED:**  The Motion is **Granted**. David Gopstein , Esq., is

authorized to appear and part icipate in the above -captioned case and to receive notifications at

the law firm of Hecker Fink LLP, 350 Fifth Avenue, 63rd Floor, New York, New York 10118,

Telephone: (212) 763-0883, Email: dgopstein@heckerfink.com.

      **DONE AND ORDERED**.

05/02/2025 15:54:42
2025-CA-002038-O

eSigned by Chad Alvaro  05/02/2025 15:54:42 rPI4BZxQ

Chad K. Alvaro
Circuit Judge

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _____ day of April, 2025, a true and correct copy of the foregoing document has been electronically filed with the Clerk of Court using the Florida Courts E-Filing Portal which will send notification to all counsel of record.

_____
Judicial Assistant

80781774;1

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,                                    Case No.: 2025-CA-002038-O
                                                Business Court Division 43
      Plaintiff,

v.

NATIONAL BASKETBALL
ASSOCIATION,

      Defendant.

_____/

## AGREED ORDER GRANTING VERIFIED MOTION FOR ADMISSION TO APPEAR PRO HAC VICE PURSUANT TO FLORIDA RULE OF GENERAL PRACTICE AND JUDICIAL ADMINISTRATION 2.510

**THIS CAUSE**, came before the Court on  the Verified Motion For Admission To Appear

Pro Hac Vice Pursuant To Florida Rule Of General Practice And Judicial Administration 2.510, of

Sean Hecker, Esq., filed on April 22, 2025 (the "Motion"), designating E. Ginnette Childs, Esq., of

Akerman, LLP, as Florida counsel for Defendant, National Basketball Association, and the Court

having reviewed the Motion, the record,   having noted that the Motion  is unopposed, and being

otherwise fully advised, it is hereby:

**ORDERED AND ADJUDGED:** The Motion is **Granted**. Sean Hecker, Esq., is authorized

to appear and participate in the above-captioned case and to receive notifications at the law firm

of Hecker Fink LLP, 350 Fifth Avenue, 63rd Floor, New York, New York 10118, Telephone: (212)

763-0883, Email: shecker@heckerfink.com.

**DONE AND ORDERED**.

05/02/2025 15:55:26
2025-CA-002038-O

eSigned by Chad Alvaro  05/02/2025 15:55:26 5h3bfl+p

Chad K. Alvaro
Circuit Judge

80781774;1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _____ day of April, 2025, a true and correct copy of the foregoing document has been electronically filed with the Clerk of Court using the Florida Courts E-Filing Portal which will send notification to all counsel of record.

_____
Judicial Assistant

80781774;1

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,                                    Case No.: 2025-CA-002038-O
                                               Business Court Division 43
     Plaintiff,

v.

NATIONAL BASKETBALL
ASSOCIATION,

     Defendant.

_____/

**AGREED ORDER GRANTING VERIFIED MOTION FOR ADMISSION TO APPEAR
PRO HAC VICE PURSUANT TO FLORIDA RULE OF GENERAL PRACTICE AND
JUDICIAL ADMINISTRATION 2.510**

     **THIS CAUSE**, came before the Court on the Verified Motion For Admission To Appear

Pro Hac Vice Pursuant To Florida Rule Of General Practice And Judicial Administration 2.510, of

David Gopstein, Esq., filed on April 22, 2025 (the "Motion"), designating E. Ginnette Childs, Esq.,

of Akerman, LLP, as Florida counsel for Defendant, National Basketball Association, and the

Court having reviewed the Motion, the record, having noted that the Motion is unopposed, and

being otherwise fully advised, it is hereby:

     **ORDERED AND ADJUDGED:** The Motion is **Granted**. David Gopstein, Esq., is

authorized to appear and participate in the above-captioned case and to receive notifications at

the law firm of Hecker Fink LLP, 350 Fifth Avenue, 63rd Floor, New York, New York 10118,

Telephone: (212) 763-0883, Email: dgopstein@heckerfink.com.

     **DONE AND ORDERED** in Chambers at Orlando, Orange County, Florida, this _____

day of April, 2025.

05/02/2025 15:54:12
2025-CA-002038-O

eSigned by Chad Alvaro  05/02/2025 15:54:12 0mKyIC0H

Chad K. Alvaro
Circuit Judge

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this _____ day of April, 2025, a true and correct copy of the foregoing document has been electronically filed with the Clerk of Court using the Florida Courts E-Filing Portal which will send notification to all counsel of record.

_____
Judicial Assistant

Filing # 223325141 E-Filed 05/16/2025 05:28:11 PM

| | |
|---|---|
| PAUL EDALAT,<br><br>       Plaintiff,<br><br>v.<br><br>NATIONAL BASKETBALL<br>ASSOCIATION,<br><br>       Defendant. | IN THE CIRCUIT COURT OF THE<br>NINTH JUDICIAL CIRCUIT, IN AND<br>FOR ORANGE COUNTY, FLORIDA<br><br>CASE NO.: 2025-CA-002038-O<br><br>Business Court Division 43 |

## THE NATIONAL BASKETBALL ASSOCIATION'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, UNDER THE DOCTRINE OF FORUM NON CONVENIENS, AND FOR FAILURE TO STATE A CLAIM

Pursuant to Fla. R. Civ. P. 1.140(b)(2), (b)(6), and 1.061(a), Defendant National

Basketball Association (the "NBA") moves to dismiss the complaint ("Complaint")

filed by Plaintiff Paul Edalat for lack of personal jurisdiction, under the doctrine of

*forum non conveniens*, and for failure to state a claim upon which relief can be granted,

and in support states as follows:

## PRELIMINARY STATEMENT

In this action, Plaintiff Paul Edalat seeks a multi-million dollar payout based on

the claim that, over a decade ago, he entered into an undocumented contract with an

unnamed NBA representative at an unidentified location and with unspecified terms

that the NBA supposedly breached by failing to pay him with respect to a 2024

sponsorship agreement between the NBA and Emirates about which Plaintiff knew

nothing prior to it being announced publicly. He does so in this Court not because this case has anything to do with Orlando or Florida, but rather based on a belief that an Orlando jury will favor him. In short, this is an asserted breach of contract case brought in a Florida court that involves neither a contract nor Florida. It should be dismissed.

*First*, the NBA is not subject to general jurisdiction in Florida—which is the only basis for jurisdiction that Plaintiff alleges. To be subject to general jurisdiction, the NBA's operations must "render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (internal quotations omitted). The Complaint does not even attempt to meet this standard. And for good reason: the NBA's headquarters, principal place of business, eighteen offices, senior executives, and books and records are all located outside of Florida.

*Second*, the Complaint should be dismissed under the doctrine of *forum non conveniens*, which permits dismissal of cases with a negligible connection to the forum and guards against forum shopping. Both considerations support dismissal here. First, this case has no connection to Florida: it involves a California Plaintiff suing a New York-based Defendant about an alleged sponsorship agreement with a Dubai-headquartered airline. Second, Plaintiff's counsel brought this case in this court based on his expressed belief that an Orlando jury would be favorably disposed towards his

client.  *See* Exhibit A.[1]  Florida courts apply the *forum non conveniens* doctrine to prevent such forum shopping and to require plaintiffs to bring cases in the jurisdictions in which they belong.

*Third*, the Complaint fails to allege a valid contract.  As a preliminary matter, it does not allege offer or acceptance, let alone any facts regarding either act, including who at the NBA entered into or formed the alleged agreement or where the agreement was allegedly formed.  Nor does the Complaint allege other essential terms of the alleged contract.  It fails to specify what services Plaintiff was obligated to provide; how, when, where, or for how long he was obligated to provide them; how the ten percent commission would be calculated; what kind of "future partnership" would be covered; whether such partnerships had any subject matter or temporal limitations; or any other terms or conditions.  The Complaint cites and attaches documents from around when the contract was allegedly formed (in 2014); tellingly, none is an actual contract or even references a contract or its terms.[2]

---

[1] Plaintiff's counsel made this statement in an interview with the *Orlando Business Journal*.  Ex. A.  Courts "are permitted to consider evidence outside the four corners of the complaint where . . . the motion to dismiss is based upon *forum non conveniens* [.]" *Steiner Transocean Ltd. v. Efremova*, 109 So. 3d 871, 873 (Fla. 3d DCA 2013).

[2] Even if the Complaint did allege a valid contract (and it does not), the absence of any allegation about the execution of a contract means there is no basis upon which to determine what law applies.  It is well-established that "the law of the state where the contract was executed governs the rights and liabilities of the parties to the contract." *Paquin v. Campbell*, 378 So. 3d 686, 690 (Fla. 5th DCA 2024).

*Finally*, because the Complaint does not specify what services Plaintiff was purportedly obligated to provide or when, it cannot and does not allege that Plaintiff actually performed them.  To the extent Plaintiff alleges that his obligation was to provide services in "securing" a sponsorship agreement with the NBA, the Complaint establishes that he *did not do so*: Plaintiff alleges that he made introductions and had meetings in 2014 and 2015, but these actions did not "secure" the NBA's agreement with Emirates in 2024.  Further, Plaintiff concedes he did nothing between 2015 and 2024 with respect to the sponsorship deal and learned of the NBA/Emirates partnership only after it was publicly announced.  To state an action for breach of contract, a plaintiff must allege performance of its obligations under the alleged contract or a legal excuse for nonperformance.  The Complaint does neither.

For these reasons, and those below, the Complaint should be dismissed.

## FACTUAL ALLEGATIONS

Plaintiff, Paul Edalat, is a resident of California and the former Chief Executive Officer of a since-dissolved company called Liwa North America Inc. ("Liwa"). Compl. ¶¶ 12, 37, 38.  The NBA is an unincorporated association of basketball teams with its headquarters and principal place of business in New York.  *See id.* ¶ 39; Fleming Decl. ¶¶ 4–5.[3]

---

[3] "A foreign defendant that wishes to contest [personal] jurisdiction . . . must attach to the motion affidavits in support of this position."  *Glovegold Shipping, Ltd. v. Sveriges*

The Complaint alleges that Plaintiff entered into a "commission-based compensation" agreement with the NBA in May 2014, pursuant to which he would provide "services in securing sponsorship deals with Emirates" and his company, Liwa, would receive "ten percent (10%) of the value of any sponsorship agreement and any future partnership between the NBA and Emirates." *See* Compl. ¶¶ 12, 45. The Complaint includes no additional information about the formation or terms of the alleged contract, including who allegedly agreed to it on behalf of the NBA.

Instead, the Complaint alleges only that in 2014, Plaintiff communicated with an NBA employee, Kiki VanDeWeghe, about helping the NBA obtain a sponsorship deal with Emirates. *See id.* ¶ 6. The Complaint further asserts that Plaintiff had conversations with Emirates' representatives to facilitate an introduction to the NBA, but that VanDeWeghe ultimately advised him that Emirates was not interested in a deal at the time, and to "temporarily back off from his activities." *Id.* ¶ 17. The following year, VanDeWeghe allegedly contacted Plaintiff and requested that he reach out to Emirates on the NBA's behalf. Plaintiff alleges that he met with other NBA employees in 2015 to continue discussing a possible sponsorship deal with Emirates. *See id.*

---

*Angfartygs Assurans Forening*, 791 So. 2d 4, 10 (Fla. 1st DCA 2000). Here, the NBA has attached the declaration of George Fleming ("Fleming Decl.").

¶¶ 23–25.   Again, no deal was reached.   Instead, the NBA renewed a ten-year agreement with Delta Airlines.  *See id.*  ¶¶ 26–27.

Approximately *nine years later*, the NBA and Emirates entered into a sponsorship deal.  Plaintiff claims he learned of the agreement in or around February 2024—after it was publicly announced.  *See id.*  ¶ 28.  Plaintiff does not allege that he had any involvement in or even awareness of any discussions, negotiations, or contacts between the NBA and Emirates between 2015 and 2024.   Nevertheless, Plaintiff now alleges that he is entitled to ten percent of the value of the 2024 sponsorship deal under the "commission-based compensation" arrangement that he alleges, without specifics, the NBA supposedly agreed to almost a decade prior in 2014.

## ARGUMENT

## I.   THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION OVER THE NBA

Courts can exercise general jurisdiction over out-of-state defendants only in "exceptional" cases when the defendant's activities render it essentially "at home" in the forum state.  *Daimler*, 571 U.S. at 139 n.19.  Plaintiff cannot meet this high standard.

### A.    Personal Jurisdiction Standard

To show that a defendant is subject to personal jurisdiction in Florida, plaintiff bears the initial burden of alleging that the defendant's conduct falls within the scope of Florida's long-arm statute and that the defendant has sufficient "minimum contacts"

with Florida to satisfy constitutional due process.  *See Robinson Helicopter Co. v. Gangapersaud*, 346 So. 3d 134, 139 (Fla. 2d DCA 2022); Fla. Stat. § 48.193.   If the plaintiff satisfies this threshold pleading requirement, a defendant may refute the jurisdictional allegations "by filing a legally sufficient affidavit or other sworn proof to the contrary."  *See Robinson Helicopter Co*., 346 So. 3d at 139 (cleaned up).  The burden then shifts back to the plaintiff to "prove by affidavit or other sworn proof that there is a basis for long-arm jurisdiction."  *See id.* (cleaned up).

Florida's long-arm statute provides for either "general" or "specific" jurisdiction.  *See Banco de los Trabajadores v. Cortez Moreno*, 237 So. 3d 1127, 1132 (Fla. 3d DCA 2018).  Here, the Complaint alleges only general jurisdiction over the NBA.  *See* Compl. ¶ 40 (citing Fla. Stat. § 48.193(2)).[4]  A defendant is subject to general jurisdiction under Florida's long arm statute when it engages in "substantial and not isolated activity" within the state.  Fla. Stat. § 48.193(2).  And the Supreme Court has made clear that beyond a business's place of incorporation or principal place of business, courts can exercise general jurisdiction over an out-of-state corporate

---

[4] Because the Complaint does not allege specific jurisdiction, the NBA has no burden to contest it.  *See, e.g*, *Crownover v. Masda Corp.*, 983 So. 2d 709, 713 (Fla. 2d DCA 2008) (holding that defendant was not required to present evidence to contest the jurisdictional basis plaintiff did not allege); *Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1204 (11th Cir. 2015) (stating that the court "need only consider" general jurisdiction where plaintiff did not allege specific jurisdiction).

defendant only in "exceptional case[s]." *Daimler*, 571 U.S. at 139 n.19.[5]   Such an

exceptional case exists only when "activities in the forum closely approximate the

activities that ordinarily characterize a corporation's place of incorporation or principal

place of business." *Carmouche*, 789 F.3d at 1204–05; *see also Ferrari S.p.A.*, 402 So.

3d at 298–99.   In other words, a defendant's operations would need to be so

"'continuous and systematic' as to render them essentially at home in the forum state."

*See Goodyear*, 564 U.S. at 919.   The key question is not the "magnitude of the

defendant's in-state contacts" but rather "an appraisal of a corporation's activities in

their entirety," highlighting that an entity that "operates in many places can scarcely

be deemed at home in all of them." *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 414 (2017)

(citation omitted); *see also Ferrari S.p.A*, 402 So. 3d at 299 ("[E]ven significant in-

forum business contacts do not [on their own] support an exercise of general

jurisdiction.").

That the NBA is an unincorporated association, rather than a corporation, does

not change the analysis.   Although the defendants in *Daimler* and *Goodyear* were

corporations, the Supreme Court's "reasoning was based on an analogy to general

---

[5] Because, as discussed below, the due process test imposes more stringent requirements than Florida's long-arm statute, Florida courts often conduct only the due process analysis to assess general jurisdiction. *See Ferrari S.p.A. v. Romanelli*, 402 So. 3d 294, 299 & n.1 (Fla. 4th DCA 2025) (conducting only due process analysis); *Teva Pharms. Indus. v. Ruiz*, 181 So.3d 513, 521 (Fla. 2d DCA 2015) (same); *see also Pinnacle Ins. & Fin. Servs., LLC v. Sehnoutka*, 2017 WL 3193641, at *2 (M.D. Fla. July 27, 2017) (same).   We do the same here.

jurisdiction over individuals, and there is no reason to invent a different test for general personal jurisdiction depending on whether the defendant is an individual, a corporation, *or another entity*." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 332 (2d Cir. 2016) (emphasis added).  For this reason, courts routinely apply the *Daimler* standard to unincorporated associations.[6]

### B.    The NBA Is Not Subject to Personal Jurisdiction in Florida

The only allegation relating to Florida in the Complaint is the boilerplate claim that the NBA "engages in substantial and not isolated activity" in the state.  *See* Compl. ¶ 39.  This does not—and, as a factual matter, Plaintiff cannot—establish that the NBA's activities render it "at home" in Florida.

*First*, the Complaint alleges no facts demonstrating that the NBA's contacts with Florida are so "'continuous and systematic' as to render it essentially at home" in Florida.  *See Meraki Invs., Ltd. v. Unit 1805 Inc.*, 319 So. 3d 718, 721 (Fla. 3d DCA 2021) (quoting *Daimler*, 571 U.S. at 139).  This is not surprising, as the NBA's home is in New York, where it is headquartered.  *See* Fleming Decl. ¶¶ 4–5.

---

[6] *See also, e.g.*, *In re Nat'l Hockey League Players' Concussion Inj. Litig.*, 2019 WL 5088516, at *3 (D. Minn. Oct. 10, 2019) (applying *Daimler* to National Hockey League ("NHL"), an unincorporated association); *McCullough v. Royal Caribbean Cruises, Ltd.*, 268 F. Supp. 3d 1336, 1344 (S.D. Fla. 2017) (applying *Daimler* to a limited liability company and noting that "many courts have favored the application of the [*Daimler*] standard to non-corporate entities").

*Second*, the NBA's presence in Florida does not even approach the "exceptional case" where a nonresident entity's activities so "closely approximate the activities that ordinarily characterize [its] place of incorporation or principal place of business" to establish general jurisdiction.  *Carmouche*, 789 F.3d at 1204–05.  Florida courts have found such an "exceptional case" to exist where a for-profit medical school had a Chief Financial Officer who "ran the company from his Florida residence for eighteen years," conducted board meetings in that residence, registered the company to do business in Florida, and deposited tuition payments in a Florida bank account, among other contacts.  *See Int'l Univ. of the Health Scis. Ltd., Inc. v. Abeles*, 299 So. 3d 405, 409 (Fla. 4th DCA 2020).  By contrast, Florida courts have repeatedly declined to exercise general jurisdiction over non-residents where *Daimler'*s high bar was not met.  *See, e.g.*, *Fincantieri-Cantieri Navali Italiani S.p.A. v. Yuzwa*, 241 So. 3d 938, 943–44 (Fla. 3d DCA 2018) (no general jurisdiction where, despite receiving more than $25 billion in revenue from partnering with a Florida company, all "executive officers and directors reside [out-of-state]," and "the vast majority of . . . employees are based in the company's offices [out-of-state]"); *Ferrari S.p.A.*, 402 So. 3d at 294 (no general jurisdiction over Ferrari despite seven authorized dealerships in the state); *Carmouche*, 789 F.3d at 1204  (no general jurisdiction despite "a Florida bank account, two [] addresses . . . , purchasing insurance from Florida companies, filing a financing

10

statement . . . , joining a non-profit trade organization . . . , and consenting to the

jurisdiction of the Southern District of Florida . . . ”).[7]

*Daimler* compels the same result here: the NBA has offices in New York, New

Jersey, and numerous international markets, Fleming Decl. ¶¶ 7–8; its senior

executives work from its New York office, *id.* ¶ 6; it maintains its books and records

in New York and New Jersey, *id.* ¶ 7; and the overwhelming majority of its business

operations are based in New York, New Jersey, and internationally, *id.* ¶ 9.  In contrast,

the NBA has no offices in Florida and the vast majority of its U.S.-based employees

(more than 97%) are based outside of the state.  *See id.* ¶¶ 7, 10.  On these facts the

NBA, plainly, is not “at home” in Florida.

Nor is the NBA subject to general jurisdiction in Florida because two of its

member teams are based there.  Numerous courts have applied *Daimler* to reject claims

for general jurisdiction over unincorporated sports associations despite the presence of

member teams in a state.  *See Aldrich v. Nat'l Collegiate Athletic Ass'n*, 484 F. Supp.

3d 779, 793–94 (N.D. Cal. 2020), 484 F. Supp. 3d at 793–94 (unincorporated

association of college athletic programs not “at home” in California, despite presence

of 58 members); *Doe 1 v. Nat'l Collegiate Athletic Ass'n*, 2023 WL 105096, at *9

---

[7] Florida courts have held that “general jurisdiction over national corporations is in
fact quite limited.” *See, e.g.*, *Perlberger v. Citigroup Inc.*, 2021 U.S. Dist. LEXIS
147314, at *6 (S.D. Fla. May 5, 2021) (citing, *inter alia*, *Ford Motor Co. v. Mont.
Eighth Judicial Dist. Ct.*, 592 U.S. 351, 359 (2021)).

11

(N.D. Cal. Jan. 4, 2023) (same); *In re Nat'l Hockey League Players' Concussion Injury Litig.*, 2019 WL 5088516, at *4 (NHL not "at home" in Minnesota, despite presence of team); *Texans Soccer Club v. Major League Soccer Players Union*, 247 F. Supp. 3d 784, 789 (E.D. Tex. 2017) (unincorporated soccer players' union not "at home" in Texas, despite presence of two teams consisting of 59 players). And the one court to consider the argument as applied to the NBA has reached the same conclusion. *See Puckett v. NBA*, 22 Civ. 1236, ECF No. 10, at 16–17 (W.D. Tenn. July 31, 2023) (recommending a finding of no general jurisdiction over the NBA in part because "[f]inding that [the] NBA is subject to general personal jurisdiction in Tennessee because it maintains a team here would be tantamount to a finding that being 'at home [is] synonymous with 'doing business.'' The Supreme Court has rejected such outcomes." (cleaned up)).[8]

If the NBA were subject to general jurisdiction in Florida based on the activities of the Heat and Magic, it would mean that the NBA is "at home" in nearly half the country (twenty-one states plus Washington D.C.). *See* Fleming Decl. ¶ 11. This outcome would effectively read out the requirement that an entity's activities in a

---

[8] Even prior to *Daimler*, courts rejected general jurisdiction claims against unincorporated associations based on the activities of members in a particular forum. *See, e.g.*, *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 470–72 (1st Cir. 1990) (rejecting argument that the NHL could be subject to general jurisdiction "on the basis of a member's contacts within the state"); *Sullivan v. Tagliabue*, 785 F. Supp. 1076, 1079–81 (D.R.I. 1992) (rejecting claim that decisions of the member team could be imputed to the National Football League for jurisdictional purposes).

foreign state approximate those in its state of incorporation or its "principal place of business," *Carmouche*, 789 F.3d at 1204–05, and replace it with a standard that subjects an entity to jurisdiction in any state where it does business. That is not the law. *See BNSF*, 581 U.S. at 414 (finding that a defendant "that operates in many places can scarcely be deemed at home in all of them").

Because this is not the "exceptional" case that could warrant the exercise of general jurisdiction outside the NBA's principal place of business, the Complaint should be dismissed for lack of jurisdiction pursuant to Fla. R. Civ. P. 1.140(b)(2).

## II.    ALTERNATIVELY, THE COMPLAINT SHOULD BE DISMISSED UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*

Even if the Court were to find that it has personal jurisdiction over the NBA, the Court should dismiss the Complaint pursuant to the doctrine of *forum non conveniens*, which permits dismissal of cases with negligible ties to the forum and guards against forum shopping.

### A.    The Statutory Factors Warrant Dismissal

Fla. R. Civ. P. 1.061(a) provides that "[a]n action may be dismissed on the ground that a satisfactory remedy may be more conveniently sought in a jurisdiction other than Florida" when: (1) an adequate alternate forum exists which possesses jurisdiction over the whole case, including all of the parties; (2) relevant factors of private interest favor the alternate forum, weighing in the balance a strong presumption against disturbing plaintiffs' initial forum choice; (3) if the balance of private interests

is at or near equipoise, factors of public interest tip the balance in favor of trial in the alternate forum; and (4) plaintiffs can reinstate their suit in the alternate forum without undue inconvenience or prejudice.  Fla. R. Civ. P. 1.061(a).

All four factors weigh in favor of dismissal.  *First*, New York provides an adequate, alternative forum.  An alternative forum is "available when [it] can assert jurisdiction" over a case, *Cortez v. Palace Resorts, Inc.*, 123 So. 3d 1085, 1091–92 (Fla. 2013) (cleaned up), and it is adequate when it "provides for litigation of the subject matter of the dispute and potentially offers redress for plaintiffs' injuries." *King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1382 (11th Cir. 2009).  Here, New York recognizes breach of contract claims.  *Kindred Hosps. E., LLC v. Buffalo Bd. of Educ.*, 2018 WL 9810848, at *7 (W.D.N.Y. Oct. 2, 2018) (finding no conflict between New York and Florida law on oral breach-of-contract claims).[9]

*Second*, private interests weigh in favor of dismissal.  Private interest factors include the "availability of evidence, access to witnesses, . . . enforceability of a judgment, and practical trial issues."  *See Hakim-Daccach v. Knauf Insulation Gmbh*, 2020 Fla. Cir. LEXIS 17922, at *18 (Fla. 1st Cir. Ct. Sept. 28, 2020) (citation omitted). Here, at least three of the four current or former NBA employees identified in the

---

[9] Under Fla. R. Civ. P. 1.061(c), a defendant who moves to dismiss based on *forum non conveniens* "will be deemed to automatically stipulate that the action will be treated in the new forum as though it had been filed in that forum on the date it was filed in Florida, with service of process accepted as of that date." The NBA stipulates to such findings as to New York.

14

Complaint—Mark Tatum, Rachel Jacobson, and Emilio Collins—reside or work in New York and New Jersey. *See* Fleming Decl. ¶ 13. And Kiki VanDeWeghe, the other NBA employee mentioned, does not reside or work in Florida. *Id.* The other potential witnesses identified in the Complaint—Zaki Kada, Salem Ghanem Al-Marri, and Mr. Boutros Boutros—appear to be based overseas. *See* Compl. ¶¶ 7, 10, 13–14, Ex. D ¶ 1. And on the face of the Complaint, "no action in this case occurred in Florida," "no witnesses to the alleged [agreement] are connected to Florida," *Fasang-Brown v. Visit Us, Inc.*, 319 So. 3d 132, 134 (Fla. 3d DCA 2021), no party is based in Florida, and there is no reason to believe that relevant evidence is in Florida, as opposed to California (Plaintiff), New York (NBA), or Dubai (Emirates).

*Third*, the public interest also weighs in favor of dismissal.[10] The public interest is served when courts "validly protect their dockets from cases" brought in "their jurisdiction, but which lack significant connection to it." *See Kinney Sys. v. Cont'l Ins. Co.*, 674 So. 2d 86, 92 (Fla. 1996) (quoting *Pain v. United Techs. Corp.*, 637 F.3d 775,

---

[10] The "public interest factors should always be considered as part of the analysis, rather than only in select cases where the private interests are at or near equipoise." *See Cortez*, 123 So. 3d at 1093 (cleaned up).

791–92 (1980)).  This is such a case: it has no nexus to Florida that could warrant the resources of Florida's courts.[11]

    *Fourth*, Plaintiff can assert his claim in New York, and there is no reason to believe doing so there, as opposed to in Florida, would cause him undue inconvenience or prejudice.  The fact that Plaintiff's lawyer is based in Florida does not tip the scales. *See Cellularvision Tech. & Telecomms., L.P. v. Cellco P'ship*, 2006 WL 2871858, at *3 (S.D. Fla. Sept. 12, 2006) ("As for the convenience of counsel . . . the location of counsel is entitled to the least consideration.") (cleaned up).

    In sum, all four factors weigh in favor of dismissal.  *See, e.g.*, *B. Little & Co. v. Choi Wai Printing H.K.*, 364 So. 3d 1078, 1080 (Fla. 3d DCA 2023) (affirming dismissal where New York was an adequate forum, both parties were non-residents with minimal ties to Florida, and "the contract at issue . . . d[id] not contemplate any business occurring in Florida").

## B.    Plaintiff's Forum Shopping Also Supports Dismissal

    The *forum non conveniens* doctrine also "serves as a brake on the tendency of some plaintiffs to shop for the best jurisdiction in which to bring suit."  *Kinney*, 674

---

[11] Florida courts have an interest in adjudicating a claim in which a Florida-based plaintiff chooses Florida as the forum state, *see Allen Sys. Grp. v. Avon Prods., Inc.*, 2016 U.S. Dist. LEXIS 175721, at *19 (M.D. Fla. Dec. 20, 2016), or when an alleged breach of contract harms businesses or individuals with a principal place of business in Florida.  Neither of those conditions is present here.

So. at 87 (cleaned up).  Courts have held that "the more it appears that the . . . choice

of a forum was motivated by forum-shopping reasons the less deference the plaintiff's

choice commands and, consequently, the easier for the defendant to succeed on a *forum*

*non conveniens* motion by showing that convenience would be better served by

litigating in another court."  *Certain Underwriting Members of Lloyd's v. Prime*

*Holdings Ins. Servs., Inc.*, 306 So. 3d 1086, 1093 (Fla. 3d DCA 2020) (cleaned up).

That is precisely the case here: when asked by media why Plaintiff brought this

case in Orlando, Plaintiff's counsel responded:

> The NBA is ubiquitous. You could pick anywhere to file a case and
> the reason why we chose Orlando is that I think it's a value-based
> community where people get it. . . . I love Florida juries because I
> think they believe in accountability and they can hold somebody
> accountable. Of course, the NBA has a presence here, and you can
> easily find Magic gear with the Emirates airline logo all over it. It's
> a little bit of home-court advantage.

Ex. A.  In addition to misstating the law, it is precisely forum shopping of this type that

the *forum non conveniens* doctrine is designed to prevent.  *See Smith Barney, Inc. v.*

*Potter*, 725 So. 2d 1223, 1226 (Fla. 4th DCA 1999) (holding that "the utter lack of any

nexus between the three nonresident claimants and the Florida forum clearly requires

a dismissal of the claims . . . on forum non conveniens grounds," especially given "the

rankest forum shopping") (quoting *Kinney*, 674 So. 2d at 93)).

## III.   THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO
STATE A CLAIM

81450322;1

The Complaint should also be dismissed, pursuant to Fla. R. Civ. P. 1.140(b)(6), for the independent reason that it fails to state a claim. Specifically, the Complaint fails to allege the existence of a valid contract – which requires "offer and acceptance" and specification of the contract's essential terms – and that Plaintiff performed his (unspecified) obligations under the alleged contract. To survive a motion to dismiss, a complaint must adequately allege each requirement; the Complaint alleges none.

### A.    Motion to Dismiss Standard

To state a cause of action, a "complaint must allege sufficient ultimate facts to show that the pleader is entitled to relief." *Perry v. Cosgrove*, 464 So. 2d 664, 665 (Fla. 2d DCA 1985); Fla. R. Civ. P. 1.110(b). Although a court must accept a plaintiff's well-pleaded factual allegations as true for purposes of a motion to dismiss, it is not required to accept internally inconsistent factual claims, conclusory allegations, or legal conclusions. *See, e.g.*, *Mandel v. Pardi*, 2022 Fla. Cir. LEXIS 10057, at *2 (Fla. 8th Cir. Ct. June 8, 2022) (a complaint must "allege . . . facts as distinguished from legal conclusions") (cleaned up); *Barrett v. City of Margate*, 743 So. 2d 1160, 1163 (Fla. 4th DCA 1999) (similar).

### B.    Elements of a Breach of Contract Claim

Under Florida's choice-of-law rules, "the law of the state where the contract was executed governs the rights and liabilities of the parties to the contract." *Paquin*, 378 So. 3d at 690. At the outset, the Complaint does not allege facts that could permit the

court to make this threshold determination: there is no allegation of a written contract and no allegation of where the agreement was reached.  *See Hendricks v. Smartvideo Techs., Inc.*, 511 F. Supp. 2d 1219, 1226 (M.D. Fla. 2007) (oral contracts "are considered 'made' in the state in which the oral agreement was reached" (citation omitted)).[12]

Because Plaintiff has failed to allege sufficient facts to inform a choice of law analysis, we address both New York and Florida contract law, both of which require a breach of contract claim to allege a valid contract, plaintiff's performance, a material breach, and damages.  *See Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. 2d DCA 2006); *Canzona v. Atanasio*, 989 N.Y.S.2d 44, 47 (N.Y. App. Div. 2014).  In all events, the flaws in the Complaint are fundamental and the result the same regardless of what law applies: the Complaint fails to allege a valid contract or Plaintiff's performance, and should be dismissed.

### C.    The Complaint Does Not Allege a Valid Contract

---

[12] A complaint based on a written instrument must attach that instrument to the pleading. Fla. R. Civ. P. 1.130(a) (stating that "[a]ll . . .contracts . . . upon which action may be brought or defense made . . . shall be incorporated in or attached to the pleading."); *see also, e.g.*, *Nat'l Collegiate Student Loan Trust 2006-4 v. Meyer*, 265 So. 3d 715, 719 (Fla. 2d DCA 2019) ("A complaint based on a written instrument does not state a cause of action until the instrument or an adequate portion thereof, is attached to or incorporated in the complaint.") (cleaned up).  If, notwithstanding the Complaint, Plaintiff were to allege a written contract, the Complaint should be dismissed for the additional reason that it does not attach that contract.

81450322;1

To allege the existence of a valid contract—whether written or oral—a complaint must include allegations sufficient to show an offer, an acceptance, consideration, and sufficient specification of the essential terms. *See W.R. Townsend Contracting, Inc. v. Jensen Civ. Constr., Inc.*, 728 So. 2d 297, 301–02 (Fla. 1st DCA 1999) (An enforceable contract requires "an offer, an acceptance, consideration, and sufficient specification of terms so that the obligations involved can be ascertained") (citation omitted); *Specialized Indus. Servs. Corp. v. Allan*, 2010 N.Y. Misc. LEXIS 1845 (N.Y. Sup. Ct. Apr. 9, 2010) (To establish a contract under New York law, "a plaintiff must allege an offer, acceptance, consideration, mutual assent, and an intent to be bound. That meeting of the minds must include agreement on all essential terms") (internal citation omitted); *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004); *Bulger v. Tri-Town Agency, Inc.*, 543 N.Y.S.2d 217, 219 (N.Y. App. Div. 1989).

### 1.    The Complaint Does Not Allege Offer and Acceptance

The Complaint fails to plead a valid contract because it alleges neither an offer nor an acceptance. It is a well-established contract law principle that a contract requires an offer and acceptance, which together form the parties' "manifestation of assent" to be bound. 1 Williston on Contracts § 4:3 (4th ed.); *see also* Restatement (Second) of Contracts § 23 (1981). In the context of a written contract, "mutual assent can be shown where a contract is knowingly and intentionally signed by both parties—the signatures serving as a demonstration and confirmation of the parties' assent." *Eglin*

*Fed. Credit Union v. Baird*, 400 So. 3d 643, 646 (Fla. 1st DCA 2024). Where the contract is alleged to be oral, the plaintiff must still allege facts sufficient to demonstrate the parties' mutual assent. *Rowe v. First Green Bank*, 2014 Fla. Cir. LEXIS 14408, at *3 (Fla. 1st Cir. Ct. June 27, 2014).

Here, Plaintiff does not attach any contract to the Complaint (signed or otherwise) as would have been required if the alleged contract were in writing. Fla. R. Civ. P. 1.130(a). Assuming, then, that Plaintiff alleges an oral contract, he fails to allege any offer to or from the NBA or that either party accepted a purported offer in any form. Instead, Plaintiff merely states in conclusory fashion that he "and the NBA had negotiated a simple commission-based compensation," Compl. ¶ 12, and that he "contracted with" the NBA to provide services, *id.* ¶ 44. But this is simply a "legal conclusion couched as a factual allegation" that the parties entered into a contract, which "cannot support" a breach of contract claim. *Jovine v. Abbott Labs., Inc.*, 795 F. Supp. 2d 1331, 1341 (S.D. Fla. 2011); *Added Extras, Inc. v. Party City Corp.*, 749 N.Y.S.2d 647, 649 (N.Y. Sup. Ct. 2002) (dismissing breach of contract claim that failed to allege acceptance, and where documents referenced "[a]t best, . . . establish[ed] that there were discussions between the parties").

Tellingly, Plaintiff does not even allege *who* at the NBA purportedly entered into or formed the alleged agreement (or where or in what manner). *See Ruff v. Allianz Life Ins. Co.*, 2021 WL 1053166, at *2 (M.D. Fla. Mar. 8, 2021) (dismissing breach of

contract claim for "fail[ure] to allege when or how an implied agreement was offered or accepted"); *Mohammed v. Juno Inc.*, 2019 N.Y.L.J. LEXIS 912, at *21 (N.Y. Sup. Ct. Jan. 22, 2019) (dismissing complaint that did not "refer to any specific written agreement nor allege when, where, how, and with whom any purported oral agreement was entered").

The Complaint's reliance on a May 1, 2014 letter from Kiki VanDeWeghe (NBA) to Timothy Clark (President of Emirates) only underscores its failure to plead the existence of a valid contract between Plaintiff and the NBA. That letter (which stated that "Liwa and CEO Paul Edalat has provided this introduction and will continue to assist in seeing the process through," *see* Compl., Ex. A) is not a contract, was not even written to Plaintiff, and fails to establish the offer and acceptance of a contract between Plaintiff and the NBA (or, as discussed below, the terms of agreement).

## 2.  The Complaint Does Not Allege Essential Terms

The Complaint fails to plead a valid contract for the independent reason that it does not specify the alleged contract's essential terms. It is black-letter law in both New York and Florida that a breach of contract claim requires specification of a contract's essential terms. *See, e.g.*, *Sud v. Sud,* 621 N.Y.S.2d 37, 38 (N.Y. App. Div. 1995) (affirming dismissal under New York law for "failure to allege, in nonconclusory language, as required, the essential terms of the parties' purported contract"); *W.R. Townsend Contracting, Inc.*, 728 So. 2d at 301–02 (under Florida law, a plaintiff must

allege facts that "demonstrate that the parties mutually assented to a certain and definite proposition and left no essential terms open" (cleaned up)).  An essential term "is '[a] contractual provision dealing with a significant issue such as subject matter, price, payment, quantity, quality, duration, or the work to be done.'" *Omni Healthcare Inc. v. Health First, Inc.*, 2017 WL 3658837, at *1 (M.D. Fla. Aug. 24, 2017) (quoting *Material Term*, Black's Law Dictionary (9th ed. 2009)); *see also Jacksonville Port Auth. v. W.R. Johnson Enters.*, 624 So.2d 313, 315 (Fla. 1st DCA 1993) (finding that "scope of [] work" and "an agreed-upon price" constituted essential terms).

As described in the Complaint, the alleged contract does not even purport to include fundamental contractual elements.  The Complaint does not identify what services Plaintiff was to provide, or how, when, for how long, or where he had to provide them. *See Omni Healthcare Inc.*, 2017 WL 3658837, at *1 ("work to be done" is an essential term); *Radde v. BMS Intermediaries, Inc.*, 2019 WL 8892618, at *3 (S.D. Fla. Mar. 6, 2019) (dismissing breach of contract claim when there was no way to determine "what services [plaintiff] was obligated to provide").

Nor does the Complaint identify what kind of "future partnership" would be covered by the alleged contract; whether such a partnership had any subject matter or temporal limitations; or how any partnership would be valued. *See Kosoy v. Kieselstein-Cord*, 2002 WL 24313, at *3 (S.D.N.Y. Jan. 8, 2002) (dismissing a breach of contract claim in part because parties failed to allege "either a specific price" or "a

mechanism for its determination"); *Uphoff v. Wachovia Secs., LLC*, 2009 U.S. Dist.
LEXIS 116679, at *6 (S.D. Fla. Dec. 14, 2009) (same); *Lipshie v. Lipshie*, 2005 N.Y.
Misc. LEXIS 8477, at *5–6 (N.Y. Sup. Ct. 2005) (dismissing complaint that failed to
allege, *inter alia*, temporal limitations).

Notably, none of the documents cited in the Complaint from the time when the
contract was allegedly formed reference a contract or any of its terms.  In sum, the
Complaint fails to state a claim because it does not identify the alleged contract's
essential terms.

### D.    The Complaint Does Not Sufficiently Plead Performance

Finally, the Complaint fails to allege that Plaintiff performed his obligations
under the purported contract.  To state a breach of contract claim, a plaintiff must plead
his "performance pursuant to the contract." *See, e.g.*, *Canzona*, 989 N.Y.S.2d at 47;
*Donaldson v. Wells Fargo Home Mortg., Inc.*, 2016 Fla. Cir. LEXIS 38232, at *3 (Fla.
6th Cir. Ct. Dec. 21, 2016) (plaintiff must allege its own performance or a legal excuse
for its nonperformance) (cleaned up).

The Complaint fails to allege performance for three reasons. *First*, because the
Complaint does not specify what services Plaintiff was purportedly obligated to
provide or when (*see supra*), it cannot and does not allege whether Plaintiff actually
performed them.   *Second*, to the extent Plaintiff contends he was contractually
obligated to provide services in "securing" a sponsorship deal with Emirates, *see*

24

Compl. ¶ 44, the Complaint establishes that he did not do so.  On the contrary, the
Complaint alleges that Plaintiff made introductions or had meetings in 2014 and 2015
and that, both times, the NBA and Emirates did *not* enter into a deal.  Plaintiff
acknowledges that he did nothing at all for the next *nine years* with respect to a
sponsorship deal, and he became apprised of Emirates' partnership with the NBA only
after it had been publicly announced.  *Id.* ¶ 29.  Accordingly, Plaintiff does not allege
that his actions "secured" the 2024 NBA/Emirates sponsorship agreement.  *Third*,
while no contract could plausibly be inferred from the May 1, 2014 letter, the
Complaint confirms that Plaintiff did not perform the sole act described in that
communication: to "continue to assist *in seeing the process through*."  *See id.*, Ex. A
(emphasis added).  Thus, even if the Complaint alleged a contract to provide services
in "securing" a deal between the NBA and Emirates, it does not plausibly allege that
Plaintiff did so.  *See, e.g.*, *Chappo & Co. v. Ion Geophysical Corp.*, 921 N.Y.S.2d 227,
228 (N.Y. App. Div. 2011) (dismissing breach of contract claim where plaintiff failed
to allege performance); *Advanced Fluids Sols., LLC v. Nat'l Ass'n for Stock Car Auto
Racing, Inc.*, 2011 WL 3627413, at *3 (M.D. Fla. July 26, 2011) (same).

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint.

81450322;1

## B.C.P. 5.3 CERTIFICATION

The undersigned hereby certifies that, on May 15, 2025, as counsel for the NBA, I, E. Ginnette Childs, Esq., met and conferred by telephone with Plaintiff's counsel, Tucker Byrd, Esq., who indicated that Plaintiff will oppose the relief sought herein.

Dated: May 16, 2025

Respectfully submitted,

*/s/ E. Ginnette Childs*
E. Ginnette Childs
ginny.childs@akerman.com
AKERMAN LLP
420 South Orange Avenue, Suite 1200
Orlando, FL 32801
D: (407) 419-8592
T: (407) 423-4000

- and -

Sean Hecker*
shecker@heckerfink.com
David Gopstein*
dgopstein@heckerfink.com
Mahrah M. Taufique*
mtaufique@heckerfink.com
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Phone: (212) 763-0883

* *admitted pro hac vice*

*Attorneys for Defendant National Basketball Association*

26

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2025, a true and correct copy of this Motion was served via the Florida e-filing portal upon all counsel of record.

*/s/ E. Ginnette Childs*
E. Ginnette Childs

27

PAUL EDALAT,

     Plaintiff,

v.

NATIONAL BASKETBALL
ASSOCIATION,

     Defendant.

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND
FOR ORANGE COUNTY, FLORIDA

CASE NO.: 2025-CA-002038-O

## DECLARATION OF GEORGE FLEMING IN SUPPORT OF DEFENDANT NATIONAL BASKETBALL ASSOCIATION'S <u>MOTION TO DISMISS</u>

I, George Fleming, pursuant to Fla. Stat § 92.525(1)(c)(2), hereby declare and state as follows:

1. I am an Assistant General Counsel of the National Basketball Association ("NBA"). I have held that position since 2025. I am familiar with the NBA's corporate form and its business activities.

2. I am an adult competent to testify to the matters set forth in this Declaration and submitted in support of Defendant NBA's Motion to Dismiss for Lack of Personal Jurisdiction, Forum Non Conveniens, and Failure to State a Claim. Unless stated otherwise, the facts presented herein are from my own personal knowledge or from my review of business records kept in the ordinary course of business by my employer, the NBA.

3.  If called as a witness, I could and would testify competently with respect to the matters set forth in this Declaration.

4.  The NBA is a professional basketball league.  It is a joint venture organized as an unincorporated association consisting of 30 separately owned professional basketball teams across North America.  The NBA is headquartered at 645 Fifth Avenue, New York, New York.  It has maintained its headquarters in New York since its founding.

5.  The NBA's principal place of business is also 645 Fifth Avenue, New York, New York.  It has maintained its principal place of business in New York since its founding.

6.  The NBA has a Commissioner who presides over the league's operations.  The Commissioner works out of the NBA's headquarters in New York.

7.  In the United States, the NBA has offices, and maintains its books and records, in New York and New Jersey.

8.  Internationally, the NBA has offices in South Africa, Senegal, Kenya, Nigeria, Egypt, China, Hong Kong, Singapore, the Philippines, Canada, the United Kingdom, Spain, India, Brazil, and Mexico.

9.  The overwhelming majority of the NBA's business operations are based in New York, New Jersey, and internationally.

10. As of May 15, 2025, 2,070 people are employed in the United States by, collectively, the NBA and its affiliates. Fifty-two of those employees, or 2.5%, are located in Florida.

11. The NBA currently has thirty member teams located in twenty-one states, the District of Columbia, and Canada.

12. Two of the NBA's teams, the Orlando Magic and Miami Heat, are located in Florida.

13. Mark Tatum, Kiki VanDeWeghe, Rachel Jacobson, and Emilio Collins are current or former NBA employees. Mr. Tatum, Ms. Jacobson, and Mr. Collins all currently reside or work in New York and New Jersey. Mr. VanDeWeghe does not reside or work in Florida.

Pursuant to Fla. Stat. § 92.525, under penalties of perjury, I declare that I have read the foregoing and that the facts stated in it are true to the best of my knowledge and belief.

Executed this 16 day of May, 2025

Signed by:

*George Fleming*
733D60C232E64D7...

George Fleming
Assistant General Counsel

3

# EXHIBIT A

**FOR THE EXCLUSIVE USE OF** CCROWLEY@NBA.COM

From the Orlando Business Journal:
https://www.bizjournals.com/orlando/news/2025/04/14/tucker-byrd-nba-
emirates-paul-edalat-california.html

SUBSCRIBER CONTENT:

**Sports Business**

# Why Orlando attorney Tucker Byrd is taking on the NBA



Tucker Byrd of Winter Park-based Byrd Campbell P.A. represents Paul Edalat in his case against the NBA.
SARAH KINBAR/OBJ


By Sarah Kinbar – Staff writer, Orlando Business Journal
Apr 14, 2025

▶  Listen to this article    5 min                                    ⫰⫿⫰⫿

---

**Story Highlights**

- Paul Edalat sues NBA for alleged breach of contract over Emirates sponsorship.
- Orlando attorney Tucker Byrd represents the plaintiff and the lawsuit was strategically filed in Orange County.
- Edalat claims 10% commission for facilitating NBA-Emirates partnership in 2014.

---

California businessman Paul Edalat has filed a lawsuit in Orlando against the National Basketball Association (NBA), alleging breach of contract related to a sponsorship deal the professional sports league secured with airline Emirates.

According to the complaint filed March 10 in the Ninth Judicial Circuit Court's Business Court Division, Edalat claims he was instrumental in introducing the NBA to Emirates in 2014. Edalat, a U.S. businessman of Iranian descent with ties in the Middle East, was allegedly enlisted by then-NBA Senior Vice President of Basketball Operations Ernest "KiKi" VanDeWeghe to help negotiate a sponsorship deal with the Dubai-based airline.

The lawsuit alleges Edalat, through his contacts, facilitated initial discussions between the NBA and Emirates, including an in-person meeting in Dubai between Edalat and Boutros Boutros, Emirates' Divisional Senior Vice President for Corporate Communications - Marketing & Brand, in May 2014.



Image: Emirates Airlines

Dubai-based Emirates has a 10-year marketing partnership with the NBA.

EMIRATES AIRLINES

The complaint details a simple commission-based compensation agreement allegedly reached between Edalat and the NBA, where Edalat and his company, Liwa North America Inc., would be paid 10% of the value of any sponsorship agreement and future partnership between the NBA and Emirates.

According to the complaint, the value of the sponsorship between the NBA and Emirates, and the ancillary financial arrangements between the two, could reach a substantial amount – easily in the tens of millions, and possibly hundreds of millions of dollars.

While discussions reportedly cooled off and the NBA renewed its sponsorship deal with Delta Airlines in 2015, the lawsuit contends the relationship Edalat initiated laid the groundwork for the multiyear global marketing partnership later announced between the NBA and Emirates on Feb. 8, 2024.

This deal named Emirates the "Official Global Airline Partner of the NBA."

After learning of the 2024 deal, Edalat allegedly contacted the NBA to confirm his compensation.

Meanwhile, the NBA, through its Assistant General Counsel Dan Spillane, allegedly disavowed any knowledge of an agreement with Edalat. This response prompted Edalat to file suit, seeking confirmation of his commission and damages exceeding $500,000.

Tucker Byrd of Winter Park-based Byrd Campbell P.A. represents Paul Edalat in this complex business litigation. Byrd, known for taking on high-stakes commercial litigation, recently discussed the case and his client's decision to file suit in Florida.

*Orlando Business Journal* sat down with Tucker Byrd to ask why he took the case – and why it's been filed in Orlando, even though the client is based in California, NBA headquarters are in New York and the deal in question involves a company based in Dubai.

## Why file this litigation in Orlando?

The NBA is ubiquitous. You could pick anywhere to file a case and the reason why we chose Orlando is that I think it's a value-based community where people get it. It's a conservative community. Some people misunderstand conservatism, but conservatism means accountability – it doesn't mean that you don't believe in recompense or reckoning in court.

I love Florida juries because I think they believe in accountability and they can hold somebody accountable.

Of course, the NBA has a presence here, and you can easily find Magic gear with the Emirates airline logo all over it. It's a little bit of home-court advantage.

## What was your client's motivation for pursuing this legal action against an entity as formidable as the NBA?

KiKi VanDeWeghe contacted Paul to tell him the deal had finally happened, and he said, "You need to look into this."

We tried to get the NBA to engage. In fact, the first letter that I sent to them was a congratulatory email. It wasn't like, "Where's my money?"

When the response was, "Who are you? We have no idea who you are. Don't bug us," it's like, wait a minute. Please don't tell me you're going to act like we don't exist.

We went back multiple times with the letter from Kiki VanDeWeghe, the emails, the declaration, the proof. To dismiss us as if we had just made this up, that was unacceptable. And we made multiple overtures to try to get them to talk to us. You don't just cavalierly file a lawsuit against anybody, particularly the NBA. When they just wouldn't even stop talking to us as if maybe they'll just go away. It's like, no, we don't just go away. We just want what's agreed upon. It's like it's simple.

## The events at the heart of this lawsuit date back about a decade. How do you address the potential argument that the connection between your client's initial involvement and the eventual deal might have weakened over time?

The causal link, what we call the procuring cause, did not somehow dissipate over time. It was the same people doing the same deal.

## Do you think this case will settle or go to trial?

I hope it goes to trial.

Case 6:26-cv-00521-JA-LHP    Document 1-1    Filed 03/06/26    Page 130 of 270 PageID
139

## In Brief

*Paul Edalat vs. National Basketball Association*

- **Case no.:** 2025-CA-002038-O
- **Court:** In the Circuit Court of the Ninth Judicial Circuit, In and For Orange County, Florida, Business Court Division
- **Judge:** Chad Alvaro
- **Plaintiff's attorney:** Tucker Byrd and Jeffrey Donner of Byrd Campbell P.A.
- **Defendant's attorney:** Ginnette Childs and Kevin McGavock of Akerman LLP

---

Ginnette Childs of Akerman LLP could not be reached for comment prior to publication. Representatives with the NBA and Emirates could not be reached for comment.

---

*Sign up for the Business Journal's free morning and afternoon daily newsletters to receive the latest business news affecting Orlando. Download the free OBJ app for breaking news alerts on your phone.*

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND
FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,

     Plaintiff,

                       Case No: 2025-CA-002038-O

v.                        **Complex Business**
                        **Litigation Court**

NATIONAL BASKETBALL
ASSOCIATION,

     Defendant.

_____/

## **AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, PAUL EDALAT ("Edalat"), sues Defendant, NATIONAL

BASKETBALL ASSOCIATION ("NBA"), and alleges:

## **INTRODUCTION**

1.    Plaintiff, Edalat, brings this action for breach of contract against the

Defendant—identified herein as the "National Basketball Association"—but which

Edalat reasonably believes to be the trade name for a corporate entity known as NBA

Properties Inc., through which the National Basketball Association league conducts

commercial activities.  Until now, the true identity of the party through which Edalat

contracted has been shieled from the public.  Edalat seeks millions of dollars in

damage for the NBA's failure to pay the commission due to him for having

facilitated and procured a sponsorship agreement between the NBA and Emirates
Airlines.

## PARTIES, JURISDICITON, AND VENUE

2.      Plaintiff. Edalat, resides in California.

3.      Edalat alleges upon information and belief that the formal, legal name
of the Defendant, NBA, with whom Edalat contracted, is NBA Properties, Inc. a
New York corporation.

4.      The Court has personal jurisdiction over the NBA under Section
48.193(2), Florida Statutes because the NBA engages in substantial and not isolated
activity within this state.

5.      Venue lies in Orange County, Florida, under Section 47.051, Florida
Statutes.

## GENERAL ALLEGATIONS

6.      NBA Properties, Inc. controls the merchandising, marketing, and
licensing activities for the professional basketball league generally operating under
the name, "National Basketball Association" or "NBA."[1]    Edalat alleges upon

---

[1] What the public knows as the "National Basketball Association," or "NBA," generally refers to
an unincorporated association comprised of thirty (30) separately owned basketball teams. The
"NBA" utilizes a series of affiliate entities, including NBA Properties, Inc., to conduct business
activities. Further references in the Amended Complaint to "NBA," shall refer to NBA Properties,
Inc. unless and until the Defendant entity appearing herein reveals having a different formal name.

information and belief that these activities occur within the state of Florida on a substantial ongoing basis.

7.     The NBA had long pursued establishing relationships with corporate partners worldwide to expand the NBA's global presence. Dubai, the largest city in the United Arab Emirates and an affluent market with a major corporate presence, offered an attractive market in general, having developed into a Middle East and North Africa ("MENA") gateway for sports and entertainment with a keen interest in basketball given its increasing popularity in the region. It also served as the home for Emirates Airline, which had a prominent global brand, already with active sponsorships in sports like soccer, cricket, and golf.

8.     To the NBA, entering a sponsorship deal with Emirates Airline would have been a major step in furthering the NBA's global brand, especially MENA. One problem, however, existed. Despite efforts to secure any partnership with Emirates Airline as early as 2013, the NBA was unable to secure a deal, in part because of the cultural differences between the USA-centric NBA business practices and the traditional value-based culture of Emirates Airlines, and the NBA's limited experience dealing with the decision-makers at Emirates Airline.

9.     The government of Dubai, through its investment corporation, The Emirates Group, owns Emirates Airline. Ultimately, the ruling family of Dubai controls Emirates Airline through CEO Sheikh Ahmed bin Saeed Al Maktoum. As

is typical with MENA-region business dealings, relationships with the decision-makers are paramount to entering any agreements.

10.     This impasse to establishing a partnership deal between the NBA and Emirates Airline led KiKi VanDeWeghe ("VanDeWeghe"), then Senior Vice President of Basketball Operations for the NBA, himself a long-time NBA player and all-star, to reach out and make a simple ask of his longtime friend, Plaintiff, Paul Edalat, a United States businessman of Iranian descent with deep ties to the region, including relationships with its business and government leaders. VanDeWeghe asked if Edalat could help the NBA negotiate a sponsorship deal with Emirates Airline.  At the time, VanDeWeghe did not identify through which "NBA" legal entity the contract with Edalat was being entered.  Edalat has since learned, and alleges upon information and belief, that the business activities of the NBA league are conducted, and the contract was entered herein, through a legal entity known as NBA Properties Inc.

11.     The NBA's partnership with its prior airline partner, Delta Airlines, was about to expire, so there was some time urgency to the matter.

12.     On or about March 28, 2014, Edalat received an email from VanDeWeghe asking Edalat to *"[relay the NBA's] interest"* about the possibility of

a    partnership    with    Emirates    Airline.    The    complete    text    reads:

**VanDeWeghe, Kiki** <KVanDeWeghe@nba.com>                                    Fri, Mar 28, 2014 at 11:27 AM
To: ": Paul Edalat" <paul@scilabs.net>

Paul

Thank you for getting back to me regarding Emirates interest in a possible partnership with the NBA.

I want to confirm our interest in having discussions with Emirates Airline about partnership opportunities within the NBA. The airline
sponsorship category is currently open and everyone here is excited about the possibility of a partnership with Emirates. The Deputy
Commissioner of the NBA, Mark Tatum, who was past head of Global Marketing Partnerships for the NBA, believes that Emirates
would be a perfect partner. Given the NBA's strong recognition within the United States, our internationally recognizable superstars
and branding potential worldwide, brought together with Emirates powerful worldwide presence and current push into United States
marketplace, the timing could not be better. We would like you to relay our interest to Timothy Clark, President of Emirates, and see
what is the best way for us to proceed.

Thank you again

Kiki Vandeweghe

13.    Edalat agreed to help the NBA and contracted with the NBA to
facilitate and procure a sponsorship agreement with Emirates Airline. To that end,
Edalat engaged Mr. Zaki Kada ("Kada"), his longtime friend and colleague from the
MENA-region to reach out to Emirates Airline, and Kada contacted Mr. Salem
Ghanem Al-Marri ("Al-Marri"), the head of Planning, Aeropolitical, and Industry
Affairs for Emirates Airline—a former colleague of Kada's—to inquire about
approaching Mr. Boutros Boutros ("Boutros"),  the Divisional Senior Vice
President, Corporate Communications, Marketing & Brand for Emirates Airline, to
share the NBA's interest in a sponsorship or partnership deal with Emirates Airline,
with an emphasis on large scale MENA expansion.

14.    Kada also forwarded VanDeWeghe's March 28, 2014, email to Al-
Marri, to which Al-Marri responded by requesting an "official" letter from the NBA

for the purposes of beginning partnership discussions and to confirm Edalat's prominent role in them. Kada sent this response to Edalat, who forwarded it back to VanDeWeghe. The wheels had been set in motion and momentum was building to pursue a sponsorship agreement between the NBA and Emirates Airline with Edalat the tip of that negotiation spear.

15.    Kada and Edalat had several telephone conversations in the first few weeks of April 2014 preparing for an in-person meeting with Boutros, who Kada had already introduced to Edalat years earlier.

16.    Kada, through his contact Al-Marri, introduced Edalat to Boutros in 2014 while Edalat was on a business trip to Dubai. Edalat met in person with Boutros the week of May 11, 2014, during the May 2014 Travel Show.

## THE NBA ENGAGED PLAINTIFF

17.    On May 1, 2014, critical to this meeting's occurring, VanDeWeghe issued the letter (*see* **Exhibit "A"**) on behalf of the NBA confirming:

a. The NBA was *"excited about the possibility of a potential partnership with Emirates Airline"*;

b. The NBA's *"focus is for Emirates to become the exclusive airline sponsor and partner of the NBA";* and

c. That *"Liwa North America and CEO Paul Edalat has provided this introduction and will continue to assist in seeing the process through."*

18.    Based upon the representations of the NBA, Edalat accepted the engagement and undertook efforts to pursue and procure the sponsorship agreement with Emirates Airlines.

19.    Edalat and the NBA had negotiated a simple commission-based compensation.  Edalat and his company, Liwa North America, Inc. ("Liwa"), would be paid ten percent (10%) of the value of any sponsorship agreement and any future partnership between the NBA and Emirates Airline.  Since then, Liwa has been dissolved, and Edalat has succeeded to the rights and interests of Liwa.

### PLAINTIFF PURSUES THE SPONSORSHIP FOR THE NBA.

20.    Kada had planned for Edalat to meet Boutros in May 2014 at Travel Show in Dubai.

21.    Edalat travelled to Dubai in early May 2014 and met with Boutros and Kada during the week of May 11, 2014.  A close mutual friend of Kada and Boutros assisted in arranging a last-minute meeting with Boutros given his busy schedule. At this meeting Edalat handed Boutros the original "wet signed" letter from VanDeWeghe, and Boutros responded favorably requesting time to communicate with other senior level executives at Emirates Airline about this opportunity.

22.    Edalat returned to the United States in late May of 2014, and continued to apprise Kada of conversations with the NBA about an Emirates Airline deal.

23.     Boutros later indicated to Kada that he was asked by his superiors to explore a good commercial deal with the NBA.  Kada related this information to Edalat, who conveyed it to VanDeWeghe, who eventually handed off the project to Mark Tatum, the NBA's Deputy Commissioner and Chief Operating Officer.

24.     The discussions between the NBA and Emirates Airline, however, cooled off in 2014.  VanDeWeghe advised Edalat that the NBA was renegotiating the Delta Airlines deal, and that Emirates Airline was not overly eager about a sponsorship with the NBA. VanDeWeghe advised Edalat to temporarily back off from his activities while the NBA regrouped on its plans for an Emirates Airlines deal.

25.     The Delta Airlines deal, announced in 2015, was a continuation of a 2004 sponsorship deal between Delta Airlines and the NBA.

## PLAINTIFF RE-ENGAGED BY THE NBA

26.     This all changed in early 2015, when VanDeWeghe, on behalf of the NBA, asked Edalat to re-engage with Emirates Airline. The NBA's request led to renewed discussions. On July 9, 2015, Edalat advised VanDeWeghe that Emirates Airline had *"come back to the table and are interested in a potential sponsorship as the NBA's airline partner."*  The complete email reads:

**From:** Paul Edalat [mailto:paul@liwana.com]
**Sent:** Thursday, July 09, 2015 3:27 PM
**To:** VandeWeghe, Kiki
**Subject:** Emirates Airline
**Importance:** High

Dear Kiki

I hope that you are well and everything is going great at the NBA.

As you are aware, I have contacts high up in emirates airlines with their CEO Mr. Timothy Clark and was close to putting a deal together last year regarding Emirates and the NBA on a sponsorship. Unfortunately, it fell apart last year due to unforeseen events that occurred back in June and their additional interest in the Clippers.

Now they (Emirates) has come back to the table and are interested in a potential sponsorship as the NBA's airline partner. Nothing has really changed in perspective with the deal that was offered to them last year from your organization. I have attached your letter of last year's offer for your review.

I have been intouch with their global marketing chief Mr. Boutros. From what I understand, he is authorized to sign off on any approved sponsorship up to $6million and can get it done pretty quickly. If over and above that amount, then he will have to have the board's approval. They are looking to expand their brand in the US and have been approached by many organizations in sports and marquee teams.

I think that we can get this done pretty quick if the terms are still available and we don't need the board's approval on behalf of Emirates. Obviously this information that I am sharing with you is highly confidential and meant for the purpose of this deal and assisting in moving things along quickly. As you are one of my dearest friends and have the trust in you I have had a long term professional relationship with the royal families of Dubai and Abu Dhabi who control these companies. We can always have a call or meeting in person to further strategize a deal with Emirates.

I will put you in direct touch with Mr. Boutros once you have approval on this deal and its availability. As Emirates plans to be a larger player in the US airline industry, I find it a great opportunity to take advantage of my contacts and trust with them to put a lucrative deal together for both sides.

I look forward to your response and hope to see you in Vegas next week.

Thanks my friend,

**Paul P. Edalat**

**Vice Chairman/CEO**

**LIWA, North America Division**

United States | www.LiwaNA.com

**Group LIWA, UAE Division**

Abu Dhabi, UAE | www.groupliwa.com

27.    Edalat's email led VanDeWeghe to introduce Edalat to Mark Tatum.

The complete email reads:

**From:** VanDeWeghe, Kiki
**Sent:** Thursday, July 09, 2015 04:16 PM
**To:** Paul Edalat <paul@liwana.com>; Tatum, Mark
**Subject:** RE: Emirates Airline

Thank you Paul. I am looping in Mark Tatum, our Deputy Commissioner, to carry the ball from our side. As I stated in my previous letter, Mark is the right person to get this done. This email will serve as an introduction for you and Mark.

I will be available throughout to help in any way I am needed.

Best – Kiki

**Kiki VanDeWeghe**

Senior Vice President - Basketball Operations

Phone: +1 2124078390

Mobile: +1 9177492872

28.    Tatum acknowledged Edalat and the NBA's renewed interest in this opportunity with Emirates Airline, stating, *"We [The NBA] are still very interested in having a discussion with Emirates about a partnership"* The complete email reads:

On Jul 9, 2015, at 4:57 PM, Tatum, Mark <mtatum@nba.com> wrote:

Paul,

It is a pleasure to meet you via email. We are still very interested in having a discussion with Emirates about a partnership. Let's set up a call or meeting to discuss. Please let me know when you might be available. Thanks.

Best,

Mark

29.     The NBA negotiating team did not have the access needed to reach the
decision-makers at Emirates Airline. Edalat, however, did.

30.     Putting his contacts to work again, over the ensuing weeks, Edalat and
Tatum attempted to coordinate an in-person or phone conference. Given his schedule
limitations, Tatum was not available, but he dispatched Emillio Collins and Rachel
Jacobson to meet Edalat on July 16, 2015, at the Wynn Terrace Point Café, in Las
Vegas, Nevada, to discuss this renewed opportunity with Emirates Airline. The
complete email showing the initial scheduling of this July 16, 2015, meeting reads:

---

**RE: Emirates Airline (Call with Mark Tatum / NBA)**

Santiago, Iveliz <ISantiago@nba.com>                                    Wed, Jul 15, 2015 at 7:38 AM
To: Paul Edalat <paul@liwana.com>
Cc: "Duperval, Arielle" <ADuperval@nba.com>

Dear Paul,

Thank you for your kind reply.

Unfortunately, Thursday (7/16) at 7:30am is the only time Mark is able to meet as he has meetings that morning and then is
immediately traveling back to NY.

I will send you a calendar notice for now to hold the time and if we need to cancel then we can.

Thursday, 7/16 @ 7:30am

Breakfast Meeting - LIWA, North America Division / NBA

Location: Wynn Las Vegas - Terrace Pointe Café

Walking Directions from Wynn Las Vegas Lobby:

To walk to Terrace Point Café you turn right when you exit the Tower Suites Lobby and walk towards the B Bar, at the B Bar you
make a right and walk down the hallway, Terrace Point Café will be down the hallway on the right hand side past La Cave.

Thank you and I look forward to hearing from you.

Best regards,

[Quoted text hidden]

---

31.     In his email, Tatum admitted that the NBA had been having discussions

with Emirates Airline and was "equipped" to have a discussion about a potential

partnership. Tatum advised that his team would explain the history of these

discussions with Edalat during their meeting.  The complete email reads:

On Jul 15, 2015, at 9:46 PM, Tatum, Mark <mtatum@nba.com> wrote:

Paul,

Unfortunately, I won't be able to meet tomorrow morning, however, Emilio Collins and Rachel
Jacobson can meet with you at the same time and place (7:30am at the Wynn Terrace Point Cafe). I've
copied them on this email.

Emilio is the head of our Global Marketing Partnerships Department and Rachel runs our Global
Business Development group. They have actually been in discussions with Emirates and are equipped
to have the conversation with you around a potential partnership with Emirates going forward. Very
sorry for the schedule change but hope that you can still get together with them to discuss.

Best,

Mark

32.     Edalat met with Emillio Collins and Rachel Jacobson on July 16, 2015,

and committed to continuing discussions about a possible Emirates Airline deal.

Collins admitted that the NBA's discussions with Emirates Airline team members at

that time were not with decisionmakers, who the NBA had been unable to reach. An

email from Ms. Jacobson acknowledges this productive meeting:

**RE: Emirates Airline**

Jacobson, Rachel <rjacobson@nba.com>                                                    Thu, Jul 16, 2015 at 2:46 PM
To: "paul@liwana.com" <paul@liwana.com>
Cc: "Tatum, Mark" <mtatum@nba.com>, "Santiago, Iveliz" <ISantiago@nba.com>, "Collins, Emilio" <ecollins@nba.com>

Paul,

It was very nice to meet you at Breakfast this morning. Let us have some internal discussions on this end and figure out the best
next steps based on our discussion. We are all flying back today, so give us a few days and we will be in touch next week.

Have a great time with your friends that are coming to town this weekend. Talk soon.

Best,
Rachel

## THE NBA RENEWS SPONSORSHIP WITH DELTA AIRLINES

33.     By the end of summer 2015, however, Rachel Jacobson advised Edalat on a phone call that the NBA would be continuing the Delta Airline sponsorship because the NBA could not find common ground with Emirates Airline.

34.     Plaintiff reasonably believes, and alleges upon information and belief, that the NBA and Delta Airlines then re-entered a ten-year agreement.

35.     The NBA never terminated the contract with Edalat, as the prospect for future negotiations remained open given the NBA's fervent desire to establish a relationship with Emirates Airline.  Rather, the NBA paused Edalat's efforts.

## THE NBA EMERGES WITH A DEAL WITH EMIRATES AIRLINE

36.     The prospect of a sponsorship deal between the NBA and Emirates Airlines lay fallow for the following years, until February 8, 2024, when the NBA announced a multiyear global marketing partnership naming Emirates Airline the "Official Global Airline Partner of the NBA." This included such luminary features as the "NBA In-Season Tournament," and extensive co-branding.  The deal was announced by none other than Mark Tatum, who had been central to the earlier initiative that had been started by Edalat, with the enthusiastic support of Emirates Airline's CEO, Sheikh Ahmed bin Saeed Al Maktoum, who said, *"The NBA is a valuable addition to our sponsorship portfolio as it allows us to connect with a vast*

*global fanbase, including in the U.S., where the game is an integral part of the country's sport culture."*[2]

37.    Edalat became apprised of the deal when VanDeWeghe, now retired as an NBA executive, contacted him and advised him to "look into" the sponsorship transaction, a strong nod that Edalat been cut out of the deal.

38.    Despite the years which had elapsed since Edalat, and his cohort, introduced and facilitated discussions between the NBA and Emirates Airline, the NBA and Emirates Airline picked up their discussions right where they had been left off years earlier—before the Delta Airlines renewal—between the same persons, negotiating the same deal, proving the negotiations had been paused, not irreversibly terminated.  What Edalat had set in motion years earlier had now come into fruition.

39.    The value of the sponsorship between the NBA and Emirates, and the ancillary financial arrangements between the two, could reach a staggering amount, easily in the tens of millions, and possibly hundreds of millions of dollars.

## PLAINTIFF SEEKS CONFIRMATION OF HIS COMMISSION

40.    Not being apprised that the NBA had recommenced and eventually consummated a sponsorship deal with Emirates Airline had been disconcerting to Edalat, but those concerns became even more alarming when Edalat, through

---

[2] *See*, APNews.Com, February 8, 2024.

counsel, contacted the NBA to confirm Edalat's compensation for having facilitated the sponsorship.

41.    Edalat sent a letter to the NBA on April 29, 2024, to confirm his recognition and compensation for the sponsorship.  *See* **Exhibit "B"** attached hereto.

42.    The NBA responded with a letter ("Spillane Letter") from its Assistant General Counsel, Dan Spillane, essentially disavowing any knowledge of Edalat and any involvement with Boutros. Incredibly, Spillane claimed, "*We have no record and are not aware of any agreement between the NBA and Edalat,*" this despite the irrefutable existence of the letter from VanDeWeghe dated May 1, 2014, creating the agreement.  Edalat attaches hereto a true and correct copy of the Spillane Letter as **Exhibit "C."**

43.    Since then, Edalat has secured the sworn statement from Zaki Kada ("Kada Declaration), confirming the truth that Edalat had indeed established the initial high-level relationship between the NBA and Emirates Airline that ultimately led to the sponsorship deal.  Edalat attaches hereto a true and correct copy of the Kada Declaration as **Exhibit "D."**

## COUNT I
## (BREACH OF CONTRACT)

44.    Plaintiff sues Defendant for damages which exceed $500,000.00 for breach of contract.

45.    Plaintiff incorporates the allegations stated in paragraphs 1 through 43.

46.    On or about May 1, 2014, Defendants contracted with Plaintiff to provide services in securing sponsorship deals with Emirates Airlines.

47.    For this service, Defendant had agreed to pay Plaintiff a fee equal to ten percent (10% ) of the value of any sponsorship deals reached.

48.    Plaintiff provided the essential introductions of Defendant to Emirates Airline which eventually led to their entering a sponsorship deal on or about February 2024, valued at tens of millions of dollars.

49.    Plaintiff also expended time and money working tirelessly on the project, traveling to the Middle East and within the United States to work on the project.

50.    But for Plaintiff's efforts, the sponsorship relationship between the Defendant and Emirates Airline would not have occurred, certainly not within the reasonably foreseeable future at that time.

51.    Despite having been the cause for procuring the Defendant's sponsorship deal, Defendant has failed and refused to pay the amounts lawfully due Plaintiffs.

52.    As a direct and proximate result of Defendant's breaches, Plaintiffs has suffered direct and consequential damages millions more than the jurisdictional threshold ($500,000.00) of this Court.

WHEREFORE, Plaintiff demands judgment against the Defendant for compensatory damages and court costs.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues so triable.

Date: June 5, 2025

s/ Tucker H. Byrd

**Tucker H. Byrd**
Florida Bar No. 381632
**Jeffrey T. Donner**
Florida Bar No. 0180122
**BYRD CAMPBELL, P.A.**
180 Park Avenue North, Suite 2A
Winter Park, Florida 32789
Telephone: (407) 392-2285
Facsimile: (407) 392-2286
Primary Email: TByrd@ByrdCampbell.com
Primary Email: SMcPherson@ByrdCampbell.com
Secondary Email: Paralegal@ByrdCampbell.com
*Attorneys for Plaintiff*

# EXHIBIT "A"



# National Basketball Association

May 1, 2014

Mr. Timothy Clark
President, Emirates Airline
C/O Paul P. Edalat
Vice Chairman/CEO
Liwa North America

Re: NBA Sponsorship

Dear Mr. Clark,

I would like to confirm our interest in having discussions with Emirates Airline about partnership opportunities within the National Basketball Association. Specifically, the NBA's airline sponsorship category is currently open and everyone here is excited about the possibility of a potential partnership with Emirates Airline.

The focus is for Emirates to become the exclusive airline sponsor and partner of the NBA. This will give Emirates the opportunity to expand their brand not only in the United States, but globally, with the assistance of the NBA, through its various marketing channels and programs. The relationship can expand in many ways; from having grassroots opportunities within the United States to having branding opportunities with possible exhibition games abroad.

The partnership opportunities and benefits associated with the NBA global brand are extensive and we would be happy to discuss any present or future thoughts or goals Emirates might have. Mark Tatum, current NBA Deputy Commissioner and Chief Operating Officer, previously Executive Vice President of Global Marketing Partnerships, also believes that Emirates would be a perfect partner for the NBA. Given the NBA's strong recognition within the United States, our internationally recognizable superstars and branding potential worldwide, brought together with Emirates powerful global presence and current expansion within the United States, the timing could not be better.

I would also like to confirm that Liwa North America and CEO Paul Edalat has provided this introduction and will continue to assist in seeing the process through.

The NBA has several offices worldwide and we would be happy to meet with you and your team at any mutually convenient time and place.

Sincerely,

Kiki VanDeWeghe
Senior Vice President, Basketball Operations
National Basketball Association

Olympic Tower • 645 Fifth Avenue • New York NY 10022 • (212) 407-8000 • Fax: (212) 832-3861

# EXHIBIT "B"

**BYRD CAMPBELL**
ORLANDO • DALLAS • BOSTON

April 29, 2024

***Via U.S. Mail and Email***
Mr. Mark Tatum
Deputy Commissioner and
Chief Operating Officer
National Basketball Association
645 Fifth Avenue
New York, NY 10022
mtatum@NBA.com

### RE: EMIRATES AIRLINES/NBA – GLOBAL MARKETING PARTNERSHIP

Dear Mr. Tatum:

This law firm represents Mr. Paul Edalat and his company LIWA North America (collectively, "Edalat") related to their services in brokering a sponsorship between Emirates Airline ("Emirates") and the National Basketball Association ("NBA").

First, congratulations are in order for the recent multiyear global marketing partnership naming Emirates the official Global Airline Partner of the NBA. The announcement on February 8, 2024, represented the culmination of efforts which began in 2014, beginning with our clients whose vision of pairing two iconic companies (NBA and Emirates) kindled this relationship. Although our clients were a bit surprised the NBA did not apprise them a deal was imminent, they nonetheless share their elation that a deal was reached and express their expectation to get compensated for their efforts in bringing the NBA and Emirates together.

A brief historical recap should make their position clear:

1.  In March 2014, ***Mr. Kiki VanDeWeghe***, the Senior Vice President Basketball Operations for the NBA shared with Mr. Edalat that the NBA had an interest in a partnership with Emirates. The NBA had no prior connection with Emirates. Emirates, long involved in other global sports, notably soccer, had no connection with American basketball. At the time Mr. VanDeWeghe shared that the NBA did not intend on continuing its relationship with Delta Airlines.

2.  Because of Mr. Edalat's unique experience in sports marketing and his decades long high-level relationships in the United Arab Emirates with government officials, the royal families of Dubai and Abu Dhabi, and the Chairman and executives of Emirates Airlines, he possessed the skills and connections to broker a sport sponsorship deal.

| BOSTON | ORLANDO | DALLAS | NATCHEZ | PENSACOLA |
|---|---|---|---|---|
| 75 Arlington Street | 180 Park Avenue North | 3838 Oak Lawn | 423 Main Street | 3298 Summit Boulevard |
| Suite 500 | Suite 2A | Suite 300 | Suite 8 | Suite 27 |
| Boston, MA 02116 | Winter Park, FL 32789 | Dallas, TX 75255 | Natchez, MS 39120 | Pensacola, FL 32503 |
| Phone (617) 967-2820 | Phone (407) 392-2285 | Phone (214) 764-4106 | Phone (407) 392-2285 | Phone (850) 308-7440 |
| | Fax (407) 392-2286 | | | By Appointment Only |

April 29, 2024
Mr. Tatum
Page Two

3.  In April 2024, Emirates requested an official letter from the NBA designating Mr. Edalat as the NBA's representative responsible for "brokering" the deal.

4.  On May 1, 2014, Mr. VanDeWeghe authored the official letter addressed to Mr. Timothy Clark, President, Emirates Airline, naming Paul Edalat as the person responsible for "seeing the process through." I have attached a copy of the letter as **Exhibit "A."**

5.  Throughout the spring of 2014, Mr. Edalat engaged in numerous talks concerning the sponsorship, even travelling to the middle east to pursue this deal for the NBA.

6.  You personally were engaged in some of those discussions. Many other high ranking NBA officials interacted with Mr. Edalat.

7.  The Emirates deal was paused in the summer of 2014 when the NBA renewed its official sponsorship with Delta Airlines. Given the timing of the Delta Airlines renewal, no doubt the NBA benefitted from the Emirates interest as leverage in the NBA's negotiations with Delta.

8.  Once the Delta Airlines deal expired, Emirates and the NBA picked right up with where they had left off and finalized the deal through the same principals for both Emirates and the NBA who Mr. Edalat had connected. Unfortunately, the person who procured the relationship, Mr. Paul Edalat, was excluded from those final negotiations.

9.  The NBA had a simple compensation arrangement with Mr. Edalat. He would get ten percent (10%) of any deal he procured. If the news reports are accurate, Emirates has agreed to pay Sixty Million Dollars ($60,000,000.00) for sponsorship rights. There may be other economic benefits which have not been disclosed.

At this point, we ask the NBA to confirm that Mr. Edalat and his company will be compensated for their efforts. We have not reached out to Emirates to confirm our clients' involvement since they had a deal with the NBA. We remain confident, lest you have any doubt, that a simple call to **_Mr. Boutros Boutros_** with Emirates will confirm their acknowledgement of Mr. Edalat's importance to the deal. With him, there would have been no relationship, and certainly no deal.

To make sure the NBA gives this immediate attention, I am inclined to put a ten (10) day deadline for a response. If you need additional information to respond, let me know.

Very Truly Yours,

Tucker H. Byrd, Esq.

C: Client

# EXHIBIT "A"

 # National Basketball Association

May 1, 2014

Mr. Timothy Clark
President, Emirates Airline
C/O Paul P. Edalat
Vice Chairman/CEO
Liwa North America


Re: NBA Sponsorship


Dear Mr. Clark,

I would like to confirm our interest in having discussions with Emirates Airline about partnership opportunities within the National Basketball Association. Specifically, the NBA's airline sponsorship category is currently open and everyone here is excited about the possibility of a potential partnership with Emirates Airline.

The focus is for Emirates to become the exclusive airline sponsor and partner of the NBA. This will give Emirates the opportunity to expand their brand not only in the United States, but globally, with the assistance of the NBA, through its various marketing channels and programs. The relationship can expand in many ways; from having grassroots opportunities within the United States to having branding opportunities with possible exhibition games abroad.

The partnership opportunities and benefits associated with the NBA global brand are extensive and we would be happy to discuss any present or future thoughts or goals Emirates might have. Mark Tatum, current NBA Deputy Commissioner and Chief Operating Officer, previously Executive Vice President of Global Marketing Partnerships, also believes that Emirates would be a perfect partner for the NBA. Given the NBA's strong recognition within the United States, our internationally recognizable superstars and branding potential worldwide, brought together with Emirates powerful global presence and current expansion within the United States, the timing could not be better.

I would also like to confirm that Liwa North America and CEO Paul Edalat has provided this introduction and will continue to assist in seeing the process through.

The NBA has several offices worldwide and we would be happy to meet with you and your team at any mutually convenient time and place.


Sincerely,

Kiki VanDeWeghe
Senior Vice President, Basketball Operations
National Basketball Association

# EXHIBIT "C"

 **National Basketball Association**

May 9, 2024

<u>Via Email</u>

Tucker H. Byrd, Esq.
Byrd Campbell, P.A.
tbyrd@byrdcampbell.com

Dear Mr. Byrd:

I write in response to your letter to Mark Tatum dated April 29, 2024.  We have reviewed the information supplied in your letter and do not agree that your clients, Paul Edalat and LIWA North America (together, "Edalat"), are entitled to any compensation from the NBA.  Among other inaccuracies and deficiencies contained in your correspondence:

1.  Edalat played no role in brokering or negotiating the NBA's marketing partnership agreement with Emirates that was announced on February 8, 2024.  That agreement was handled by the NBA's in-house Global Partnerships group with the assistance of an agency firm, with no involvement from Edalat.  Any interactions Edalat may have had with Emirates and a member of the NBA's Basketball Operations group in 2014 have no relevance to the Emirates partnership that the NBA directly negotiated and announced a decade later.

2.  As you suggested, we contacted Mr. Boutros Boutros at Emirates. Contrary to what your letter states, he has no recollection of Paul Edalat, let alone any involvement of Mr. Edalat with the NBA-Emirates marketing partnership agreement.

3.  You assert that Edalat had a "compensation arrangement" with the NBA, but offer no evidence to support that contention.  We have no record and are not aware of any agreement between the NBA and Edalat.

4.  Your letter's statement that in 2014 "the NBA had no prior connection to Emirates" is not correct.  To the contrary, the NBA entered into agreements with Emirates in 2012 and 2013 to sponsor NBA games played in China.  Discussions between the NBA and Emirates regarding

a broader partnership were publicly reported more than one year before the 2014 letter you cite.[1]

For these and other reasons, we see no basis to conclude that your clients are owed any compensation by the NBA.

Sincerely,

Dan Spillane
Senior Vice President and
Assistant General Counsel,
League Governance & Policy

---

[1] *See, e.g., Emirates deal could land at NBA*, Sports Business Journal, Jan. 21, 2013,
ht ps://www.sportsbusinessjournal.com/Journal/Issues/2013/01/21/Marketing-and-Sponsorship/Emirates.aspx

# EXHIBIT "D"

## <u>DECLARATION OF ZAKI KADA</u>

1. I am over the age of eighteen and live and work in Dubai, United Arab Emirates.  I make this declaration based upon the facts personally known to me.  If called upon to testify as to any of the below facts, I could and would competently do so.

2. I made an introduction between Paul Edalat and Emirates Airlines ("Emirates") Chief Marketing Officer Boutros Boutros sometime in 2014 during one of Mr. Edalat's business trips to Dubai.

3. Mr. Boutros has been a personal friend since being introduced by his close friend Tony Kazal who I have known since 2009. Mr. Edalat has been a close personal friend of mine since 2010.

4. In or around February of 2014, Mr. Edalat had discussed with me that the National Basketball Association ("NBA") was in search of a new airline partner as the NBA and Delta Airlines partnership was to expire in 2014.

5. On or about March 29, 2014, Mr. Edalat forwarded to me an e-mail dated March 28, 2014 from KiKi VanDeWeghe, the Head of Basketball Operations at the NBA. In that e-mail Mr. VanDeWeghe stated that the NBA was seeking a partnership opportunity with Emirates. Furthermore, Mr. VanDeWeghe's email specifically requested that Mr. Edalat "[relay NBA's] interest to … Emirates, and see what is the best way for us to proceed."

6. Separate to this e-mail, Mr. Edalat relayed to me that NBA had no direct contact with Emirates executives– and that NBA was reliant on Mr. Edalat to make the introduction to the appropriate Emirates senior executive.

7.  Acting on this information I initially reached out to Salem Ghanem Al-Marri, the head of Planning, Aeropolitical, and Industry Affairs at Emirates, and a former colleague of mine. I forwarded Mr. VanDeWeghe's email to Mr. Ghanem Al-Marri to ascertain early interest from Emirates before approaching Mr. Boutros.

8.  On April 1, 2014, Mr. Ghanem Al-Marri responded, requesting an "official" letter from NBA for the purposes of beginning partnership discussions. I forwarded this response to Mr. Edalat. It is my understanding that Mr. Edalat in turn forwarded my e-mail to Mr. VanDeWeghe.

9.  During a telephonic conversation later that same week, Mr. Edalat and I discussed the opportunity between Emirates and NBA at length. As part of the multiple phone calls during the first few weeks of April 2014, we were preparing for the in-person meeting between Mr. Edalat and Mr. Boutros.

10. I planned for Mr. Edalat and Mr. Boutros to meet in person during the May 2014 Travel Show in Dubai, United Arab Emirates.

11. On or about May 1, 2014 Mr. Edalat sent the NBA's sponsorship request letter ("NBA Letter") dated May 1, 2014 to myself and Mr. Boutros. A true and correct copy of the NBA Letter is attached as **Exhibit A** to this declaration.

12. Subsequently, Mr. Edalat travelled to Dubai in early May 2014, and met with Mr. Boutros, and myself during the week of May 11, 2014. Mr. Kazal assisted in arranging a last minute meeting with Mr. Boutros, given the latter's very busy schedule.

13. At the time of our initial meeting, Mr. Edalat handed Mr. Boutros the original wet signed copy of the NBA Letter, as Mr. Boutros had requested. Mr. Boutros requested some time to communicate with other senior level executives at Emirates in pursuit of this opportunity.

14. After Mr. Edalat's return to the United States in late May of 2014, he continued to keep me apprised of conversations with NBA officials.

15. At some point later on Mr. Boutros indicated that he would be keen to explore a good commercial deal with NBA.

16. Mr. Edalat relayed this information to Mr. VanDeWeghe, and discussions were subsequently handed off to Mark Tatum, the NBA Deputy Commissioner and Chief Operating Officer.

17. Mr. Edalat and Mr. Tatum exchanged a series of e-mails, some of which Mr. Edalat forwarded to me to keep Mr. Boutros updated on the conversation. In his July 9, 2014 email to Mr. Edalat, Mr. Tatum stated "[NBA] are still very interested in having a discussion with Emirates about a partnership".

18. It is my understanding that Mr. Edalat and Mr. Tatum were to meet in Las Vegas in July 2014 to further discuss the opportunity and arrange for the introduction between Mr. Tatum and Mr. Boutros.

19. After these July 2014 conversations, it came to light that NBA chose to re-sign their agreement with Delta, and we heard no further updates on the matter.

20. In late February 2024, Mr. Edalat and I became aware of the Emirates and NBA sponsorship deal via a Retuer's article in which both Mr. Boutros and Mr. Tatum were quoted. This deal is reported to be worth at least $250M over a period of 5 years.

21. After becoming aware of this, I reached out to Mr. Boutros and Mr. Kazal for further information.

22. Mr. Edalat requested a confirmation of the introduction from Mr. Boutros, who was at the time willing to provide this information. However, due to Mr. Boutros' position at Emirates, he advised me that the Emirates legal department prevented him from providing any information in his official capacity and have advised him to not communicate in writing about this matter.

23. It has been relayed to me by Mr. Edalat that the NBA's attorney has claimed that Mr. Boutros disavowed knowing Mr. Edalat. However, Mr. Boutros advised that his conversation with the NBA attorney was simply that he could not recall a meeting from 10 years ago, and needed time to refer to his diaries from that time. Mr. Boutros did not deny knowing Mr. Edalat. Therfore, I do not know on what basis the NBA's attorney makes that statement.

24. Furthermore, Mr. Boutros has relayed to both Mr. Kazal and myself that he has reached out to Mark Tatum in an effort to resolve this dispute between Mr. Edalat and NBA prior to any escalation, but cautioned that Emirates would not tolerate any negative publicity surrounding the NBA and Emirates 2024 deal, and, to quote Mr. Boutros, "if there was any noise, the contract would be cancelled".


I certify under penalty of perjury that the foregoing is true and correct.

Dated this 30th day of July, 2024

Dubai, United Arab Emirates


ZAKI KADA

4



Kevin McGavock

Akerman LLP
420 South Orange Avenue
Suite 1200
Orlando, FL  32801-4904

D: 407 419 8437
T: 407 423 4000
F: 407 843 6610
kevin.mcgavock@akerman.com

June 11, 2025

**VIA ELECTRONIC SERVICE**

Honorable Chad K. Alvaro
Circuit Judge
Ninth Judicial Circuit, Division 43
Orange County Courthouse
425 N. Orange Avenue

> **RE:    Paul Edalat v. National Basketball Association**
> **Case Number: 2025-CA-002038-O**
> **Agreed Order Granting Defendant, National Basketball Association's**
> **Unopposed Motion For Extension Of Time To Respond To Plaintiff's**
> **Amended Complaint**

Dear Judge Alvaro:

Attached to this email, please find an agreed order (in Word format) relating to the following matter:

- National Basketball Association's Unopposed Motion To Extend Time To Respond To Plaintiff's Amended Complaint, dated June 11, 2025 (Filing # 224977597 E-Filed 06/11/2025 08:39:48 AM).

Counsel for Plaintiff, Paul Edalat, has reviewed the order and has no objection to its form or content.  If the proposed order meets your approval, please sign and e-file it.

Respectfully submitted,

**AKERMAN LLP**

*/s/ Kevin T. McGavock*
Kevin T. McGavock

Enclosure

| | |
|---|---|
| PAUL EDALAT, | IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT, IN AND FOR ORANGE COUNTY, FLORIDA |
| Plaintiff, | |
| v. | CASE NO.: 2025-CA-002038-O |
| NATIONAL BASKETBALL ASSOCIATION, | Business Court Division 43 |
| Defendant. | |

**NOTICE OF APPEARANCE AND EMAIL DESIGNATIONS**

Sean Hecker, Esq., David Gopstein, Esq., and Mahrah M. Taufique, Esq., of

Hecker Fink, LLP, hereby give notice of their appearance as counsel for Defendant,

NATIONAL BASKETBALL ASSOCIATION. All notices, pleadings and other

papers served or filed in this action should be sent to the undersigned. Additionally,

pursuant to Florida Rule of General Practice and Judicial Administration 2.516,

counsel hereby designates the following addresses for service by e-mail:

**Primary Emails:**
shecker@heckerfink.com
dgopstein@heckerfink.com
mtaufique@heckerfink.com

Dated: June 11, 2025                    Respectfully submitted,

Sean Hecker*
PHV No. 0088371
shecker@heckerfink.com

David Gopstein*
PHV No. 1065331
dgopstein@heckerfink.com
Mahrah M. Taufique*
PHV No. 1065209
mtaufique@heckerfink.com
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Phone: (212) 763-0883

* *admitted pro hac vice*

- and -

E. Ginnette Childs, Esq.
Florida Bar No. 0298130
ginny.childs@akerman.com
AKERMAN LLP
420 South Orange Avenue, Suite 1200
Orlando, FL 32801
D: (407) 419-8592
T: (407) 423-4000

*Attorneys for Defendant National Basketball Association*

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2025, a true and correct copy of this Notice

was served via the Florida e-filing portal upon all counsel of record.

_____
Sean Hecker, Esq.

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,                                  Case No.: 2025-CA-002038-O
                                             Business Court Division 43
      Plaintiff,

v.

NATIONAL BASKETBALL
ASSOCIATION,

      Defendant.

_____/

## NATIONAL BASKETBALL ASSOCIATION'S UNOPPOSED MOTION TO EXTEND TIME TO RESPOND TO PLAINTIFF'S AMENDED COMPLAINT

Defendant, National Basketball Association, through undersigned counsel, and pursuant to Rule 1.090 of the Florida Rules of Civil Procedure, moves for an extension of time to respond to Plaintiff's Amended Complaint, filed June 5, 2025, and states as follows:

1.    Plaintiff filed a Complaint and Demand for Jury Trial on March 10, 2025.

2.    Defendant filed a Motion to Dismiss the Complaint on May 16, 2025.

3.    Plaintiff filed his Amended Complaint and Demand for Jury trial on June 5, 2025.

81798741;1

4.    Defendant's current deadline to respond to Plaintiff's Amended Complaint is June 16, 2025.

5.    Undersigned counsel seeks a one-week extension, through and including June 23, 2025, to respond to Plaintiff's Amended Complaint.

6.    This motion is unopposed, is filed in good faith for the purpose of evaluating the Amended Complaint and preparing a response, and not for any improper purpose.

7.    Undersigned counsel has conferred with Plaintiff's counsel regarding the requested extension of time. Plaintiff's counsel has agreed to the requested extension of time to respond to the Amended Complaint.

**WHEREFORE**, Defendant, National Basketball Association, respectfully requests that this Court grant it an extension of time to respond to Plaintiff's Amended Complaint, making the new deadline to respond June 23, 2025, together with such other and further relief as it may deem just, equitable, and proper under the circumstances.

Dated: June 11, 2025

*/s/ Kevin T. McGavock*
**E. Ginnette Childs, Esq.**
Florida Bar No. 0298130
Primary Email:
ginny.childs@akerman.com
Secondary Emails:
melisa.tejada@akerman.com
masterdocketlit@akerman.com

-2-

**Kevin T. McGavock, Esq.**
Florida Bar No. 1002313
Primary Email:
kevin.mcgavock@akerman.com
Secondary Emails:
caren.deruiter@akerman.com
masterdocketlit@akerman.com

**AKERMAN LLP**
420 South Orange Avenue, Suite 1200
Orlando, FL 32801
P. O. Box 231
Orlando, FL 32802-0231
Phone: (407) 423-4000

- and -

Sean Hecker*
shecker@heckerfink.com
David Gopstein*
dgopstein@heckerfink.com
Mahrah M. Taufique*
mtaufique@heckerfink.com
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Phone: (212) 763-0883

81798741;1

## CERTIFICATE OF COMPLIANCE OF GOOD FAITH CONFERRAL

I HEREBY CERTIFY that on June 11, 2025, I conferred with Plaintiff's counsel, Tucker Byrd, regarding the relief requested in in this motion. Plaintiff's counsel does not oppose the motion.

*/s/ Kevin T. McGavock*
Kevin T. McGavock, Esq.


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 11, 2025, a true and correct copy of the foregoing document has been electronically filed with the Clerk of Court using the Florida Courts E-Filing Portal which will send notification to all counsel of record.

*/s/ Kevin T. McGavock*
Kevin T. McGavock, Esq.

81798741;1

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT, IN AND FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,

     Plaintiff,

v.

NATIONAL BASKETBALL ASSOCIATION,

     Defendant.

**COMPLEX BUSINESS DIVISION**

CASE NO.: 2025-CA-002038-O

---

## JOINT CASE MANAGEMENT REPORT

Pursuant to the Order Setting Case Management Conference dated March 26, 2025, Plaintiff, PAUL EDALAT ("Plaintiff"), and Defendant, NATIONAL BASKETBALL ASSOCIATION ("Defendant"), submit the following Joint Case Management Report.

### 1.    A brief factual statement of the case.

Plaintiff filed a Complaint alleging that he entered into a contract with the NBA under which the NBA agreed to pay him a commission for securing a sponsorship agreement with Emirates. Plaintiff alleges that the NBA breached that alleged contract by not making the payment. The NBA moved to dismiss the Complaint. Rather than file a response to the NBA's motion, Plaintiff filed an Amended Complaint on June 5, 2025, again alleging breach of contract.

2.      **Pleadings issues, service of process, venue, joinder of additional**
        **parties, theories of liability, damages claimed and applicable**
        **defenses.**

Defendant filed a Motion to Dismiss the Complaint for lack of personal jurisdiction, for failure to state a claim, and pursuant to the doctrine of *forum non conveniens*. Defendant anticipates filing a motion to dismiss the Amended Complaint that may include the same grounds for dismissal. If Defendant moves to dismiss the Amended Complaint on jurisdictional and *forum non conveniens* grounds, Plaintiff will likely seek to conduct limited discovery on those topics.

Plaintiff seeks compensatory damages, plus applicable interest and costs. In addition to the arguments to be raised in the Defendant's anticipated motion to dismiss the Amended Complaint, the NBA's defense will include contesting each of the elements of Plaintiff's claim.

3.      **The identity and number of any motions to dismiss or other**
        **preliminary or pre-discovery motions which have been filed and**
        **the time period in which they shall be filed, briefed and argued.**

On June 5, 2025, Plaintiff filed an Amended Complaint. Defendant has sought a one-week extension to respond to Plaintiff's Amended Complaint (to which Plaintiff agreed) and anticipates filing a motion to dismiss the Amended Complaint on or before June 23, 2025. Plaintiff anticipates filing a Response to Defendant's

2

Motion to Dismiss the Amended Complaint on or before July 14, 2025, and Defendant anticipates filing a Reply on or before July 24, 2025. The parties anticipate that Defendant's Motion to Dismiss the Amended Complaint will be fully briefed on July 24, 2025. However, these dates could be enlarged if the parties pursue limited discovery on any jurisdictional or venue challenges.

**4.     A discovery plan and schedule including the length of the discovery period, the anticipated number of fact and expert depositions to be permitted and, as appropriate, the length and sequence of such depositions.**

The parties agree as follows:

**A.     <u>Limits on Discovery</u>**

Absent leave of Court or further stipulation, the parties agree that:

1.     **<u>Depositions</u>**: Plaintiff and Defendants intend to conduct no more than ten (10) depositions per side (not including depositions of testifying experts).

2.     **<u>Expert Depositions</u>**: Each expert witness may be deposed one time with the parties coordinating among themselves such deposition.

3.     **<u>Deposition length</u>**: Each deposition is limited to one day of seven (7) hours (excluding breaks and lunch), absent leave of Court or stipulations of the parties and witness for depositions of greater length.

4.     **Other Areas**:  Other than as modified herein, the parties agree that the Florida Rules of Civil Procedure and the rules and procedures of this Court shall govern all other discovery issues.

B.     **Discovery Deadline**

Each party shall serve discovery requests timely so that the rules allow for a response prior to the discovery deadline.

A proposed Discovery Schedule is provided at the conclusion of this Joint Case Management Report.

5.     **Anticipated areas of expert testimony, timing for identification of experts, responses to expert discovery and exchange of expert reports.**

The parties anticipate that expert testimony may be necessary in the area of damages. The parties reserve the right to retain experts on other issues should the needs of the case require it.

Timing for identification of experts, responses to expert discovery and the exchange of expert reports is included in the parties' proposed Discovery Schedule provided at the conclusion of this Joint Case Management Report.

6.     **An estimate of the volume of documents and computerized information likely to be the subject of discovery from parties and nonparties and whether there are technological means that may**

**render document discovery more manageable at an acceptable cost.**

Document discovery in this matter is expected to be moderate. The parties agree that ESI will be produced as ordinarily maintained in its native format. Alternatively, ESI may be produced in load files with searchable metadata and extracted text. If the parties wish to produce documents in any other format, they must have consent from the opposing party.

7. **The advisability of using the general magistrate or special magistrate for fact finding, mediation, discovery disputes or such other matters as the parties may agree upon.**

The parties do not believe that a special master should be utilized at this time.

8. **The time period after the close of discovery within which post-discovery dispositive motions shall be filed, briefed and argued and a tentative schedule for such activities.**

A proposed Discovery Schedule is provided at the conclusion of this Joint Case Management Report.

9. **The possibility of settlement and the timing of Alternative Dispute Resolution, including the selection of a mediator or arbitrator(s).**

81832844;1

A proposed Discovery Schedule is provided at the conclusion of this Joint Case Management Report. In addition to those matters provided for therein, the parties report that:

A.    Settlement is unlikely at this time; and

B.    The parties propose conducting mediation before a mediator who is mutually agreeable to all parties at a time to be determined in the future.

**10.    Whether or not a party or parties desire to use technologically advanced methods of presentation or court-reporting and, to the extent this is the case, a determination of the following:**

**a.    Fairness issues, including but not necessarily limited to use of such capabilities by some but not all of the parties and/or by parties whose resources permit or require variations in the use of such capabilities;**

**b.    Issues related to compatibility of court and party facilities and equipment;**

**c.    Issues related to the use of demonstrative exhibits and any balancing of relevance and potential prejudice which may need to occur in connection with such exhibits;**

**d.    Such other issues related to the use of the Court's and parties' special technological facilities as may be raised by**

81832844;1

**any party or the Court or its technological advisor, given**

**the nature of the case and the resources of the party.**

The parties do not anticipate the use of technologically advanced methods of presentation or court-reporting at this time other than possible power point presentations and the use of a document projector.

11. **A good faith estimate by counsel for each party based upon consultation with all of the parties of the attorney's fees and costs each party is likely to incur in pursuing the litigation through trial court adjudication.**

Plaintiff estimates he is likely to incur in excess of $250,000 - $500,000 in attorneys' fees and costs of an additional $50,000 should the case be litigated through trial. Defendant estimates that it is likely to incur $1.5 million - $2 million in attorneys' fees and costs through trial.

12. **A preliminary listing of the principal legal and factual issues which counsel believes will need to be decided in the case.**

The preliminary legal and factual issues to be decided center on the following:

    a. Whether the Court has personal jurisdiction over the Defendant;

    b. Whether the Complaint should be dismissed under the doctrine of *forum non conveniens*;

    c. What law governs Plaintiff's breach of contract claim;

    d.  Whether Plaintiff has alleged the formation of an enforceable contract and his performance under that contract;

    e.  Whether Plaintiff can prove the formation of an enforceable contract;

    f.  Whether Plaintiff can prove the terms of the contract;

    g.  Whether Plaintiff can prove his performance under the contract;

    h.  Whether Plaintiff can prove Defendant breached the contract; and

    i.  Whether Plaintiff can prove the existence and  amount of damages resulting from the alleged breach.

**13.    A preliminary listing of any legal principles and facts that are not in dispute.**

The following items are not in dispute:

    None.

**14.    A good faith estimate by counsel for each party of the length of time to try the case.**

Counsel for both parties estimate a two-week trial.

**15.    Whether a demand for jury trial has been made.**

Jury Trial is demanded.

8

**16.    The deadline for filing motions in *limine*.**

An agreed-upon Discovery Schedule is provided at the conclusion of this Joint

Case Management Report.

**17.    The track to which the case will be assigned.**

This case should be assigned a Business Standard Track (Target Trial Date

within 18 months).

## DISCOVERY SCHEDULE

Subject to further court order or further stipulation by the parties, the

following dates shall govern this case:

| DEADLINE OR EVENT | Proposed Date |
|---|---|
| **Disclosure of Expert Reports**<br>    **Party Bearing Burden of Proof**:<br>    **Responding Party:** | **March 30, 2026**<br>**April 27, 2026** |
| **Discovery Deadline:** | **May 26, 2026** |
| **Mediation Deadline:** | **June 1, 2026** |
| **Dispositive Motions** | **June 22, 2026** |
| **Motions *In Limine*** | **September 14, 2026** |
| **Pretrial Conference** | **October 2026** |
| **Trial Term Begins** | **November 2026** |
| **Estimated Length of Trial [trial days]** | **10 Days** |
| **Jury / Non-Jury** | **Jury** |

Dated:  June 13, 2025

/s Tucker H. Byrd
**Tucker H. Byrd**
Florida Bar No. 381632
**Jeffrey T. Donner**
Florida Bar No. 180122
**BYRD CAMPBELL, P.A.**
180 Park Avenue North, Suite 2A
Winter Park, Florida 32789
Telephone: (407) 392-2285
Facsimile: (407) 392-2286
Primary Email:
TByrd@ByrdCampbell.com
Primary Email:
JDonner@ByrdCampbell.com
Secondary Email:
Paralegal@ByrdCampbell.com
*Attorneys for Plaintiff*

/s E. Ginnette Childs
**E. Ginnette Childs**
Florida Bar No. 0298130
**Kevin T. McGavock**
Florida Bar No. 1002313
**AKERMAN LLP**
420 South Orange Avenue, Suite 1200
Orlando, Florida 32801
Telephone: (407) 423-4000
Facsimile: (407) 843-6610
Primary Email:
ginny.childs@akerman.com
Primary Email:
kevin.mcgavock@akerman.com

**Sean Hecker** – *pro hac vice*
**HECKER FINK LLP**
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Phone: (212) 763-0883
Email: shecker@heckerfink.com
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 13, 2025, a copy of the foregoing was filed using the State of Florida e-Portal Filing System, which will serve a copy by email on all counsel of record.

s/ Jeffrey T. Donner
**Jeffrey T. Donner**

81832844;1

PAUL EDALAT,

      Plaintiff,

v.

NATIONAL BASKETBALL
ASSOCIATION,

      Defendant.

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND
FOR ORANGE COUNTY, FLORIDA

CASE NO.: 2025-CA-002038-O

Business Court Division 43

### THE NATIONAL BASKETBALL ASSOCIATION'S MOTION TO DISMISS THE AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION, UNDER THE DOCTRINE OF FORUM NON CONVENIENS, AND FOR <u>FAILURE TO STATE A CLAIM</u>

Pursuant to Fla. R. Civ. P. 1.140(b)(2), (b)(6), and 1.061(a), Defendant National Basketball Association (the "NBA") moves to dismiss the amended complaint ("Amended Complaint") filed by Plaintiff Paul Edalat for lack of personal jurisdiction, under the doctrine of *forum non conveniens*, and for failure to state a claim upon which relief can be granted, and in support states as follows:

## PRELIMINARY STATEMENT

In this action, Plaintiff Paul Edalat seeks a multi-million dollar payout based on the claim that, over a decade ago, he entered into an undocumented contract with an unknown NBA affiliate through an unnamed NBA representative at an unidentified location and with unspecified terms. Plaintiff alleges that the NBA breached this purported contract by failing to pay him with respect to a 2024 sponsorship agreement between the NBA and Emirates about which Plaintiff knew nothing prior to its public announcement. He does so in this Court not because this case has anything to do with Orlando or Florida, but rather based on a belief that an Orlando jury will favor him.

After the NBA moved to dismiss, Plaintiff filed the Amended Complaint asserting that he does not know the identity of his purported contractual counterparty, but believes it to be nonparty NBA Properties, Inc. ("NBAP"), an NBA affiliate incorporated in New York. Plaintiff also added internally inconsistent allegations that underscore his failure to allege the essential terms of the purported contract or the requisite meeting of the minds between contractual counterparties. Under any of

1

Plaintiff's formulations, however, the bottom line is the same: this is an asserted breach of contract case brought in a Florida court that involves neither a contract nor Florida. It should be dismissed.

*First*, the NBA is not subject to general jurisdiction in Florida—which is the only basis for jurisdiction that Plaintiff alleges.  To be subject to general jurisdiction, a defendant's operations must "render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (internal quotations omitted).  The Amended Complaint does not attempt to meet this standard.  And for good reason: the NBA's headquarters, principal places of business, offices, senior executives, and books and records are all located outside of Florida.  The same is true for nonparty NBAP.

*Second*, the Amended Complaint should be dismissed under the doctrine of *forum non conveniens*, which permits dismissal of cases with a negligible connection to the forum and guards against forum shopping.  Both considerations support dismissal here.  First, this case has no connection to Florida:  it involves a California Plaintiff suing a New York-based Defendant about an alleged sponsorship agreement with a Dubai-headquartered airline.  Second, Plaintiff's counsel brought this case in this court based on his expressed belief that an Orlando jury would be favorably disposed towards his client.  *See* Exhibit A.[1]  Florida courts apply the *forum non*

---

[1] Plaintiff's counsel made this statement to the *Orlando Business Journal*.  Ex. A. Courts "are permitted to consider evidence outside the four corners of the complaint

*conveniens* doctrine to prevent such forum shopping and to require plaintiffs to bring cases in the jurisdictions in which they belong.

*Third*, the Amended Complaint fails to allege a valid contract. As a preliminary matter, Plaintiff does not allege that he entered into a contract with the NBA, but rather with nonparty NBAP. Nor does Plaintiff allege offer and acceptance; who on behalf of the NBA (or NBAP) entered into or formed the alleged contract; or where the contract was allegedly formed. While the Amended Complaint identifies the subject matter of the purported agreement in the most general way, it fails to allege the essential terms, including failing to specify what services Plaintiff was obligated to provide; how, when, where, or for how long he was obligated to provide them; how his payment would be calculated; what kind of "future partnership" would be covered; or any other terms or conditions. To the extent the Amended Complaint references Plaintiff's purported contractual obligations, its allegations are internally inconsistent. The Amended Complaint cites and attaches documents from the period during which the contract was allegedly formed (in 2014); tellingly, none is a contract or even references a contract or its terms.[2]

_____

where . . . the motion to dismiss is based upon *forum non conveniens*[.]" *Steiner Transocean Ltd. v. Efremova*, 109 So. 3d 871, 873 (Fla. 3d DCA 2013).

[2] Even if the Amended Complaint alleged a valid contract (and it does not), the absence of any allegation about the execution of a contract means there is no basis upon which to determine what law applies. It is well-established that "the law of the state where the contract was executed governs the rights and liabilities of the parties to the

*Finally*, because the Amended Complaint does not specify what services Plaintiff was purportedly obligated to provide or when, it does not allege that Plaintiff actually performed them.  To the extent Plaintiff alleges that his obligation was to "procure" or provide services in "securing" a sponsorship agreement, the Amended Complaint establishes that he did neither:  Plaintiff alleges that he made introductions and had meetings in 2014 and 2015, but these actions are not alleged to have "procured" or "secured" anything, let alone a 2024 agreement with Emirates.  Plaintiff concedes he did nothing between 2015 and 2024 with respect to the sponsorship deal and learned of it only after it was publicly announced.  Further, there is no alleged nexus between any actions Plaintiff purportedly undertook in 2014 and 2015 and the NBA's 2024 agreement with Emirates.  To state a breach of contract claim, a plaintiff must allege performance of its obligations under the alleged contract or a legal excuse for nonperformance.  The Amended Complaint does neither.  For these reasons, and those below, the Amended Complaint should be dismissed.

## FACTUAL ALLEGATIONS

Plaintiff, Paul Edalat, is a resident of California and the former Chief Executive Officer of a since-dissolved company called Liwa North America Inc. ("Liwa").  *See* Am. Compl. ¶¶ 2, 17, 19.  Defendant NBA is an unincorporated association of

---

contract." *Paquin v. Campbell*, 378 So. 3d 686, 690 (Fla. 5th DCA 2024).  The NBA raised this issue in its motion to dismiss Plaintiff's original complaint (Dkt. 21 at 18–19); the Amended Complaint contains no allegations to address it.

basketball teams with its headquarters and principal place of business in New York.
*See id.* ¶ 6 n.1; Fleming Decl. ¶¶ 4–5.[3]  Nonparty NBAP is a corporation established
under New York law, with its headquarters and principal place of business in New
York.  *See* Deutsch Decl. ¶¶ 4–5; Am. Compl. ¶ 3.

The Amended Complaint alleges that Plaintiff entered into a "commission-based
compensation" agreement with NBAP in May 2014, pursuant to which Plaintiff would
either "facilitate and procure a sponsorship agreement" or provide "services in securing
sponsorship deals" with Emirates and his company, Liwa, would receive "ten percent
(10%) of the value of any sponsorship agreement and any future partnership between
the NBA and Emirates."  *See* Am. Compl. ¶¶ 3, 10, 13, 19, 46–47.  The Amended
Complaint includes no additional information about the formation or terms of the
alleged contract, including who allegedly agreed to it on behalf of NBAP.

Instead, the Amended Complaint alleges only that in 2014 Plaintiff
communicated with NBA employee Kiki VanDeWeghe about helping the NBA obtain
a sponsorship deal with Emirates.  *See id.* ¶ 10.[4]  Plaintiff further asserts that he had

---

[3] "A foreign defendant that wishes to contest [personal] jurisdiction . . . must attach to
the motion affidavits in support of this position."  *Glovegold Shipping, Ltd. v. Sveriges
Angfartygs Assurans Forening*, 791 So. 2d 4, 10 (Fla. 1st DCA 2000).  Here, the NBA
has attached the declarations of George Fleming ("Fleming Decl."), first filed in
connection with the NBA's initial motion to dismiss, and Ayala Deutsch ("Deutsch
Decl.").

[4] Plaintiff's substitution of the "NBAP" for "NBA" throughout the Amended

conversations with Emirates' representatives to facilitate an introduction to the NBA, but that VanDeWeghe ultimately advised him that Emirates was not interested in a deal at the time, and to "temporarily back off from his activities." *Id.* ¶ 24. The following year, VanDeWeghe allegedly contacted Plaintiff and requested that he reach out to Emirates on the NBA's behalf. Plaintiff alleges that he met with other NBA employees in 2015 to continue discussing a possible sponsorship deal with Emirates. *See id.* ¶¶ 30–32. Again, no deal was reached. Instead, the NBA renewed a ten-year agreement with Delta Airlines. *See id.* ¶¶ 33–34.

Approximately *nine years later*, Plaintiff learned of a 2024 NBA/Emirates agreement—after it was publicly announced. *See id.* ¶ 37. Plaintiff does not allege that he had any involvement in or even awareness of any discussions, negotiations, or contacts between the NBA and Emirates between 2015 and 2024. Nevertheless, Plaintiff now alleges that he is entitled to ten percent of the value of the 2024 sponsorship deal under the "commission-based compensation" arrangement that he alleges, without specifics, NBAP supposedly agreed to almost a decade prior in 2014.

## **ARGUMENT**

## I.    THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION OVER THE NBA

Courts can exercise general jurisdiction over out-of-state defendants only in

---

Complaint, *see* Am. Compl. ¶ 6 n.1, results in obviously false allegations, such as that VanDeWeghe was an NBAP "player," *see id.* ¶ 10. VanDeWeghe played in the NBA, not for NBAP.

"exceptional" cases when the defendant's activities render it "at home" in the forum

state. *Daimler*, 571 U.S. at 139 n.19.  Plaintiff cannot meet this high standard.

## A.    Personal Jurisdiction Standard

To show that a defendant is subject to personal jurisdiction in Florida, plaintiff

bears the initial burden of alleging that the defendant's conduct falls within the scope

of Florida's long-arm statute and that the defendant has sufficient "minimum contacts"

with Florida to satisfy constitutional due process.  *See Robinson Helicopter Co. v.*

*Gangapersaud*, 346 So. 3d 134, 139 (Fla. 2d DCA 2022); Fla. Stat. § 48.193.  If the

plaintiff satisfies this threshold pleading requirement, a defendant may refute the

jurisdictional allegations "by filing a legally sufficient affidavit or other sworn proof

to the contrary." *See Robinson Helicopter Co.*, 346 So. 3d at 139 (cleaned up).  The

burden then shifts back to the plaintiff to "prove by affidavit or other sworn proof that

there is a basis for long-arm jurisdiction." *See id.* (cleaned up).

Florida's long-arm statute provides for either "general" or "specific"

jurisdiction. *See Banco de los Trabajadores v. Cortez Moreno*, 237 So. 3d 1127, 1132

(Fla. 3d DCA 2018).  Here, the Amended Complaint alleges only general jurisdiction.

*See* Am. Compl. ¶ 4 (citing Fla. Stat. § 48.193(2)).[5]  A defendant is subject to general

---

[5] Because the Amended Complaint does not allege specific jurisdiction, the NBA has
no burden to contest it.  *See, e.g.*, *Crownover v. Masda Corp.*, 983 So. 2d 709, 713
(Fla. 2d DCA 2008) (holding that defendant was not required to present evidence to
contest the jurisdictional basis plaintiff did not allege); *Carmouche v. Tamborlee*

jurisdiction under Florida's long arm statute when it engages in "substantial and not isolated activity" within the state. Fla. Stat. § 48.193(2). And the Supreme Court has made clear that beyond a business's place of incorporation or principal place of business, courts can exercise general jurisdiction over an out-of-state corporate defendant only in "exceptional case[s]." *Daimler*, 571 U.S. at 139 n.19.[6] Such an exceptional case exists only when "activities in the forum closely approximate the activities that ordinarily characterize a corporation's place of incorporation or principal place of business." *Carmouche*, 789 F.3d at 1204–05; *see also Ferrari S.p.A.*, 402 So. 3d at 298–99. Thus, a defendant's operations would need to be so "'continuous and systematic' as to render them essentially at home in the forum state." *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). The key question is not the "magnitude of the defendant's in-state contacts" but rather "an appraisal of a corporation's activities in their entirety," highlighting that an entity that "operates in many places can scarcely be deemed at home in all of them." *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 414 (2017) (citation omitted); *see also Ferrari S.p.A*, 402 So. 3d at 299

---

*Mgmt., Inc.*, 789 F.3d 1201, 1204 (11th Cir. 2015) (stating that the court "need only consider" general jurisdiction where plaintiff did not allege specific jurisdiction).

[6] Because, as discussed below, the due process test imposes more stringent requirements than Florida's long-arm statute, Florida courts often consider only the former to assess general jurisdiction. *See Ferrari S.p.A. v. Romanelli*, 402 So. 3d 294, 299 & n.1 (Fla. 4th DCA 2025) (conducting only due process analysis); *Teva Pharms. Indus. v. Ruiz*, 181 So.3d 513, 521 (Fla. 2d DCA 2015) (same). We do the same here.

("[E]ven significant in-forum business contacts do not [on their own] support an exercise of general jurisdiction.").[7]

## B.    The NBA Is Not Subject to Personal Jurisdiction in Florida

The only allegations relating to Florida in the Amended Complaint are the boilerplate claims that "the NBA engages in substantial and not isolated activity" in the state, *see* Am. Compl. ¶ 4, and that "upon information and belief," NBAP's merchandising, marketing, and licensing activities occur in Florida "on a substantial ongoing basis," *id*. ¶ 6. These allegations do not—and, as a factual matter, Plaintiff cannot—establish facts that even approach the "exceptional case" that could warrant the exercise of general jurisdiction outside the NBA's principal place of business.

Florida courts have found such an "exceptional case" to exist where Florida was an organization's de facto principal place of business, for example where a Chief Financial Officer "ran the company from his Florida residence for eighteen years,"

---

[7] That the NBA is an unincorporated association, rather than a corporation, does not change the analysis. *See, e.g.*, *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 332 (2d Cir. 2016) (stating that *Daimler's* "reasoning was based on an analogy to general jurisdiction over individuals, and there is no reason to invent a different test for general personal jurisdiction depending on whether the defendant is an individual, a corporation, *or another entity*") (emphasis added); *see also, e.g.*, *In re Nat'l Hockey League Players' Concussion Inj. Litig.*, 2019 WL 5088516, at *3 (D. Minn. Oct. 10, 2019) (applying *Daimler* to the National Hockey League, an unincorporated association); *McCullough v. Royal Caribbean Cruises, Ltd.*, 268 F. Supp. 3d 1336, 1344 (S.D. Fla. 2017) (applying *Daimler* to a limited liability company and noting that "many courts have favored the application of the [*Daimler*] standard to non-corporate entities").

conducted board meetings in that residence, registered the company to do business in

Florida, and deposited tuition payments in a Florida bank account, among other

contacts. *See Int'l Univ. of the Health Scis. Ltd., Inc. v. Abeles*, 299 So. 3d 405, 408

(Fla. 4th DCA 2020). By contrast, Florida courts have repeatedly declined to exercise

general jurisdiction over non-residents where *Daimler's* high bar was not met. *See,*

*e.g.*, *Fincantieri-Cantieri Navali Italiani S.p.A. v. Yuzwa*, 241 So. 3d 938, 943–44 (Fla.

3d DCA 2018) (no general jurisdiction where, despite receiving more than $25 billion

in revenue from partnering with a Florida company, all "executive officers and

directors reside [out-of-state]," and "the vast majority of . . . employees are based in

the company's offices [out-of-state]"); *Ferrari S.p.A.*, 402 So. 3d at 294 (no general

jurisdiction over Ferrari despite seven authorized dealerships in the state); *Carmouche*,

789 F.3d at 1204 (no general jurisdiction despite "a Florida bank account, two []

addresses . . . , purchasing insurance from Florida companies, filing a financing

statement . . . , joining a non-profit trade organization . . . , and consenting to the

jurisdiction of the Southern District of Florida . . . .").[8]

Daimler and its progeny compel the same result here: the NBA has offices in

New York, New Jersey, and numerous international markets, Fleming Decl. ¶¶ 7–8; its

---

[8] Florida courts have held that "general jurisdiction over national corporations is in fact
quite limited." *See, e.g.*, *Perlberger v. Citigroup Inc.*, 2021 U.S. Dist. LEXIS 147314,
at *6 (S.D. Fla. May 5, 2021) (citing, *inter alia*, *Ford Motor Co. v. Mont. Eighth
Judicial Dist. Ct.*, 592 U.S. 351, 359 (2021)).

senior executives work from its New York office, *id*. ¶ 6; it maintains its books and records in New York and New Jersey, *id*. ¶ 7; and the overwhelming majority of its business operations are based in New York, New Jersey, and internationally, *id*. ¶ 9. In contrast, the NBA has no offices in Florida and the vast majority of its U.S.-based employees (more than 97%) are based outside of the state. *See id*. ¶¶ 7, 10.

Nor is the NBA subject to general jurisdiction in Florida because two of its member teams are based there. Numerous courts have applied *Daimler* to reject claims for general jurisdiction over unincorporated sports associations despite the presence of member teams in a state. *See, e.g.*, *Aldrich v. Nat'l Collegiate Athletic Ass'n*, 484 F. Supp. 3d 779, 793–94 (N.D. Cal. 2020) (unincorporated association of college athletic programs not "at home" in California, despite presence of 58 members); *Doe 1 v. Nat'l Collegiate Athletic Ass'n*, 2023 WL 105096, at *9 (N.D. Cal. Jan. 4, 2023) (same); *In re Nat'l Hockey League*, 2019 WL 5088516, at *4 (NHL not "at home" in Minnesota, despite presence of team). And the one court to consider the argument as applied to the NBA has reached the same conclusion. *See Puckett v. NBA*, 22 Civ. 1236, ECF No. 10, at 16–17 (W.D. Tenn. July 31, 2023) (recommending a finding of no general jurisdiction over the NBA, in part, because "[f]inding that [the] NBA is subject to general personal jurisdiction in Tennessee because it maintains a team here would be tantamount to a finding that being 'at home [is] synonymous with 'doing business.'' The Supreme Court has rejected such outcomes" (cleaned up)). Indeed, if the NBA

11

were subject to general jurisdiction in Florida based on the presence of member teams, it would mean that the NBA is "at home" in twenty-one states plus Washington D.C., *see* Fleming Decl. ¶ 11, a holding that could not be reconciled with the principle that a defendant "that operates in many places can scarcely be deemed at home in all of them," *BNSF*, 581 U.S. at 414 (citation omitted).

The Amended Complaint's attempt to replace the NBA with NBAP does not solve its jurisdictional problem. As an initial matter, Plaintiff's "belie[f]" that the NBA is the "trade name" for NBAP is incorrect. Am. Compl. ¶ 1. A "trade name" is "any name used by a person to identify a business or vocation of such person." Fla. Stat. § 495.011(12). In other words, it is another name for the same entity. *See, e.g.*, *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 116 F. Supp. 3d 1326, 1351–52 (S.D. Fla. 2015). But the NBA and NBAP are distinct entities, *see* Fleming Decl. ¶ 4; Deutsch Decl. ¶ 4, a fact the Amended Complaint acknowledges. *Compare* Am. Compl. ¶ 6, n.1 (describing the NBA as "an unincorporated association of thirty (30) separately owned basketball teams") *with id.* ¶¶ 3, 6 (describing NBAP as "a New York corporation" that provides "activities for" the NBA).

In any event, if NBAP were a defendant (and it is not), it too would not be subject to general jurisdiction in Florida. NBAP is incorporated in New York, where it maintains headquarters and its principal place of business, and the overwhelming majority of NBAP's business operations are based in New York, New Jersey, and

12

internationally.  Deutsch Decl. ¶¶ 4–7.  By contrast, NBAP has no offices in Florida and less than 1% of its U.S.-based employees are located in the state.  *See id.* ¶ 8.  On these facts, NBAP is plainly not "at home" in Florida.

Finally, Plaintiff's allegation that NBAP's unspecified merchandising, marketing and licensing activities occur in Florida "on a substantial ongoing basis," Am. Compl. ¶ 6, has no bearing on the question of where NBAP is "at home." As stated above, even significant revenue-generating activities in a state do not render a defendant subject to general jurisdiction, *see Fincantieri-Cantieri*, 241 So. 3d at 943–44; *Ferrari S.p.A.*, 402 So. 3d at 294, and a defendant who does business in multiple states cannot be "at home" in them all.  *See supra*, at 11–12.  To the extent Plaintiff alleges that NBAP goods or services are offered in Florida, such "stream-of-commerce analysis elide[s] the essential difference between case-specific and all-purpose (general) jurisdiction." *Goodyear*, 564 U.S. at 927 (stating that "[f]low of a manufacturer's products into the forum . . . may bolster an affiliation germane to *specific* jurisdiction" (emphasis in original)).  Here, however, Plaintiff asserts only general jurisdiction.  And because this is not the "exceptional" case that could warrant the exercise of general jurisdiction outside the NBA's principal place of business, the Amended Complaint should be dismissed pursuant to Fla. R. Civ. P. 1.140(b)(2).

## II.    THE AMENDED COMPLAINT SHOULD BE DISMISSED UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*

Even if the Court had jurisdiction over the NBA, it should dismiss the Amended

Complaint pursuant to the doctrine of *forum non conveniens*, which permits dismissal of cases with negligible ties to the forum and guards against forum shopping.

### A.    The Statutory Factors Warrant Dismissal

Fla. R. Civ. P. 1.061(a) provides that "[a]n action may be dismissed on the ground that a satisfactory remedy may be more conveniently sought in a jurisdiction other than Florida" when: (1) an adequate alternate forum exists which possesses jurisdiction over the whole case, including all of the parties; (2) relevant factors of private interest favor the alternate forum, weighing in the balance a strong presumption against disturbing plaintiffs' initial forum choice; (3) if the balance of private interests is at or near equipoise, factors of public interest tip the balance in favor of trial in the alternate forum; and (4) plaintiffs can reinstate their suit in the alternate forum without undue inconvenience or prejudice.  Fla. R. Civ. P. 1.061(a).

All four factors weigh in favor of dismissal.  *First*, New York provides an adequate, alternative forum.  An alternative forum is "available when [it] can assert jurisdiction" over a case, *Cortez v. Palace Resorts, Inc.*, 123 So. 3d 1085, 1091–92 (Fla. 2013) (cleaned up), and it is adequate when it "provides for litigation of the subject matter of the dispute and potentially offers redress for plaintiffs' injuries." *King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1382 (11th Cir. 2009).  Here, New York recognizes breach of contract claims.  *Kindred Hosps. E., LLC v. Buffalo Bd. of Educ.*, 2018 WL 9810848, at *7 (W.D.N.Y. Oct. 2, 2018) (finding no conflict between New

York and Florida law on oral breach-of-contract claims).[9]

*Second*, private interests weigh in favor of dismissal.  Private interest factors include the "availability of evidence, access to witnesses, . . . enforceability of a judgment, and practical trial issues."  *See Hakim-Daccach v. Knauf Insulation Gmbh*, 2020 Fla. Cir. LEXIS 17922, at *18 (Fla. 1st Cir. Ct. Sept. 28, 2020) (citation omitted). Here, at least three of the four current or former NBA employees identified in the Amended Complaint—Mark Tatum, Rachel Jacobson, and Emilio Collins—reside or work in New York and New Jersey.  *See* Fleming Decl. ¶ 13.  And Kiki VanDeWeghe, the other NBA employee mentioned, does not reside or work in Florida.  *Id.*  The other potential witnesses identified in the Amended Complaint—Zaki Kada, Salem Ghanem Al-Marri, and Mr. Boutros Boutros—appear to be based overseas.  *See* Am. Compl. ¶¶ 13, 16, 20–21, Ex. D ¶ 1.  And as alleged, "no action in this case occurred in Florida," "no witnesses to the alleged [agreement] are connected to Florida," *Fasang-Brown v. Visit Us, Inc.*, 319 So. 3d 132, 134 (Fla. 3d DCA 2021), no party is based in Florida, and there is no reason to believe that relevant evidence is in Florida, as opposed to California (Plaintiff), New York (NBA and NBAP), or Dubai (Emirates).

---

[9] Under Fla. R. Civ. P. 1.061(c), a defendant who moves to dismiss based on *forum non conveniens* "will be deemed to automatically stipulate that the action will be treated in the new forum as though it had been filed in that forum on the date it was filed in Florida, with service of process accepted as of that date." The NBA stipulates to such findings as to New York.

*Third*, the public interest weighs in favor of dismissal.[10]  The public interest is served when courts "validly protect their dockets from cases" brought in "their jurisdiction, but which lack significant connection to it."  *See Kinney Sys. v. Cont'l Ins. Co.*, 674 So. 2d 86, 92 (Fla. 1996) (cleaned up).  This is such a case: it has no nexus to Florida that could warrant the resources of Florida's courts.[11]  *Fourth*, Plaintiff can assert his claim in New York, and there is no reason to believe doing so there, as opposed to in Florida, would cause him undue inconvenience or prejudice.  The fact that Plaintiff's lawyer is based in Florida does not tip the scales.  *See Cellularvision Tech. & Telecomms., L.P. v. Cellco P'ship*, 2006 WL 2871858, at *3 (S.D. Fla. Sept. 12, 2006) ("As for the convenience of counsel . . . the location of counsel is entitled to the least consideration") (cleaned up).

In sum, all four factors favor dismissal.  *See, e.g., B. Little & Co. v. Choi Wai Printing H.K.*, 364 So. 3d 1078, 1080 (Fla. 3d DCA 2023) (reversing trial court's denial of motion to dismiss for lack of personal jurisdiction and *forum non conveniens* where New York was an adequate forum, parties were non-residents with minimal Florida

---

[10] The "public interest factors should always be considered as part of the analysis, rather than only in select cases where the private interests are at or near equipoise." *See Cortez*, 123 So. 3d at 1093 (cleaned up).

[11] Florida courts have an interest in adjudicating a claim in which a Florida-based plaintiff chooses Florida as the forum state, or when an alleged breach of contract harms businesses or individuals with a principal place of business in Florida. *See Allen Sys. Grp. v. Avon Prods., Inc.*, 2016 U.S. Dist. LEXIS 175721, at *19 (M.D. Fla. Dec. 20, 2016).  Neither of those conditions is present here.

ties, and the contract "d[id] not contemplate any business occurring in Florida").

### B.    Plaintiff's Forum Shopping Also Supports Dismissal

The *forum non conveniens* doctrine also "serves as a brake on the tendency of some plaintiffs to shop for the best jurisdiction in which to bring suit." *Kinney*, 674 So. at 87 (cleaned up).  Courts have held that "the more it appears that the . . . choice of a forum was motivated by forum-shopping reasons the less deference the plaintiff's choice commands and, consequently, the easier for the defendant to succeed on a *forum non conveniens* motion by showing that convenience would be better served by litigating in another court." *Certain Underwriting Members of Lloyd's v. Prime Holdings Ins. Servs., Inc.*, 306 So. 3d 1086, 1093 (Fla. 3d DCA 2020) (cleaned up). That is precisely the case here.  When asked by a reporter why Plaintiff brought this case in Orlando, Plaintiff's counsel responded:

> The NBA is ubiquitous. You could pick anywhere to file a case and the reason why we chose Orlando is that I think it's a value-based community where people get it. . . . I love Florida juries because I think they believe in accountability and they can hold somebody accountable. Of course, the NBA has a presence here, and you can easily find Magic gear with the Emirates airline logo all over it. It's a little bit of home-court advantage.

Ex. A.  In addition to misstating the law, it is precisely forum shopping of this type that the *forum non conveniens* doctrine is designed to prevent.  *See Smith Barney, Inc. v. Potter*, 725 So. 2d 1223, 1226 (Fla. 4th DCA 1999) (holding that "the utter lack of any nexus between the three nonresident claimants and the Florida forum clearly requires

17

a dismissal of the claims . . . on forum non conveniens grounds," especially given "the rankest forum shopping") (quoting *Kinney*, 674 So. 2d at 93)).

## III.    THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

The Amended Complaint should also be dismissed, pursuant to Fla. R. Civ. P. 1.140(b)(6), because it fails to state a claim. Specifically, it fails to allege the existence of a valid contract – which requires "offer and acceptance" and specification of the contract's essential terms – and that Plaintiff performed his (unspecified) obligations under the alleged contract. To survive a motion to dismiss, a complaint must adequately allege each requirement; the Amended Complaint alleges none.

### A.    Motion to Dismiss Standard

To state a cause of action, a "complaint must allege sufficient ultimate facts to show that the pleader is entitled to relief." *Perry v. Cosgrove*, 464 So. 2d 664, 665 (Fla. 2d DCA 1985); Fla. R. Civ. P. 1.110(b). Although a court must accept a plaintiff's well-pleaded factual allegations as true for purposes of a motion to dismiss, it is not required to accept internally inconsistent factual claims, conclusory allegations, or legal conclusions. *See, e.g.*, *Mandel v. Pardi*, 2022 Fla. Cir. LEXIS 10057, at *2 (Fla. 8th Cir. Ct. June 8, 2022) (a complaint must "allege . . . facts as distinguished from legal conclusions") (cleaned up).

### B.    Elements of a Breach of Contract Claim

Under Florida's choice-of-law rules, "the law of the state where the contract was

executed governs the rights and liabilities of the parties to the contract." *Paquin*, 378

So. 3d at 690.  At the outset, the Amended Complaint does not allege facts that could

permit the court to make this determination: there is no allegation of a written contract

and no allegation of where the purported agreement was reached.  *See Hendricks v.*

*Smartvideo Techs., Inc.*, 511 F. Supp. 2d 1219, 1226 (M.D. Fla. 2007) (oral contracts

"are considered 'made' in the state in which the oral agreement was reached" (citation

omitted)).  Because Plaintiff has failed to allege any facts to inform a choice of law

analysis, we address New York and Florida contract law, both of which require a

breach of contract claim to allege a valid contract, plaintiff's performance, a material

breach, and damages.  *See Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. 2d DCA

2006); *Canzona v. Atanasio*, 989 N.Y.S.2d 44, 47 (N.Y. App. Div. 2014).  In all events,

the flaws are fundamental and the result the same: the Amended Complaint fails to

allege a valid contract or Plaintiff's performance.  It should therefore be dismissed.

### C.    The Amended Complaint Does Not Allege a Valid Contract

To allege a valid contract a complaint must include allegations sufficient to show

an offer, an acceptance, consideration, and sufficient specification of essential terms.

*See W.R. Townsend Contracting, Inc v. Jensen Civ. Const., Inc.*, 728 So. 2d 297, 301–

02 (Fla. 1st DCA 1999) (An enforceable contract requires "an offer, an acceptance,

consideration, and sufficient specification of terms so that the obligations involved can

be ascertained"); *Specialized Indus. Servs. Corp. v. Allan*, 2010 N.Y. Misc. LEXIS

1845, at *6 (N.Y. Sup. Ct. Apr. 9, 2010) ("[A] plaintiff must allege an offer, acceptance, consideration, mutual assent, and an intent to be bound. That meeting of the minds must include agreement on all essential terms.") (internal citation omitted).

### 1. The Amended Complaint Does Not Allege That The NBA Was Plaintiff's Counterparty

The Amended Complaint fails out of the gate because it does not allege that the NBA was a party to the alleged contract. Remarkably, Plaintiff now asserts that a nonparty, NBAP, was his contractual counterparty. Am. Compl. ¶ 3. Plaintiff's breach of contract claim against the NBA thus fails to satisfy the "unremarkable proposition that in Florida a breach of contract claim may only be maintained against a party to the agreement." *Runton v. Brookdale Senior Living, Inc.*, 2018 WL 1057436, at *6 (S.D. Fla. Feb. 2, 2018). It should be dismissed for this reason alone.

### 2. The Amended Complaint Does Not Allege Offer and Acceptance

Regardless of the identity of the alleged counterparty, the Amended Complaint fails to plead offer and acceptance. It is well established that a contract requires an offer and acceptance, which together form the parties' "manifestation of assent" to be bound. 1 Williston on Contracts § 4:3 (4th ed.); *see also* Restatement (Second) of Contracts § 23 (1981). In the context of a written contract, "mutual assent can be shown where a contract is knowingly and intentionally signed by both parties—the signatures serving as a demonstration and confirmation of the parties' assent." *Eglin Fed. Credit Union v. Baird*, 400 So. 3d 643, 646 (Fla. 1st DCA 2024). Where the

contract is alleged to be oral, the plaintiff must still allege facts sufficient to demonstrate the parties' mutual assent. *See, e.g. W.R. Townsend Contracting, Inc.* 728 So. 2d at 301 (allegations of offer and acceptance to provide and purchase materials at certain prices sufficient to allege oral contract).

Here, the Amended Complaint does not attach any contract (signed or otherwise) as would have been required if the alleged contract were in writing.  Fla. R. Civ. P. 1.130(a).  Assuming, then, that Plaintiff alleges an oral contract, he fails to allege any offer to or from the NBA (or NBAP), or that any party accepted a purported offer in any form.  Plaintiff states in conclusory fashion that he "contracted" with the NBA, Am. Compl. ¶¶ 13, 46, but these are merely "legal conclusion[s] couched as a factual allegation[s]" that the parties entered into a contract, which "cannot support" a breach of contract claim.  *Jovine v. Abbott Labs., Inc.*, 795 F. Supp. 2d 1331, 1341 (S.D. Fla. 2011); *Added Extras, Inc. v. Party City Corp.*, 749 N.Y.S.2d 647, 649 (N.Y. Sup. Ct. 2002) (dismissing breach of contract claim that failed to allege acceptance, and where documents referenced "[a]t best, . . . establish[ed] that there were discussions between the parties").  Tellingly, Plaintiff does not even allege that an NBA employee entered into the contract on its behalf, let alone *who* purportedly did so (or where or in what manner).  *See Ruff v. Allianz Life Ins. Co.*, 2021 WL 1053166, at *2 (M.D. Fla. Mar. 8, 2021) (dismissing breach of contract claim for "fail[ure] to allege when or how an implied agreement was offered or accepted"); *Mohammed v. Juno Inc.*, 2019 N.Y.L.J.

21

LEXIS 912, at *21 (N.Y. Sup. Ct. Jan. 22, 2019) (dismissing complaint that did not "refer to any specific written agreement nor allege when, where, how, and with whom any purported oral agreement was entered").

Plaintiff's reliance on a May 1, 2014 letter from Kiki VanDeWeghe (NBA) to Timothy Clark (President of Emirates) only highlights his failure to plead the existence of a valid contract with the NBA. On the one hand, Plaintiff alleges that the letter "create[ed] the agreement," Am. Compl. ¶ 42; on the other hand, he alleges that he "accepted the engagement" "based on the representations" in that letter, *id.* ¶ 18. These internally inconsistent allegations cannot mask the reality: the May 1, 2014 letter (which stated that "Liwa North America and CEO Paul Edalat has provided this introduction and will continue to assist in seeing the process through," *see id.* Ex. A) is not a contract, was not addressed to Plaintiff, and does not establish offer and acceptance of an agreement.

### 3. The Amended Complaint Does Not Allege Essential Terms

The Amended Complaint fails for the independent reason that it does not specify the alleged contract's essential terms. It is black-letter law that a breach of contract claim – in addition to being brought against the actual, putative counterparty – requires specification of a contract's essential terms. *See, e.g.*, *Sud v. Sud*, 621 N.Y.S.2d 37, 38 (N.Y. App. Div. 1995) (affirming dismissal under New York law for "failure to allege, in nonconclusory language, as required, the essential terms of the parties' purported

22

contract"); *W.R. Townsend Contracting, Inc.*, 728 So. 2d at 301–02.  An essential term

"is '[a] contractual provision dealing with a significant issue such as subject matter,

price, payment, quantity, quality, duration, or the work to be done.'" *Omni Healthcare*

*Inc. v. Health First, Inc.*, 2017 WL 3658837, at *1 (M.D. Fla. Aug. 24, 2017) (quoting

*Material Term*, Black's Law Dictionary (9th ed. 2009)); *see also Jacksonville Port*

*Auth. v. W.R. Johnson Enters.*, 624 So.2d 313, 315 (Fla. 1st DCA 1993) (finding that

"scope of [] work" and "an agreed-upon price" constituted essential terms).

The Amended Complaint does not even purport to include fundamental

contractual elements.  *First*, there can be no "meeting of the minds" where, as here,

one party does not know with whom he purportedly contracted.  *See Dreyfuss v.*

*Dreyfuss*, 701 So. 2d 437, 438 (Fla. 3d DCA 1997) (no "meeting of the minds" to form

a contract where plaintiff "failed to identify such essential terms as the parties to the

contract").  *Second*, while the Amended Complaint identifies the subject matter of the

purported agreement in extremely general terms, it does not identify what specific

services Plaintiff was to provide, or how, when, for how long, or where he had to

provide them.  *See Omni Healthcare Inc.*, 2017 WL 3658837, at *1 ("work to be done"

is an essential term); *Radde v. BMS Intermediaries, Inc.*, 2019 WL 8892618, at *3

(S.D. Fla. Mar. 6, 2019) (dismissing breach of contract claim when there was no way

to determine "what services [plaintiff] was obligated to provide").  Whereas Plaintiff's

original complaint alleged that he had contracted only to "provide services in securing

23

sponsorship deals" Compl. ¶ 44, the Amended Complaint added the claim that Plaintiff

contracted to "procure a sponsorship agreement." Am. Compl. ¶ 13.   These two

descriptions of what Plaintiff was purportedly obligated to do under the alleged

contract are inconsistent: the former alleges that Plaintiff had to provide (unspecified)

services; the latter alleges that Plaintiff had to in fact procure a deal.  Far from alleging

a meeting of the minds as to essential terms, Plaintiff presents conflicting versions of

what they purportedly were; the Court need not accept these "internally inconsistent"

allegations as true.  *See W.R. Townsend Contracting, Inc.*, 728 So. 2d at 300.

*Third*, the Amended Complaint does not identify what kind of "future

partnership" would be covered by the alleged contract, or how any partnership would

be valued.  *See Kosoy v. Kieselstein-Cord*, 2002 WL 24313, at *3 (S.D.N.Y. Jan. 8,

2002) (dismissing a breach of contract claim in part because of failure to allege "either

a specific price" or "a mechanism for its determination"); *Uphoff v. Wachovia Secs.,*

*LLC*, 2009 U.S. Dist. LEXIS 116679, at *6–8 (S.D. Fla. Dec. 14, 2009) (same).

### D.    The Amended Complaint Does Not Sufficiently Plead Performance

Finally, the Amended Complaint fails to allege that Plaintiff performed his

obligations under the purported contract.  *First*, because the Amended Complaint does

not specify what specific services Plaintiff was purportedly obligated to provide or

when, it cannot and does not allege Plaintiff actually performed them.  *Second*, to the

extent Plaintiff contends he was contractually obligated to procure a deal with Emirates

or provide services in securing deals, the Amended Complaint establishes that he did neither. On the contrary, Plaintiff alleges that he made introductions or had meetings in 2014 and 2015 and that, both times, there was no deal. Plaintiff acknowledges that he did nothing at all for the next *nine years* with respect to a sponsorship deal, and he became apprised of an Emirates/NBA partnership only after it was publicly announced. Am. Compl. ¶¶ 36–37. Accordingly, Plaintiff does not allege that his actions in 2014 and 2015 had any nexus to the 2024 NBA/Emirates deal, much less that they "procured" or "secured" that deal occurring almost a decade later.

*Third*, while no contract could plausibly be inferred from the May 1, 2014 letter, the Amended Complaint confirms that Plaintiff did not perform the sole act described in that communication: to "continue to assist *in seeing the process through*." *See id.*, Ex. A (emphasis added). Thus, even if the Amended Complaint alleged a contract to "procure" a deal between the NBA and Emirates, it does not plausibly allege that Plaintiff did so. *See, e.g.*, *Chappo & Co. v. Ion Geophysical Corp.*, 921 N.Y.S.2d 227, 228 (N.Y. App. Div. 2011) (dismissing breach of contract claim where plaintiff failed to allege performance); *Advanced Fluids Sols., LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 2011 WL 3627413, at *3 (M.D. Fla. July 26, 2011) (same).

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Amended Complaint.

25

## B.C.P. 5.3 CERTIFICATION

The undersigned hereby certifies that, on June 23, 2025, counsel for the NBA met and conferred with Plaintiff's counsel (Tucker Byrd), who indicated that Plaintiff will oppose the relief sought herein.

Dated: June 23, 2025

Respectfully submitted,

*/s/ E. Ginnette Childs*
E. Ginnette Childs, Esq.
Florida Bar No. 0298130
Primary Email:
ginny.childs@akerman.com
Secondary Emails:
melisa.tejada@akerman.com
masterdocketlit@akerman.com
Kevin T. McGavock, Esq.
Florida Bar No. 1002313
Primary Email:
kevin.mcgavock@akerman.com
Secondary Emails:
caren.deruiter@akerman.com
masterdocketlit@akerman.com
**AKERMAN LLP**
420 South Orange Avenue, Suite 1200
Orlando, FL 32801
D: (407) 419-8437
T: (407) 423-4000

- and -

Sean Hecker*
shecker@heckerfink.com
David Gopstein*
dgopstein@heckerfink.com
Mahrah M. Taufique*
mtaufique@heckerfink.com

26

HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Phone: (212) 763-0883

*admitted pro hac vice*

*Attorneys for Defendant National Basketball Association*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 23, 2025, a true and correct copy of the foregoing document has been electronically filed with the Clerk of Court using the Florida Courts E-Filing Portal which will send notification to all counsel of record.

*/s/ Kevin T. McGavock*
Kevin T. McGavock, Esq.

27

# EXHIBIT A

**FOR THE EXCLUSIVE USE OF** CCROWLEY@NBA.COM

From the Orlando Business Journal:
https://www.bizjournals.com/orlando/news/2025/04/14/tucker-byrd-nba-
emirates-paul-edalat-california.html

SUBSCRIBER CONTENT:

**Sports Business**

# Why Orlando attorney Tucker Byrd is taking on the NBA



Tucker Byrd of Winter Park-based Byrd Campbell P.A. represents Paul Edalat in his case against the NBA.
SARAH KINBAR/OBJ



By Sarah Kinbar – Staff writer, Orlando Business Journal
Apr 14, 2025

▶ Listen to this article    5 min    ᵢₗᵢₗᵢ

---

**Story Highlights**

- Paul Edalat sues NBA for alleged breach of contract over Emirates sponsorship.

- Orlando attorney Tucker Byrd represents the plaintiff and the lawsuit was strategically filed in Orange County.

- Edalat claims 10% commission for facilitating NBA-Emirates partnership in 2014.

---

California businessman Paul Edalat has filed a lawsuit in Orlando against the National Basketball Association (NBA), alleging breach of contract related to a sponsorship deal the professional sports league secured with airline Emirates.

According to the complaint filed March 10 in the Ninth Judicial Circuit Court's Business Court Division, Edalat claims he was instrumental in introducing the NBA to Emirates in 2014. Edalat, a U.S. businessman of Iranian descent with ties in the Middle East, was allegedly enlisted by then-NBA Senior Vice President of Basketball Operations Ernest "KiKi" VanDeWeghe to help negotiate a sponsorship deal with the Dubai-based airline.

The lawsuit alleges Edalat, through his contacts, facilitated initial discussions between the NBA and Emirates, including an in-person meeting in Dubai between Edalat and Boutros Boutros, Emirates' Divisional Senior Vice President for Corporate Communications - Marketing & Brand, in May 2014.



Dubai-based Emirates has a 10-year marketing partnership with the NBA.

EMIRATES AIRLINES

The complaint details a simple commission-based compensation agreement allegedly reached between Edalat and the NBA, where Edalat and his company, Liwa North America Inc., would be paid 10% of the value of any sponsorship agreement and future partnership between the NBA and Emirates.

According to the complaint, the value of the sponsorship between the NBA and Emirates, and the ancillary financial arrangements between the two, could reach a substantial amount – easily in the tens of millions, and possibly hundreds of millions of dollars.

While discussions reportedly cooled off and the NBA renewed its sponsorship deal with Delta Airlines in 2015, the lawsuit contends the relationship Edalat initiated laid the groundwork for the multiyear global marketing partnership later announced between the NBA and Emirates on Feb. 8, 2024.

This deal named Emirates the "Official Global Airline Partner of the NBA."

After learning of the 2024 deal, Edalat allegedly contacted the NBA to confirm his compensation.

Meanwhile, the NBA, through its Assistant General Counsel Dan Spillane, allegedly disavowed any knowledge of an agreement with Edalat. This response prompted Edalat to file suit, seeking confirmation of his commission and damages exceeding $500,000.

Tucker Byrd of Winter Park-based Byrd Campbell P.A. represents Paul Edalat in this complex business litigation. Byrd, known for taking on high-stakes commercial litigation, recently discussed the case and his client's decision to file suit in Florida.

*Orlando Business Journal* sat down with Tucker Byrd to ask why he took the case – and why it's been filed in Orlando, even though the client is based in California, NBA headquarters are in New York and the deal in question involves a company based in Dubai.

## Why file this litigation in Orlando?

The NBA is ubiquitous. You could pick anywhere to file a case and the reason why we chose Orlando is that I think it's a value-based community where people get it. It's a conservative community. Some people misunderstand conservatism, but conservatism means accountability – it doesn't mean that you don't believe in recompense or reckoning in court.

I love Florida juries because I think they believe in accountability and they can hold somebody accountable.

Of course, the NBA has a presence here, and you can easily find Magic gear with the Emirates airline logo all over it. It's a little bit of home-court advantage.

**What was your client's motivation for pursuing this legal action against an entity as formidable as the NBA?**

KiKi VanDeWeghe contacted Paul to tell him the deal had finally happened, and he said, "You need to look into this."

We tried to get the NBA to engage. In fact, the first letter that I sent to them was a congratulatory email. It wasn't like, "Where's my money?"

When the response was, "Who are you? We have no idea who you are. Don't bug us," it's like, wait a minute. Please don't tell me you're going to act like we don't exist.

We went back multiple times with the letter from Kiki VanDeWeghe, the emails, the declaration, the proof. To dismiss us as if we had just made this up, that was unacceptable. And we made multiple overtures to try to get them to talk to us. You don't just cavalierly file a lawsuit against anybody, particularly the NBA. When they just wouldn't even stop talking to us as if maybe they'll just go away. It's like, no, we don't just go away. We just want what's agreed upon. It's like it's simple.

**The events at the heart of this lawsuit date back about a decade. How do you address the potential argument that the connection between your client's initial involvement and the eventual deal might have weakened over time?**

The causal link, what we call the procuring cause, did not somehow dissipate over time. It was the same people doing the same deal.

**Do you think this case will settle or go to trial?**

I hope it goes to trial.

## In Brief

*Paul Edalat vs. National Basketball Association*

- **Case no.:** 2025-CA-002038-O
- **Court:** In the Circuit Court of the Ninth Judicial Circuit, In and For Orange County, Florida, Business Court Division
- **Judge:** Chad Alvaro
- **Plaintiff's attorney:** Tucker Byrd and Jeffrey Donner of Byrd Campbell P.A.
- **Defendant's attorney:** Ginnette Childs and Kevin McGavock of Akerman LLP

Ginnette Childs of Akerman LLP could not be reached for comment prior to publication. Representatives with the NBA and Emirates could not be reached for comment.

*Sign up for the Business Journal's free morning and afternoon daily newsletters to receive the latest business news affecting Orlando. Download the free OBJ app for breaking news alerts on your phone.*

PAUL EDALAT,

      Plaintiff,

v.

NATIONAL BASKETBALL
ASSOCIATION,

      Defendant.

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND
FOR ORANGE COUNTY, FLORIDA

CASE NO.: 2025-CA-002038-O

## DECLARATION OF AYALA DEUTSCH

I, Ayala Deutsch, pursuant to Fla. Stat § 92.525(1)(c)(2), hereby declare and state as follows:

1. I am Executive Vice President and Deputy General Counsel of NBA Properties, Inc. ("NBAP"). I have been employed by NBAP since 1998. I am familiar with NBAP's corporate form and its business activities.

2. I am an adult competent to testify to the matters set forth in this Declaration. Unless stated otherwise, the facts presented herein are from my own personal knowledge or from my review of business records kept in the ordinary course of business by my employer, NBAP.

3. If called as a witness, I could and would testify competently with respect to the matters set forth in this Declaration.

4. NBAP is a corporation duly established under the laws of the state of New York.

5. NBAP has a headquarters and principal place of business at 645 Fifth Avenue, New York, NY 10022.

6. In the United States, NBAP has offices, and maintains its books and records, in New York and New Jersey.

7. The overwhelming majority of NBAP's business operations are based in New York, New Jersey, and internationally.

8. As of June 19, 2025, less than 1% of NBAP's U.S.-based employees are located in Florida.

Pursuant to Fla. Stat. § 92.525, under penalties of perjury, I declare that I have read the foregoing and that the facts stated in it are true to the best of my knowledge and belief.

Executed this 23rd day of June, 2025

Ayala Deutsch
Executive VP & Deputy General Counsel, NBAP

2

PAUL EDALAT,

     Plaintiff,

v.

NATIONAL BASKETBALL
ASSOCIATION,

     Defendant.

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND
FOR ORANGE COUNTY, FLORIDA

CASE NO.: 2025-CA-002038-O

## DECLARATION OF GEORGE FLEMING IN SUPPORT OF DEFENDANT NATIONAL BASKETBALL ASSOCIATION'S <u>MOTION TO DISMISS</u>

I, George Fleming, pursuant to Fla. Stat § 92.525(1)(c)(2), hereby declare and state as follows:

1. I am an Assistant General Counsel of the National Basketball Association ("NBA"). I have held that position since 2025. I am familiar with the NBA's corporate form and its business activities.

2. I am an adult competent to testify to the matters set forth in this Declaration and submitted in support of Defendant NBA's Motion to Dismiss for Lack of Personal Jurisdiction, Forum Non Conveniens, and Failure to State a Claim. Unless stated otherwise, the facts presented herein are from my own personal knowledge or from my review of business records kept in the ordinary course of business by my employer, the NBA.

3. If called as a witness, I could and would testify competently with respect to the matters set forth in this Declaration.

4. The NBA is a professional basketball league.  It is a joint venture organized as an unincorporated association consisting of 30 separately owned professional basketball teams across North America.  The NBA is headquartered at 645 Fifth Avenue, New York, New York.  It has maintained its headquarters in New York since its founding.

5. The NBA's principal place of business is also 645 Fifth Avenue, New York, New York.  It has maintained its principal place of business in New York since its founding.

6. The NBA has a Commissioner who presides over the league's operations.  The Commissioner works out of the NBA's headquarters in New York.

7. In the United States, the NBA has offices, and maintains its books and records, in New York and New Jersey.

8. Internationally, the NBA has offices in South Africa, Senegal, Kenya, Nigeria, Egypt, China, Hong Kong, Singapore, the Philippines, Canada, the United Kingdom, Spain, India, Brazil, and Mexico.

9. The overwhelming majority of the NBA's business operations are based in New York, New Jersey, and internationally.

10. As of May 15, 2025, 2,070 people are employed in the United States by, collectively, the NBA and its affiliates.  Fifty-two of those employees, or 2.5%, are located in Florida.

11. The NBA currently has thirty member teams located in twenty-one states, the District of Columbia, and Canada.

12. Two of the NBA's teams, the Orlando Magic and Miami Heat, are located in Florida.

13. Mark Tatum, Kiki VanDeWeghe, Rachel Jacobson, and Emilio Collins are current or former NBA employees.   Mr. Tatum, Ms. Jacobson, and Mr. Collins all currently reside or work in New York and New Jersey.   Mr. VanDeWeghe does not reside or work in Florida.

Pursuant to Fla. Stat. § 92.525, under penalties of perjury, I declare that I have read the foregoing and that the facts stated in it are true to the best of my knowledge and belief.

Executed this 16 day of May, 2025

George Fleming
Assistant General Counsel

3

# IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT, IN AND FOR ORANGE COUNTY, FLORIDA

Case number:  2025-CA-002038-O

## <u>COURT MINUTES</u>

COURT OPENED 9:33 AM on 27th day of June 2025 in Room 9-A On The 9th Floor. This case came on this day for Case Management
Honorable Alvaro, Chad K, presiding.

Paul Edalat

_____

     Petitioner / Plaintiff

VS

National Basketball Association

_____

  Respondent / Defendant

<u>Parties Present:</u>

| | |
|---|---|
| BYRD, TUCKER HARRISON, Esquire | Attorney |
| CHILDS, E GINNETTE, Esquire | Attorney |
| HECKER, SEAN, Esquire | Attorney |
| TAUFIQUE, MAHRAH M, Esquire | Attorney |

Court Reporter: N/A

Court Deputy:  Wesley Tavares and Marsha Hayes

Hearing Held Via Webex

Attorney Jeff Donner appeared on behalf of the Plaintiff.

Matter: Case Management Conference

THE COURT SET THE FOLLOWING DATES AT CASE MANAGEMENT:

Pre-Trial:02/02/27 at 9:30 a.m.
Trial Period:03/22/27-04/09/27

Parties to prepare agreed case management order.


COURT RECESSED at 9:42 AM on this the 27th day of June 2025, subject to call.
Filed in Open Court on 06/27/2025.
Deputy Clerk in Attendance: s/Annmarie P.
Office of Tiffany M. Russell, Orange County Clerk of the Circuit and County Courts

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,                                    Case No.: 2025-CA-002038-O
                                               Business Court Division 43
      Plaintiff,

v.

NATIONAL BASKETBALL
ASSOCIATION,

      Defendant.

_____/

## AGREED ORDER GRANTING NATIONAL BASKETBALL ASSOCIATION'S UNOPPOSED MOTION TO EXTEND TIME TO RESPOND TO PLAINTIFF'S AMENDED COMPLAINT

THIS CAUSE came before the Court on Defendant, National Basketball

Association's Unopposed Motion To Extend Time To Respond To Plaintiff's Amended

Complaint, dated June 11, 2025 (the "Motion"). The Court having reviewed the Motion,

the record, and being otherwise fully advised, finds that it is

ORDERED and ADJUDGED that:

1.      Defendant's Motion is Granted.

2.      Defendant, National Basketball Association's deadline to file a response to

Plaintiff's Amended Complaint is June 23, 2025 and the pleadings filed on such date are

deemed timely filed.

DONE and ORDERED.

                            06/30/2025 13:40:38
                            2025-CA-002038-O

                    eSigned by Chad Alvaro  06/30/2025 13:40:38 ES8lZUcP

                Chad K. Alvaro
                CIRCUIT JUDGE

-1-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document has been electronically filed with the Clerk of Court using the Florida Courts E-Filing Portal which will send notification to all counsel of record.

/s/
_____
Judicial Assistant

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT, IN AND FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,                                    **COMPLEX BUSINESS DIVISION**

     Plaintiff,

                                 CASE NO.: 2025-CA-002038-O

v.

NATIONAL BASKETBALL ASSOCIATION,

     Defendant.

_____

## NOTICE OF APPEARANCE OF COUNSEL AND EMAIL DESIGNATION

PLEASE TAKE NOTICE that Julien W. Maynard, of the law firm of Byrd Campbell, P.A., has entered an appearance as counsel for Plaintiff, PAUL EDALAT, in the above-styled cause. Please forward copies of all future pleadings and correspondence to the undersigned counsel utilizing the following contact information:

**BYRD CAMPBELL, P.A.**
180 Park Avenue North, Suite 2A
Winter Park, Florida 32789
Telephone: (407) 392-2285
Facsimile: (407) 392-2286
Primary Email: JMaynard@ByrdCampbell.com
Secondary Email: MQuallio@ByrdCampbell.com

**<Certificate of Service on the Following page>**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 1, 2025, a copy of the foregoing was filed

using the State of Florida e-Portal Filing System, which will serve a copy by email

on all counsel of record.

*/s/ Julien W. Maynard*

**Tucker H. Byrd**
Florida Bar No. 381632
**Jeffrey T. Donner**
Florida Bar No.: 180122
**Julien W. Maynard**
Florida Bar No.: 1035332
**BYRD CAMPBELL, P.A.**
180 Park Avenue North, Suite 2A
Winter Park, Florida 32789
Telephone: (407) 392-2285
Facsimile: (407) 392-2286
Primary Email: TByrd@ByrdCampbell.com
Primary Email: JDonner@ByrdCampbell.com
Primary Email: JMaynard@ByrdCampbell.com
Secondary Email: MQuallio@ByrdCampbell.com
*Attorneys for Plaintiff*

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND
FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,                                **COMPLEX BUSINESS DIVISION**

      Plaintiff,

                                  CASE NO.: 2025-CA-002038-O

v.

NATIONAL BASKETBALL
ASSOCIATION,

      Defendant.

_____

### PLAINTIFF'S UNOPPOSED MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT AND FOR AN ORDER DISMISSING THE NATIONAL BASKETBALL ASSOCIATION

Plaintiff, PAUL EDALAT, with the written consent of Defendant's counsel, moves the Court under Florida Rule of Civil Procedure 1.190(a), for leave to file a Second Amended Complaint. The proposed Second Amended Complaint, which is attached hereto as **Exhibit "A,"** replaces the National Basketball Association with NBA Properties, Inc., as the defendant.

Upon filing of the proposed Second Amended Complaint, the parties stipulate to the entry of an order dismissing the National Basketball Association from this case. A proposed order granting Plaintiff's motion for leave to file the Second Amended Complaint and dismissing the National Basketball Association is attached hereto as **Exhibit "B."**

## CERTIFICATE OF GOOD FAITH CONFERENCE

Under BCP 5.3, counsel for Plaintiff, Tucker H. Byrd, conferred with counsel

for the Defendant on August 20, 2025, regarding the relief sought in this Motion,

and counsel for the Defendant has no objection to the relief sought.

*s/ Tucker H. Byrd*
**Tucker H. Byrd**


Dated: August 20, 2025,

*s/ Tucker H. Byrd*
**Tucker H. Byrd**
Florida Bar No. 381632
**Jeffrey T. Donner**
Florida Bar No. 180122
**Julien W. Maynard**
Florida Bar No. 1035332
**BYRD CAMPBELL, P.A.**
180 Park Avenue North, Suite 2A
Winter Park, Florida 32789
Telephone: (407) 392-2285
Facsimile: (407) 392-2286
Primary Email: TByrd@ByrdCampbell.com
Primary Email: JDonner@ByrdCampbell.com
Primary Email: JMaynard@ByrdCampbell.com
Secondary Email: MQuallio@ByrdCampbell.com
*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 20, 2025, a true and correct copy of the

foregoing was electronically served on all counsel of record.

s/ *Tucker H. Byrd*
**Tucker H. Byrd**

# EXHIBIT "A"

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND
FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,

     Plaintiff,

                            Case No: 2025-CA-002038-O

v.                          **Complex Business**
                            **Litigation Court**

NBA PROPERTIES, INC.

     Defendant.

_____/

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

     Plaintiff, PAUL EDALAT ("Edalat"), sues Defendant, NBA PROPERTIES, INC. ("NBA"), and alleges:

### INTRODUCTION

     1.    Plaintiff, Edalat, brings this action for breach of contract against the Defendant, NBA Properties, Inc., which does business under the tradenames "National Basketball Association" or "NBA," an affiliate entity through which the basketball league known as the National Basketball Association conducts commercial activities. Edalat seeks millions of dollars in damage for the NBA's failure to pay the commission due to him for having facilitated and procured a sponsorship agreement between the NBA and Emirates Airlines.

## PARTIES, JURISDICITON, AND VENUE

2.    Plaintiff. Edalat, resides in California.

3.    Defendant, NBA Properties, Inc., is a New York corporation.

4.    The Court has personal jurisdiction over the NBA under Section 48.193(2), Florida Statutes, because the NBA engages in substantial and not isolated activity within this state.

5.    Venue lies in Orange County, Florida, under Section 47.051, Florida Statutes.

## GENERAL ALLEGATIONS

6.    NBA Properties, Inc. controls the merchandising, marketing, and licensing activities for the professional basketball league generally operating under the name, "National Basketball Association" or "NBA."   Edalat alleges upon information and belief that these activities occur within the state of Florida on a substantial ongoing basis.

7.    The NBA had long pursued establishing relationships with corporate partners worldwide to expand the NBA's global presence. Dubai, the largest city in the United Arab Emirates and an affluent market with a major corporate presence, offered an attractive market in general, having developed into a Middle East and North Africa ("MENA") gateway for sports and entertainment with a keen interest in basketball given its increasing popularity in the region. It also served as the home

for Emirates Airline, which had a prominent global brand, already with active sponsorships in sports like soccer, cricket, and golf.

8.      To the NBA, entering a sponsorship deal with Emirates Airline would have been a major step in furthering the NBA's global brand, especially MENA. One problem, however, existed. Despite efforts to secure any partnership with Emirates Airline as early as 2013, the NBA was unable to secure a deal, in part because of the cultural differences between the USA-centric NBA business practices and the traditional value-based culture of Emirates Airlines, and the NBA's limited experience dealing with the decision-makers at Emirates Airline.

9.      The government of Dubai, through its investment corporation, The Emirates Group, owns Emirates Airline.  Ultimately, the ruling family of Dubai controls Emirates Airline through CEO Sheikh Ahmed bin Saeed Al Maktoum. As is typical with MENA-region business dealings, relationships with the decision-makers are paramount to entering any agreements.

10.      This impasse to establishing a partnership deal between the NBA and Emirates Airline led KiKi VanDeWeghe ("VanDeWeghe"), then Senior Vice President of Basketball Operations for the NBA, himself a long-time NBA player and all-star, to reach out and make a simple ask of his longtime friend, Plaintiff, Paul Edalat, a United States businessman of Iranian descent with deep ties to the region, including relationships with its business and government leaders. VanDeWeghe

asked if Edalat could help the NBA negotiate a sponsorship deal with Emirates Airline.  At the time, VanDeWeghe did not identify through which "NBA" legal entity the contract with Edalat was being entered.  Edalat has since learned, and alleges upon information and belief, that the business activities of the NBA league are conducted, and the contract was entered herein, through a legal entity known as NBA Properties Inc.

11.    The NBA's partnership with its prior airline partner, Delta Airlines, was about to expire, so there was some time urgency to the matter.

12.    On or about March 28, 2014, Edalat received an email from VanDeWeghe asking Edalat to *"[relay the NBA's] interest"* about the possibility of a partnership with Emirates Airline.  The complete text reads:

**VanDeWeghe, Kiki** <KVanDeWeghe@nba.com>                              Fri, Mar 28, 2014 at 11:27 AM
To: ": Paul Edalat" <paul@scilabs.net>

Paul

Thank you for getting back to me regarding Emirates interest in a possible partnership with the NBA.

I want to confirm our interest in having discussions with Emirates Airline about partnership opportunities within the NBA. The airline sponsorship category is currently open and everyone here is excited about the possibility of a partnership with Emirates. The Deputy Commissioner of the NBA, Mark Tatum, who was past head of Global Marketing Partnerships for the NBA, believes that Emirates would be a perfect partner. Given the NBA's strong recognition within the United States, our internationally recognizable superstars and branding potential worldwide, brought together with Emirates powerful worldwide presence and current push into United States marketplace, the timing could not be better. We would like you to relay our interest to Timothy Clark, President of Emirates, and see what is the best way for us to proceed.

Thank you again

Kiki Vandeweghe

13.    Edalat agreed to help the NBA and contracted with the NBA to facilitate and procure a sponsorship agreement with Emirates Airline. To that end,

Edalat engaged Mr. Zaki Kada ("Kada"), his longtime friend and colleague from the MENA-region to reach out to Emirates Airline, and Kada contacted Mr. Salem Ghanem Al-Marri ("Al-Marri"), the head of Planning, Aeropolitical, and Industry Affairs for Emirates Airline—a former colleague of Kada's—to inquire about approaching Mr. Boutros Boutros ("Boutros"),  the Divisional Senior Vice President, Corporate Communications, Marketing & Brand for Emirates Airline, to share the NBA's interest in a sponsorship or partnership deal with Emirates Airline, with an emphasis on large scale MENA expansion.

14.    Kada also forwarded VanDeWeghe's March 28, 2014, email to Al-Marri, to which Al-Marri responded by requesting an "official" letter from the NBA for the purposes of beginning partnership discussions and to confirm Edalat's prominent role in them.  Kada sent this response to Edalat, who forwarded it back to VanDeWeghe.  The wheels had been set in motion and momentum was building to pursue a sponsorship agreement between the NBA and Emirates Airline with Edalat the tip of that negotiation spear.

15.    Kada and Edalat had several telephone conversations in the first few weeks of April 2014 preparing for an in-person meeting with Boutros, who Kada had already introduced to Edalat years earlier.

16.     Kada, through his contact Al-Marri, introduced Edalat to Boutros in 2014 while Edalat was on a business trip to Dubai.  Edalat met in person with Boutros the week of May 11, 2014, during the May 2014 Travel Show.

**THE NBA ENGAGED PLAINTIFF**

17.     On May 1, 2014, critical to this meeting's occurring, VanDeWeghe issued the letter (*see* **Exhibit "A")**  on behalf of the NBA confirming:

a.   The NBA was *"excited about the possibility of a potential partnership with Emirates Airline"*;

b.   The NBA's *"focus is for Emirates to become the exclusive airline sponsor and partner of the NBA";* and

c.   That *"Liwa North America and CEO Paul Edalat has provided this introduction and will continue to assist in seeing the process through."*

18.     Based upon the representations of the NBA, Edalat accepted the engagement and undertook efforts to pursue and procure the sponsorship agreement with Emirates Airlines.

19.     Edalat and the NBA had negotiated a simple commission-based compensation.  Edalat and his company, Liwa North America, Inc. ("Liwa"), would be paid ten percent (10%) of the value of any sponsorship agreement and any future partnership between the NBA and Emirates Airline.  Since then, Liwa has been dissolved, and Edalat has succeeded to the rights and interests of Liwa.

## PLAINTIFF PURSUES THE SPONSORSHIP FOR THE NBA.

20.    Kada had planned for Edalat to meet Boutros in May 2014 at Travel Show in Dubai.

21.    Edalat travelled to Dubai in early May 2014 and met with Boutros and Kada during the week of May 11, 2014.  A close mutual friend of Kada and Boutros assisted in arranging a last-minute meeting with Boutros given his busy schedule. At this meeting Edalat handed Boutros the original "wet signed" letter from VanDeWeghe, and Boutros responded favorably requesting time to communicate with other senior level executives at Emirates Airline about this opportunity.

22.    Edalat returned to the United States in late May of 2014, and continued to apprise Kada of conversations with the NBA about an Emirates Airline deal.

23.    Boutros later indicated to Kada that he was asked by his superiors to explore a good commercial deal with the NBA.  Kada related this information to Edalat, who conveyed it to VanDeWeghe, who eventually handed off the project to Mark Tatum, the NBA's Deputy Commissioner and Chief Operating Officer.

24.    The discussions between the NBA and Emirates Airline, however, cooled off in 2014.  VanDeWeghe advised Edalat that the NBA was renegotiating the Delta Airlines deal, and that Emirates Airline was not overly eager about a sponsorship with the NBA. VanDeWeghe advised Edalat to temporarily back off

from his activities while the NBA regrouped on its plans for an Emirates Airlines

deal.

25.     The Delta Airlines deal, announced in 2015, was a continuation of a

2004 sponsorship deal between Delta Airlines and the NBA.

## PLAINTIFF RE-ENGAGED BY THE NBA

26.     This all changed in early 2015, when VanDeWeghe, on behalf of the

NBA, asked Edalat to re-engage with Emirates Airline. The NBA's request led to

renewed discussions. On July 9, 2015, Edalat advised VanDeWeghe that Emirates

Airline had *"come back to the table and are interested in a potential sponsorship as*

*the NBA's airline partner."*  The complete email reads:

**From:** Paul Edalat [mailto:paul@liwana.com]
**Sent:** Thursday, July 09, 2015 3:27 PM
**To:** VanDeWeghe, Kiki
**Subject:** Emirates Airline
**Importance:** High


Dear Kiki


I hope that you are well and everything is going great at the NBA.

As you are aware, I have contacts high up in emirates airlines with their CEO Mr. Timothy Clark and was close to putting a deal together last year regarding Emirates and the NBA on a sponsorship. Unfortunately, it fell apart last year due to unforeseen events that occurred back in June and their additional interest in the Clippers.

Now they (Emirates) has come back to the table and are interested in a potential sponsorship as the NBA's airline partner. Nothing has really changed in perspective with the deal that was offered to them last year from your organization. I have attached your letter of last year's offer for your review.

I have been intouch with their global marketing chief Mr. Boutros. From what I understand, he is authorized to sign off on any approved sponsorship up to $6milllon and can get it done pretty quickly. If over and above that amount, then he will have to have the board's approval. They are looking to expand their brand in the US and have been approached by many organizations in sports and marquee teams.

I think that we can get this done pretty quick if the terms are still available and we don't need the board's approval on behalf of Emirates. Obviously this information that I am sharing with you is highly confidential and meant for the purpose of this deal and assisting in moving things along quickly. As you are one of my dearest friends and have the trust in you I have had a long term professional relationship with the royal families of Dubai and Abu Dhabi who control these companies. We can always have a call or meeting in person to further strategize a deal with Emirates.

I will put you in direct touch with Mr. Boutros once you have approval on this deal and its availability. As Emirates plans to be a larger player in the US airline industry, I find it a great opportunity to take advantage of my contacts and trust with them to put a lucrative deal together for both sides.

I look forward to your response and hope to see you in Vegas next week.

Thanks my friend,

**Paul P. Edalat**

**Vice Chairman/CEO**

**LIWA, North America Division**

United States | www.LiwaNA.com

**Group LIWA, UAE Division**

Abu Dhabi, UAE | www.groupliwa.com


27.    Edalat's email led VanDeWeghe to introduce Edalat to Mark Tatum.

The complete email reads:

**From:** VanDeWeghe, Kiki
**Sent:** Thursday, July 09, 2015 04:16 PM
**To:** Paul Edalat <paul@liwana.com>; Tatum, Mark
**Subject:** RE: Emirates Airline

Thank you Paul. I am looping in Mark Tatum, our Deputy Commissioner, to carry the ball from our side. As I stated in my previous letter, Mark is the right person to get this done. This email will serve as an introduction for you and Mark.

I will be available throughout to help in any way I am needed.

Best – Kiki

**Kiki VanDeWeghe**

Senior Vice President - Basketball Operations

Phone: +1 2124078390

Mobile: +1 9177492872

28.    Tatum acknowledged Edalat and the NBA's renewed interest in this opportunity with Emirates Airline, stating, *"We [The NBA] are still very interested in having a discussion with Emirates about a partnership"*  The complete email reads:

On Jul 9, 2015, at 4:57 PM, Tatum, Mark <mtatum@nba.com> wrote:

Paul,

It is a pleasure to meet you via email. We are still very interested in having a discussion with Emirates about a partnership. Let's set up a call or meeting to discuss. Please let me know when you might be available. Thanks.

Best,

Mark

29.    The NBA negotiating team did not have the access needed to reach the decision-makers at Emirates Airline. Edalat, however, did.

SECOND AMENDED COMPLAINT
10

30.     Putting his contacts to work again, over the ensuing weeks, Edalat and Tatum attempted to coordinate an in-person or phone conference. Given his schedule limitations, Tatum was not available, but he dispatched Emillio Collins and Rachel Jacobson to meet Edalat on July 16, 2015, at the Wynn Terrace Point Café, in Las Vegas, Nevada, to discuss this renewed opportunity with Emirates Airline. The complete email showing the initial scheduling of this July 16, 2015, meeting reads:

---

**RE: Emirates Airline (Call with Mark Tatum / NBA)**

Santiago, Iveliz <ISantiago@nba.com>                              Wed, Jul 15, 2015 at 7:38 AM
To: Paul Edalat <paul@liwana.com>
Cc: "Duperval, Arielle" <ADuperval@nba.com>

Dear Paul,

Thank you for your kind reply.

Unfortunately, Thursday (7/16) at 7:30am is the only time Mark is able to meet as he has meetings that morning and then is immediately traveling back to NY.

I will send you a calendar notice for now to hold the time and if we need to cancel then we can.

Thursday, 7/16 @ 7:30am

Breakfast Meeting - LIWA, North America Division / NBA

Location: Wynn Las Vegas - Terrace Pointe Café

*Walking Directions from Wynn Las Vegas Lobby:*

To walk to Terrace Point Café you turn right when you exit the Tower Suites Lobby and walk towards the B Bar, at the B Bar you make a right and walk down the hallway, Terrace Point Café will be down the hallway on the right hand side past La Cave.

Thank you and I look forward to hearing from you.

Best regards,

[Quoted text hidden]

---

31.     In his email, Tatum admitted that the NBA had been having discussions with Emirates Airline and was "equipped" to have a discussion about a potential

partnership. Tatum advised that his team would explain the history of these discussions with Edalat during their meeting. The complete email reads:

On Jul 15, 2015, at 9:46 PM, Tatum, Mark <mtatum@nba.com> wrote:

Paul,

Unfortunately, I won't be able to meet tomorrow morning, however, Emilio Collins and Rachel Jacobson can meet with you at the same time and place (7:30am at the Wynn Terrace Point Cafe). I've copied them on this email.

Emilio is the head of our Global Marketing Partnerships Department and Rachel runs our Global Business Development group. They have actually been in discussions with Emirates and are equipped to have the conversation with you around a potential partnership with Emirates going forward. Very sorry for the schedule change but hope that you can still get together with them to discuss.

Best,

Mark

32.     Edalat met with Emillio Collins and Rachel Jacobson on July 16, 2015, and committed to continuing discussions about a possible Emirates Airline deal. Collins admitted that the NBA's discussions with Emirates Airline team members at that time were not with decisionmakers, who the NBA had been unable to reach. An email from Ms. Jacobson acknowledges this productive meeting:

**RE: Emirates Airline**

Jacobson, Rachel <rjacobson@nba.com>                    Thu, Jul 16, 2015 at 2:46 PM
To: "paul@liwana.com" <paul@liwana.com>
Cc: "Tatum, Mark" <mtatum@nba.com>, "Santiago, Iveliz" <ISantiago@nba.com>, "Collins, Emilio" <ecollins@nba.com>

Paul,

It was very nice to meet you at Breakfast this morning. Let us have some internal discussions on this end and figure out the best next steps based on our discussion. We are all flying back today, so give us a few days and we will be in touch next week.

Have a great time with your friends that are coming to town this weekend. Talk soon.

Best,
Rachel

## THE NBA RENEWS SPONSORSHIP WITH DELTA AIRLINES

33.     By the end of summer 2015, however, Rachel Jacobson advised Edalat on a phone call that the NBA would be continuing the Delta Airline sponsorship because the NBA could not find common ground with Emirates Airline.

34.     Plaintiff reasonably believes, and alleges upon information and belief, that the NBA and Delta Airlines then re-entered a ten-year agreement.

35.     The NBA never terminated the contract with Edalat, as the prospect for future negotiations remained open given the NBA's fervent desire to establish a relationship with Emirates Airline.  Rather, the NBA paused Edalat's efforts.

## THE NBA EMERGES WITH A DEAL WITH EMIRATES AIRLINE

36.     The prospect of a sponsorship deal between the NBA and Emirates Airlines lay fallow for the following years, until February 8, 2024, when the NBA announced a multiyear global marketing partnership naming Emirates Airline the "Official Global Airline Partner of the NBA." This included such luminary features as the "NBA In-Season Tournament," and extensive co-branding.  The deal was announced by none other than Mark Tatum, who had been central to the earlier initiative that had been started by Edalat, with the enthusiastic support of Emirates Airline's CEO, Sheikh Ahmed bin Saeed Al Maktoum, who said, *"The NBA is a valuable addition to our sponsorship portfolio as it allows us to connect with a vast*

*global fanbase, including in the U.S., where the game is an integral part of the country's sport culture."*[1]

37.    Edalat became apprised of the deal when VanDeWeghe, now retired as an NBA executive, contacted him and advised him to "look into" the sponsorship transaction, a strong nod that Edalat been cut out of the deal.

38.    Despite the years which had elapsed since Edalat, and his cohort, introduced and facilitated discussions between the NBA and Emirates Airline, the NBA and Emirates Airline picked up their discussions right where they had been left off years earlier—before the Delta Airlines renewal—between the same persons, negotiating the same deal, proving the negotiations had been paused, not irreversibly terminated.  What Edalat had set in motion years earlier had now come into fruition.

39.    The value of the sponsorship between the NBA and Emirates, and the ancillary financial arrangements between the two, could reach a staggering amount, easily in the tens of millions, and possibly hundreds of millions of dollars.

## PLAINTIFF SEEKS CONFIRMATION OF HIS COMMISSION

40.    Not being apprised that the NBA had recommenced and eventually consummated a sponsorship deal with Emirates Airline had been disconcerting to Edalat, but those concerns became even more alarming when Edalat, through

---

[1] *See*, APNews.Com, February 8, 2024.

counsel, contacted the NBA to confirm Edalat's compensation for having facilitated the sponsorship.

41.    Edalat sent a letter to the NBA on April 29, 2024, to confirm his recognition and compensation for the sponsorship. *See* **Exhibit "B"** attached hereto.

42.    The NBA responded with a letter ("Spillane Letter") from its Assistant General Counsel, Dan Spillane, essentially disavowing any knowledge of Edalat and any involvement with Boutros. Incredibly, Spillane claimed, "*We have no record and are not aware of any agreement between the NBA and Edalat,*" this despite the irrefutable existence of the letter from VanDeWeghe dated May 1, 2014, creating the agreement. Edalat attaches hereto a true and correct copy of the Spillane Letter as **Exhibit "C."**

43.    Since then, Edalat has secured the sworn statement from Zaki Kada ("Kada Declaration), confirming the truth that Edalat had indeed established the initial high-level relationship between the NBA and Emirates Airline that ultimately led to the sponsorship deal. Edalat attaches hereto a true and correct copy of the Kada Declaration as **Exhibit "D."**

## COUNT I
## (BREACH OF CONTRACT)

44.    Plaintiff sues Defendant for damages which exceed $500,000.00 for breach of contract.

45.    Plaintiff incorporates the allegations stated in paragraphs 1 through 43.

46.    On or about May 1, 2014, Defendants contracted with Plaintiff to provide services in securing sponsorship deals with Emirates Airlines.

47.    For this service, Defendant had agreed to pay Plaintiff a fee equal to ten percent (10% ) of the value of any sponsorship deals reached.

48.    Plaintiff provided the essential introductions of Defendant to Emirates Airline which eventually led to their entering a sponsorship deal on or about February 2024, valued at tens of millions of dollars.

49.    Plaintiff also expended time and money working tirelessly on the project, traveling to the Middle East and within the United States to work on the project.

50.    But for Plaintiff's efforts, the sponsorship relationship between the Defendant and Emirates Airline would not have occurred, certainly not within the reasonably foreseeable future at that time.

51.    Despite having been the cause for procuring the Defendant's sponsorship deal, Defendant has failed and refused to pay the amounts lawfully due Plaintiffs.

52.    As a direct and proximate result of Defendant's breaches, Plaintiffs has suffered direct and consequential damages millions more than the jurisdictional threshold ($500,000.00) of this Court.

WHEREFORE, Plaintiff demands judgment against the Defendant for compensatory damages and court costs.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

Date: August 20, 2025          *s/ Tucker H. Byrd*

**Tucker H. Byrd**
Florida Bar No. 381632
**Jeffrey T. Donner**
Florida Bar No. 0180122
**BYRD CAMPBELL, P.A**.
180 Park Avenue North, Suite 2A
Winter Park, Florida 32789
Telephone: (407) 392-2285
Facsimile: (407) 392-2286
Primary Email: TByrd@ByrdCampbell.com
Primary Email: SMcPherson@ByrdCampbell.com
Secondary Email: Paralegal@ByrdCampbell.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 20, 2025, a copy of the foregoing was filed using the State of Florida e-Portal Filing System, which will serve a copy by email on all counsel of record.

s/ Tucker H. Byrd
Attorney

# EXHIBIT "B"

IN THE CIRCUIT COURT OF THE NNTH JUDICIAL CIRCUIT, IN AND FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,

      Plaintiff,

                            CASE NO.: 2025-CA-002038-O
                            **COMPLEX BUSINESS**
v.                              **LITIGATION COURT**

NATIONAL BASKETBALL ASSOCIATION,

      Defendants.

_____/

## ORDER ON PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

This matter having been presented for the Court's consideration via Plaintiff's Unopposed Motion for Leave to File Second Amended Complaint on August 20, 2025, and the Court having considered said pleading, motion, and being otherwise fully advised in the premises, is hereby adjudged:

1.    Plaintiff's Motion for Leave to file Second Amended Complaint is GRANTED.

2.      Plaintiff dismisses the National Basketball Association; NBA Properties, Inc., is the named Defendant.

**DONE AND ORDERED** in Chambers in Orlando, Orange County, Florida this ___ day of August 2025.

_____
The Honorable Chad K. Alvaro
Circuit Judge

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this ___ day of August, 2025, a copy of the foregoing was filed with the Clerk of this Court by using the Florida Courts E-Filing Portal System, which will serve a copy to all attorneys and interested parties identified on the Portal Electronic Service List via transmission of Notices of Electronic Filing.



Kevin McGavock

Akerman LLP
420 South Orange Avenue
Suite 1200
Orlando, FL  32801-4904

D: 407 419 8437
T: 407 423 4000
F: 407 843 6610
kevin.mcgavock@akerman.com

December 05, 2025

**VIA ELECTRONIC SERVICE**

Honorable Chad K. Alvaro
Circuit Judge
Ninth Judicial Circuit, Division 43
Orange County Courthouse
425 N. Orange Avenue

RE:   **Paul Edalat v. National Basketball Association**
      **Case Number: 2025-CA-002038-O**
      **Agreed Order Granting Plaintiff's Unopposed Motion For Leave to File**
      **Second Amended Complaint and For an Order Dismissing the National**
      **Basketball Association**

Dear Judge Alvaro:

Attached to this email, please find an agreed order (in Word format) relating to the following matter:

- Plaintiff's Unopposed Motion For Leave to File Second Amended Complaint and For an Order Dismissing the National Basketball Association (Filing # 229891193 E-Filed 08/20/2025 07:11:51 PM).

Counsel for Plaintiff, Paul Edalat, and counsel for Defendant, National Basketball Association, have reviewed the proposed order and have no objection to its form or content. If the proposed order meets your approval, please sign and e-file it.

Respectfully submitted,

**AKERMAN LLP**

*/s/ Kevin T. McGavock*
Kevin T. McGavock

Enclosure

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,                                    Case No.: 2025-CA-002038-O
                                                Business Court Division 43
     Plaintiff,

v.

NATIONAL BASKETBALL
ASSOCIATION,

     Defendant.

_____/

### AGREED ORDER GRANTING
### PLAINTIFF'S UNOPPOSED MOTION FOR
### LEAVE TO FILE SECOND AMENDED COMPLAINT AND
### DISMISSING THE NATIONAL BASKETBALL ASSOCIATION

THIS CAUSE came before the Court on Plaintiff's Unopposed Motion For Leave

to File Second Amended Complaint And For An Order Dismissing The National Basketball

Association ("Motion"). The Court, having reviewed the Motion, the record, and being

otherwise fully advised, finds that it is

ORDERED and ADJUDGED that:

1.    The Motion is GRANTED.

2.    Plaintiff is granted leave to file the proposed Second Amended Complaint.

3.    Defendant, National Basketball Association, is DISMISSED.

DONE and ORDERED.

01/13/2026 11:12:56
2025-CA-002038-O

eSigned by Chad Alvaro 01/13/2026 11:12:56 sKRSbfc8

Chad K. Alvaro
CIRCUIT JUDGE

Copies to Counsel of Record
via Florida's E-Filing Portal

1

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,                                    Case No.: 2025-CA-002038-O
                                               Business Court Division 43
         Plaintiff,

v.

NATIONAL BASKETBALL
ASSOCIATION,

         Defendant.
_____/

**AGREED ORDER GRANTING**
**PLAINTIFF'S UNOPPOSED MOTION FOR**
**LEAVE TO FILE SECOND AMENDED COMPLAINT AND**
**DISMISSING THE NATIONAL BASKETBALL ASSOCIATION**

THIS CAUSE came before the Court on Plaintiff's Unopposed Motion For Leave

to File Second Amended Complaint And For An Order Dismissing The National Basketball

Association ("Motion"). The Court, having reviewed the Motion, the record, and being

otherwise fully advised, finds that it is

ORDERED and ADJUDGED that:

1.       The Motion is GRANTED.

2.       Plaintiff is granted leave to file the proposed Second Amended Complaint.

3.       Defendant, National Basketball Association, is DISMISSED.

DONE and ORDERED.

01/13/2026 11:12:56
2025-CA-002038-O

eSigned by Chad Alvaro 01/13/2026 11:12:56 sKRSbfc8

                                               Chad K. Alvaro
                                               CIRCUIT JUDGE

Copies to Counsel of Record
via Florida's E-Filing Portal

1

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND
FOR ORANGE COUNTY, FLORIDA

PAUL EDALAT,

      Plaintiff,

      Case No: 2025-CA-002038-O

v.                     **Complex Business**
**Litigation Court**

NBA PROPERTIES, INC.

      Defendant.

_____/

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, PAUL EDALAT ("Edalat"), sues Defendant, NBA PROPERTIES, INC. ("NBA"), and alleges:

### INTRODUCTION

1.    Plaintiff, Edalat, brings this action for breach of contract against the Defendant, NBA Properties, Inc., which does business under the tradenames "National Basketball Association" or "NBA," an affiliate entity through which the basketball league known as the National Basketball Association conducts commercial activities. Edalat seeks millions of dollars in damage for the NBA's failure to pay the commission due to him for having facilitated and procured a sponsorship agreement between the NBA and Emirates Airlines.

**PARTIES, JURISDICITON, AND VENUE**

2.    Plaintiff. Edalat, resides in California.

3.    Defendant, NBA Properties, Inc., is a New York corporation.

4.    The Court has personal jurisdiction over the NBA under Section 48.193(2), Florida Statutes, because the NBA engages in substantial and not isolated activity within this state.

5.    Venue lies in Orange County, Florida, under Section 47.051, Florida Statutes.

**GENERAL ALLEGATIONS**

6.    NBA Properties, Inc. controls the merchandising, marketing, and licensing activities for the professional basketball league generally operating under the name, "National Basketball Association" or "NBA."    Edalat alleges upon information and belief that these activities occur within the state of Florida on a substantial ongoing basis.

7.    The NBA had long pursued establishing relationships with corporate partners worldwide to expand the NBA's global presence. Dubai, the largest city in the United Arab Emirates and an affluent market with a major corporate presence, offered an attractive market in general, having developed into a Middle East and North Africa ("MENA") gateway for sports and entertainment with a keen interest in basketball given its increasing popularity in the region. It also served as the home

for Emirates Airline, which had a prominent global brand, already with active sponsorships in sports like soccer, cricket, and golf.

8.      To the NBA, entering a sponsorship deal with Emirates Airline would have been a major step in furthering the NBA's global brand, especially MENA. One problem, however, existed. Despite efforts to secure any partnership with Emirates Airline as early as 2013, the NBA was unable to secure a deal, in part because of the cultural differences between the USA-centric NBA business practices and the traditional value-based culture of Emirates Airlines, and the NBA's limited experience dealing with the decision-makers at Emirates Airline.

9.      The government of Dubai, through its investment corporation, The Emirates Group, owns Emirates Airline.  Ultimately, the ruling family of Dubai controls Emirates Airline through CEO Sheikh Ahmed bin Saeed Al Maktoum. As is typical with MENA-region business dealings, relationships with the decision-makers are paramount to entering any agreements.

10.      This impasse to establishing a partnership deal between the NBA and Emirates Airline led KiKi VanDeWeghe ("VanDeWeghe"), then Senior Vice President of Basketball Operations for the NBA, himself a long-time NBA player and all-star, to reach out and make a simple ask of his longtime friend, Plaintiff, Paul Edalat, a United States businessman of Iranian descent with deep ties to the region, including relationships with its business and government leaders. VanDeWeghe

asked if Edalat could help the NBA negotiate a sponsorship deal with Emirates Airline. At the time, VanDeWeghe did not identify through which "NBA" legal entity the contract with Edalat was being entered. Edalat has since learned, and alleges upon information and belief, that the business activities of the NBA league are conducted, and the contract was entered herein, through a legal entity known as NBA Properties Inc.

11.    The NBA's partnership with its prior airline partner, Delta Airlines, was about to expire, so there was some time urgency to the matter.

12.    On or about March 28, 2014, Edalat received an email from VanDeWeghe asking Edalat to *"[relay the NBA's] interest"* about the possibility of a partnership with Emirates Airline. The complete text reads:

VanDeWeghe, Kiki <KVanDeWeghe@nba.com>                                    Fri, Mar 28, 2014 at 11:27 AM
To: ": Paul Edalat" <paul@scilabs.net>

Paul

Thank you for getting back to me regarding Emirates interest in a possible partnership with the NBA.

I want to confirm our interest in having discussions with Emirates Airline about partnership opportunities within the NBA. The airline sponsorship category is currently open and everyone here is excited about the possibility of a partnership with Emirates. The Deputy Commissioner of the NBA, Mark Tatum, who was past head of Global Marketing Partnerships for the NBA, believes that Emirates would be a perfect partner. Given the NBA's strong recognition within the United States, our internationally recognizable superstars and branding potential worldwide, brought together with Emirates powerful worldwide presence and current push into United States marketplace, the timing could not be better. We would like you to relay our interest to Timothy Clark, President of Emirates, and see what is the best way for us to proceed.

Thank you again

Kiki Vandeweghe

13.    Edalat agreed to help the NBA and contracted with the NBA to facilitate and procure a sponsorship agreement with Emirates Airline. To that end,

Edalat engaged Mr. Zaki Kada ("Kada"), his longtime friend and colleague from the MENA-region to reach out to Emirates Airline, and Kada contacted Mr. Salem Ghanem Al-Marri ("Al-Marri"), the head of Planning, Aeropolitical, and Industry Affairs for Emirates Airline—a former colleague of Kada's—to inquire about approaching Mr. Boutros Boutros ("Boutros"), the Divisional Senior Vice President, Corporate Communications, Marketing & Brand for Emirates Airline, to share the NBA's interest in a sponsorship or partnership deal with Emirates Airline, with an emphasis on large scale MENA expansion.

14.    Kada also forwarded VanDeWeghe's March 28, 2014, email to Al-Marri, to which Al-Marri responded by requesting an "official" letter from the NBA for the purposes of beginning partnership discussions and to confirm Edalat's prominent role in them.  Kada sent this response to Edalat, who forwarded it back to VanDeWeghe.  The wheels had been set in motion and momentum was building to pursue a sponsorship agreement between the NBA and Emirates Airline with Edalat the tip of that negotiation spear.

15.    Kada and Edalat had several telephone conversations in the first few weeks of April 2014 preparing for an in-person meeting with Boutros, who Kada had already introduced to Edalat years earlier.

16.    Kada, through his contact Al-Marri, introduced Edalat to Boutros in 2014 while Edalat was on a business trip to Dubai.  Edalat met in person with Boutros the week of May 11, 2014, during the May 2014 Travel Show.

### THE NBA ENGAGED PLAINTIFF

17.    On May 1, 2014, critical to this meeting's occurring, VanDeWeghe issued the letter (*see* **Exhibit "A"**)  on behalf of the NBA confirming:

a.    The NBA was *"excited about the possibility of a potential partnership with Emirates Airline"*;

b.    The NBA's *"focus is for Emirates to become the exclusive airline sponsor and partner of the NBA";* and

c.    That *"Liwa North America and CEO Paul Edalat has provided this introduction and will continue to assist in seeing the process through."*

18.    Based upon the representations of the NBA, Edalat accepted the engagement and undertook efforts to pursue and procure the sponsorship agreement with Emirates Airlines.

19.    Edalat and the NBA had negotiated a simple commission-based compensation.  Edalat and his company, Liwa North America, Inc. ("Liwa"), would be paid ten percent (10%) of the value of any sponsorship agreement and any future partnership between the NBA and Emirates Airline.  Since then, Liwa has been dissolved, and Edalat has succeeded to the rights and interests of Liwa.

## **PLAINTIFF PURSUES THE SPONSORSHIP FOR THE NBA.**

20.    Kada had planned for Edalat to meet Boutros in May 2014 at Travel Show in Dubai.

21.    Edalat travelled to Dubai in early May 2014 and met with Boutros and Kada during the week of May 11, 2014.  A close mutual friend of Kada and Boutros assisted in arranging a last-minute meeting with Boutros given his busy schedule. At this meeting Edalat handed Boutros the original "wet signed" letter from VanDeWeghe, and Boutros responded favorably requesting time to communicate with other senior level executives at Emirates Airline about this opportunity.

22.    Edalat returned to the United States in late May of 2014, and continued to apprise Kada of conversations with the NBA about an Emirates Airline deal.

23.    Boutros later indicated to Kada that he was asked by his superiors to explore a good commercial deal with the NBA.  Kada related this information to Edalat, who conveyed it to VanDeWeghe, who eventually handed off the project to Mark Tatum, the NBA's Deputy Commissioner and Chief Operating Officer.

24.    The discussions between the NBA and Emirates Airline, however, cooled off in 2014.  VanDeWeghe advised Edalat that the NBA was renegotiating the Delta Airlines deal, and that Emirates Airline was not overly eager about a sponsorship with the NBA. VanDeWeghe advised Edalat to temporarily back off

from his activities while the NBA regrouped on its plans for an Emirates Airlines deal.

25.     The Delta Airlines deal, announced in 2015, was a continuation of a 2004 sponsorship deal between Delta Airlines and the NBA.

## PLAINTIFF RE-ENGAGED BY THE NBA

26.     This all changed in early 2015, when VanDeWeghe, on behalf of the NBA, asked Edalat to re-engage with Emirates Airline. The NBA's request led to renewed discussions. On July 9, 2015, Edalat advised VanDeWeghe that Emirates Airline had *"come back to the table and are interested in a potential sponsorship as the NBA's airline partner."* The complete email reads:

**From:** Paul Edalat [mailto:paul@liwana.com]
**Sent:** Thursday, July 09, 2015 3:27 PM
**To:** VanDeWeghe, Kiki
**Subject:** Emirates Airline
**Importance:** High

Dear Kiki

I hope that you are well ar everything is going grea a the NBA.

As you are aware, I have contacts high up in emirates airlines with their CEO Mr. Timothy Clark and was close to putting a deal together last year regarding Emirates and the NBA on a sponsorship. Unfortunately, it fell apart last year due to unforeseen events that occurred back in June and their additional interest in the Clippers.

Now they (Emirates) has come back to the table and are interested in a potential sponsorship as the NBA's airline partner. Nothing has really changed in perspective with the deal that was offered to them last year from your organization. I have attached your letter of last year's offer for your review.

I have been intouch with their global marketing chief Mr. Boutros. From what I understand, he is authorized to sign off on any approved sponsorship up to $6million and can get it done pretty quickly. If over and above that amount, then he will have to have the board's approval. They are looking to expand their brand in the US and have been approached by many organizations in sports and marquee teams.

I think that we can get this done pretty quick if the terms are still available and we don't need the board's approval on behalf of Emirates. Obviously this information that I am sharing with you is highly confidential and meant for the purpose of this deal and assisting in moving things along quickly. As you are one of my dearest friends and have the trust in you I have had a long term professional relationship with the royal families of Dubai and Abu Dhabi who control these companies. We can always have a call or meeting in person to further strategize a deal with Emirates.

I will put you in direct touch with Mr. Boutros once you have approval on this deal and its availability. As Emirates plans to be a larger player in the US airline industry, I find it a great opportunity to take advantage of my contacts and trust with them to put a lucrative deal together for both sides.

I look forward to your response and hope to see you in Vegas next week.

Thanks my friend,


**Paul P. Edalat**

**Vice Chairman/CEO**

**LIWA, North America Division**

United States | www.LiwaNA.com

**Group LIWA, UAE Division**

Abu Dhabi, UAE | www.groupliwa.com


27.    Edalat's email led VanDeWeghe to introduce Edalat to Mark Tatum.

The complete email reads:

**From:** VanDeWeghe, Kiki
**Sent:** Thursday, July 09, 2015 04:16 PM
**To:** Paul Edal- -<paul@liwana.com>; Tatum, Mark
**Subject:** RE: Emirates Airline

Thank you Pau.. I am looping in Mark Tatur.. our Deputy Commissioner, to carry the ball fro rour side. As I stated in my previous letter, Mark is the right person to get this done. This e mal will s erveastan introduction for you and Mar..

I will be available throughout to help in any way I am needed.

Best – Kiki

**Kiki VanDeWeghe**

Senior Vice Pres..identBasketbc.. Operations

Phone: +1 212   4078390

Mobile: +1 9177492872

28.    Tatum acknowledged Edalat and the NBA's renewed interest in this opportunity with Emirates Airline, stating, *"We [The NBA] are still very interested in having a discussion with Emirates about a partnership"* The complete email reads:

On Jul 9, 2015, at 4:57 PM, Tatum, Mark <mtatum@nba.com> wrote:

Paul,

It is a pleasure to meet you via email. We are still very interested in having a discussion with Emirates about a partnership. Let's set up a call or meeting to discuss. Please let me know when you might be available. Thanks.

Best,

Mark

29.    The NBA negotiating team did not have the access needed to reach the decision-makers at Emirates Airline. Edalat, however, did.

30.     Putting his contacts to work again, over the ensuing weeks, Edalat and Tatum attempted to coordinate an in-person or phone conference. Given his schedule limitations, Tatum was not available, but he dispatched Emillio Collins and Rachel Jacobson to meet Edalat on July 16, 2015, at the Wynn Terrace Point Café, in Las Vegas, Nevada, to discuss this renewed opportunity with Emirates Airline. The complete email showing the initial scheduling of this July 16, 2015, meeting reads:

---

**RE: Emirates Airline (Call with Mark Tatum / NBA)**

Santiago, Iveliz <ISantiago@nba.com>                                    Wed, Jul 15, 2015 at 7:38 AM
To: Paul Edalat <paul@liwana.com>
Cc: "Duperval, Arielle" <ADuperval@nba.com>

Dear Paul,

Thank you for your kind reply.

Unfortunately, Thursday (7/16) at 7:30am is the only time Mark is able to meet as he has meetings that morning and then is immediately traveling back to NY.

I will send you a calendar notice for now to hold the time and if we need to cancel then we can.

Thursday, 7/16 @ 7:30am

Breakfast Meeting - LIWA, North America Division / NBA

Location: Wynn Las Vegas - Terrace Pointe Café

*Walking Directions from Wynn Las Vegas Lobby:*

To walk to Terrace Point Café you turn right when you exit the Tower Suites Lobby and walk towards the B Bar, at the B Bar you make a right and walk down the hallway, Terrace Point Café will be down the hallway on the right hand side past La Cave.

Thank you and I look forward to hearing from you.

Best regards,

[Quoted text hidden]

---

31.     In his email, Tatum admitted that the NBA had been having discussions with Emirates Airline and was "equipped" to have a discussion about a potential

partnership. Tatum advised that his team would explain the history of these discussions with Edalat during their meeting. The complete email reads:

> On Jul 15, 2015, at 9:46 PM, Tatum, Mark <mtatum@nba.com> wrote:
>
> Paul,
>
> Unfortunately, I won't be able to meet tomorrow morning, however, Emilio Collins and Rachel Jacobson can meet with you at the same time and place (7:30am at the Wynn Terrace Point Cafe). I've copied them on this email.
>
> Emilio is the head of our Global Marketing Partnerships Department and Rachel runs our Global Business Development group. They have actually been in discussions with Emirates and are equipped to have the conversation with you around a potential partnership with Emirates going forward. Very sorry for the schedule change but hope that you can still get together with them to discuss.
>
> Best,
>
> Mark

32. Edalat met with Emillio Collins and Rachel Jacobson on July 16, 2015, and committed to continuing discussions about a possible Emirates Airline deal. Collins admitted that the NBA's discussions with Emirates Airline team members at that time were not with decisionmakers, who the NBA had been unable to reach. An email from Ms. Jacobson acknowledges this productive meeting:

> **RE: Emirates Airline**
>
> Jacobson, Rachel <rjacobson@nba.com>                    Thu, Jul 16, 2015 at 2:46 PM
> To: "paul@liwana.com" <paul@liwana.com>
> Cc: "Tatum, Mark" <mtatum@nba.com>, "Santiago, Iveliz" <ISantiago@nba.com>, "Collins, Emilio" <ecollins@nba.com>
>
> Paul,
>
> It was very nice to meet you at Breakfast this morning. Let us have some internal discussions on this end and figure out the best next steps based on our discussion. We are all flying back today, so give us a few days and we will be in touch next week.
>
> Have a great time with your friends that are coming to town this weekend. Talk soon.
>
> Best,
> Rachel

## THE NBA RENEWS SPONSORSHIP WITH DELTA AIRLINES

33.     By the end of summer 2015, however, Rachel Jacobson advised Edalat on a phone call that the NBA would be continuing the Delta Airline sponsorship because the NBA could not find common ground with Emirates Airline.

34.     Plaintiff reasonably believes, and alleges upon information and belief, that the NBA and Delta Airlines then re-entered a ten-year agreement.

35.     The NBA never terminated the contract with Edalat, as the prospect for future negotiations remained open given the NBA's fervent desire to establish a relationship with Emirates Airline.  Rather, the NBA paused Edalat's efforts.

## THE NBA EMERGES WITH A DEAL WITH EMIRATES AIRLINE

36.     The prospect of a sponsorship deal between the NBA and Emirates Airlines lay fallow for the following years, until February 8, 2024, when the NBA announced a multiyear global marketing partnership naming Emirates Airline the "Official Global Airline Partner of the NBA." This included such luminary features as the "NBA In-Season Tournament," and extensive co-branding.  The deal was announced by none other than Mark Tatum, who had been central to the earlier initiative that had been started by Edalat, with the enthusiastic support of Emirates Airline's CEO, Sheikh Ahmed bin Saeed Al Maktoum, who said, *"The NBA is a valuable addition to our sponsorship portfolio as it allows us to connect with a vast*

*global fanbase, including in the U.S., where the game is an integral part of the country's sport culture.*"[1]

37.     Edalat became apprised of the deal when VanDeWeghe, now retired as an NBA executive, contacted him and advised him to "look into" the sponsorship transaction, a strong nod that Edalat been cut out of the deal.

38.     Despite the years which had elapsed since Edalat, and his cohort, introduced and facilitated discussions between the NBA and Emirates Airline, the NBA and Emirates Airline picked up their discussions right where they had been left off years earlier—before the Delta Airlines renewal—between the same persons, negotiating the same deal, proving the negotiations had been paused, not irreversibly terminated.  What Edalat had set in motion years earlier had now come into fruition.

39.     The value of the sponsorship between the NBA and Emirates, and the ancillary financial arrangements between the two, could reach a staggering amount, easily in the tens of millions, and possibly hundreds of millions of dollars.

## **PLAINTIFF SEEKS CONFIRMATION OF HIS COMMISSION**

40.     Not being apprised that the NBA had recommenced and eventually consummated a sponsorship deal with Emirates Airline had been disconcerting to Edalat, but those concerns became even more alarming when Edalat, through

---

[1] *See*, APNews.Com, February 8, 2024.

counsel, contacted the NBA to confirm Edalat's compensation for having facilitated the sponsorship.

41.    Edalat sent a letter to the NBA on April 29, 2024, to confirm his recognition and compensation for the sponsorship.  *See* **Exhibit "B"** attached hereto.

42.    The NBA responded with a letter ("Spillane Letter") from its Assistant General Counsel, Dan Spillane, essentially disavowing any knowledge of Edalat and any involvement with Boutros. Incredibly, Spillane claimed, "*We have no record and are not aware of any agreement between the NBA and Edalat,*" this despite the irrefutable existence of the letter from VanDeWeghe dated May 1, 2014, creating the agreement.  Edalat attaches hereto a true and correct copy of the Spillane Letter as **Exhibit "C."**

43.    Since then, Edalat has secured the sworn statement from Zaki Kada ("Kada Declaration), confirming the truth that Edalat had indeed established the initial high-level relationship between the NBA and Emirates Airline that ultimately led to the sponsorship deal.  Edalat attaches hereto a true and correct copy of the Kada Declaration as **Exhibit "D."**

## COUNT I
## (BREACH OF CONTRACT)

44.    Plaintiff sues Defendant for damages which exceed $500,000.00 for breach of contract.

45.    Plaintiff incorporates the allegations stated in paragraphs 1 through 43.

46.    On or about May 1, 2014, Defendants contracted with Plaintiff to provide services in securing sponsorship deals with Emirates Airlines.

47.    For this service, Defendant had agreed to pay Plaintiff a fee equal to ten percent (10% ) of the value of any sponsorship deals reached.

48.    Plaintiff provided the essential introductions of Defendant to Emirates Airline which eventually led to their entering a sponsorship deal on or about February 2024, valued at tens of millions of dollars.

49.    Plaintiff also expended time and money working tirelessly on the project, traveling to the Middle East and within the United States to work on the project.

50.    But for Plaintiff's efforts, the sponsorship relationship between the Defendant and Emirates Airline would not have occurred, certainly not within the reasonably foreseeable future at that time.

51.    Despite having been the cause for procuring the Defendant's sponsorship deal, Defendant has failed and refused to pay the amounts lawfully due Plaintiffs.

52.    As a direct and proximate result of Defendant's breaches, Plaintiffs has suffered direct and consequential damages millions more than the jurisdictional threshold ($500,000.00) of this Court.

WHEREFORE, Plaintiff demands judgment against the Defendant for compensatory damages and court costs.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues so triable.

Date: February 27, 2026

*s/ Tucker H. Byrd*
_____
**Tucker H. Byrd**
Florida Bar No. 381632
**BYRD CAMPBELL, P.A**.
180 Park Avenue North, Suite 2A
Winter Park, Florida 32789
Telephone: (407) 392-2285
Facsimile: (407) 392-2286
Primary Email: TByrd@ByrdCampbell.com
Secondary Email: Paralegal@ByrdCampbell.com
*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 27, 2026 a copy of the foregoing was filed using the State of Florida e-Portal Filing System, which will serve a copy by email on all counsel of record.

s/ Tucker H. Byrd
Attorney